UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| In re application of ArcelorMittal )<br>Holdings AG for an order directing )<br>discovery pursuant to 28 U.S.C. § 1782 )<br>    )<br>    )<br>    )<br>    )<br>    )<br>    )<br>_____ ) | CIVIL ACTION NO: |

**Memorandum of Law in Support of *Ex Parte* Petition
for Assistance in Aid of a Foreign Proceeding Pursuant to 28 U.S.C. § 1782**

Brian A. White
KING & SPALDING LLP
1180 Peachtree St, NE
Suite 1600
Atlanta, GA 30309
Tel.: +1 404 572 4739

*Counsel for Petitioner ArcelorMittal
Holdings AG*

# **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ...............................................................1

FACTUAL BACKGROUND.................................................................3

    I.    The Arbitration Award and the Recognition and Enforcement
        Actions in England and Singapore .......................................................3

    II.    The Singapore High Court Enforced the Award and Issued a
        Freezing Injunction Against Liberty Due to the Real Risk of
        Dissipation of Assets ............................................................................5

    III.    The English High Court has Recognized and Enforced the Final
        Award ..................................................................................................12

    IV.    Reibus Is a Digital Metals Marketplace with Ties to Liberty.............13

ARGUMENT .........................................................................................15

    I.    Each of the Three Statutory Requirements Is Met..............................15

    II.    Each of the Discretionary Factors Favors Discovery.........................17

CONCLUSION ......................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Application of Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc.*,
  747 F.3d 1262 (11th Cir. 2014) .........................................................................16

*In re Batbold*,
  2021 WL 4596536 (S.D.N.Y. Oct. 6, 2021), aff'd, No. 21-MC-218
  (RA) (OTW), 2023 WL 2088524 (S.D.N.Y. Feb. 17, 2023) ............................18

*In re Chevron Corp.*,
  No. 1:10-MI-0076-TWT-GGB, 2010 WL 8767265 (N.D. Ga. Mar.
  2, 2010) ............................................................................................................19

*In re Clerici*,
  481 F.3d 1324 (11th Cir. 2007) .........................................................................17

*Intel Corp. v. Advanced Micro Devices, Inc.*,
  542 U.S. 241, 243 (2004).............................................................................16, 18

*Pons v. AMKE Registered Agents*,
  LLC, 835 F. App'x 465 (11th Cir. 2020) ...........................................................19

*In re Pons*,
  614 F. Supp. 3d 1134 (S.D. Fla.).......................................................................19

*Scherk v. Alberto-Culver Co.*,
  417 U.S. 506 (1974)...........................................................................................20

*Sergeeva v. Tripleton Int'l Ltd.*,
  834 F.3d 1194 (11th Cir. 2016) .........................................................................17

*In re Sergeeva*,
  2015 WL 12866970 (N.D. Ga. Feb. 6, 2015).....................................................21

ii

*Union Fenosa Gas, S.A. v. Depository Tr. Co.*,
  No. 20 MISC. 188 (PAE), 2020 WL 2793055 (S.D.N.Y. May 29,
  2020) ................................................................................................17

**Statutes**

9 U.S.C. § 201 *et seq.*...................................................................................5

28 U.S.C. § 1782 ..............................................................................*passim*

28 U.S.C. § 1782(a) .......................................................................18

English Arbitration Act 1996, § 66................................................12, 20

Singapore International Arbitration Act, § 29
  (2020 Rev Ed) ...........................................................................5, 20

Singapore Rules of Court (2021) ............................................................5

## PRELIMINARY STATEMENT

Petitioner ArcelorMittal Holdings AG ("**ArcelorMittal**") hereby petitions this Court pursuant to 28 U.S.C. § 1782 ("**Section 1782**") for discovery in the Northern District of Georgia in aid of foreign legal proceedings pending in the courts of England and Singapore. This action arises out of the refusal of Liberty Steel East Europe Limited ("**Liberty Steel**"), a company incorporated in the United Kingdom, and Liberty House Group Ptd Limited ("**LH Group**," and with Liberty Steel, "**Liberty**"), a company incorporated in Singapore, to pay a €140 million arbitration award ("**Award**") issued in favor of ArcelorMittal. The Award has been reduced to court judgments in Singapore and England, but Liberty has refused to pay the Award.

The Award arose out of Liberty's breach of its obligations under the parties' Share Purchase Agreement ("**SPA**"), pursuant to which ArcelorMittal agreed to sell numerous steel mills to Liberty and for which Liberty agreed to compensate ArcelorMittal, including a deferred amount of €140 million ("**Deferred Compensation**"). Liberty also agreed to provide audited, consolidated financial statements to ArcelorMittal until its obligations were satisfied in full, but never did, triggering acceleration of the Deferred Compensation under the parties' SPA, as set

1

forth in the Award. To date, Liberty has neither produced audited, consolidated financial statements, nor paid the Award.

ArcelorMittal has been forced to undertake a multi-jurisdictional enforcement process to collect the substantial sum due to it. However, Liberty's apparently fraudulent business practices have complicated that effort. Liberty is part of the GFG Alliance, an opaque, complicated, and ever-shifting web of companies that moves assets in and out of Alliance companies as and when it suits Mr. Sanjeev Gupta, who appears to sit at the helm of the Alliance. The GFG Alliance has attracted intense scrutiny for its highly questionable corporate governance and audit practices, and regulators around the world have launched investigations into the GFG Alliance for fraud and other wrongdoing.

In recognition of the real risk of dissipation of assets, the High Court of the Republic of Singapore ("**Singapore High Court**") not only recognized and enforced the Award but also granted ArcelorMittal's application for a freezing injunction, which prohibits the transfer of Liberty's Singaporean assets outside of the country up to €140 million. Here too Liberty has attempted to evade its obligations and thwart enforcement of the Award by refusing to comply with its obligation to disclose its assets that are subject to the jurisdiction of the Singapore High Court.

Thus, Liberty has a documented history of evading obligations to disclose its finances to ArcelorMittal and prevent ArcelorMittal from identifying and attaching assets in order to execute on the Award. Accordingly, this petition seeks Section 1782 discovery from third parties Reibus International, Inc., Reibus Logistics LLC, and Reibus Financial LLC (collectively "**Reibus**"), which have done business with Liberty and thus are likely to have information on the whereabouts of Liberty's assets around the world.

The Court should grant the Petition because all of the mandatory criteria for Section 1782 discovery are met and each of the discretionary factors weighs in Petitioner's favor.

## FACTUAL BACKGROUND

### I.   The Arbitration Award and the Recognition and Enforcement Actions in England and Singapore

Pursuant to the parties' SPA and other related documents, ArcelorMittal agreed to sell certain steel mills in Romania (Galati), Czechia (Ostrava), Italy (Livorno), Luxembourg (Dudelange), North Macedonia (Skopje) and Belgium (Tilleur and Flémalle, Liège region) to Liberty. As part of the compensation, Liberty agreed to pay ArcelorMittal the Deferred Compensation in the amount of €140,000,000 that would "fall due some years in the future." Kirby Decl., Ex. 1, ¶ 68. Moreover, the SPA required Liberty to provide ArcelorMittal with audited,

3

consolidated financial statements demonstrating that Liberty's total consolidated assets, less total consolidated liabilities, amounted to at least €150,000,000 on March 31 and September 30 of each year until Liberty's obligations under the SPA were discharged in full. Kirby Decl., Ex. 1, ¶ 68. Failure to provide audited, consolidated financial statements would trigger acceleration of the Deferred Compensation, which would become immediately due and payable. Kirby Decl., Ex. 1, ¶¶ 68, 69, 81-82.

Liberty refused to provide ArcelorMittal with the required financial statements, notwithstanding ArcelorMittal's requests. ArcelorMittal was therefore forced to turn to arbitration to obtain relief, and prevailed.

As explained in the declaration of Charity R. Kirby ("**Kirby Decl**."), on January 24, 2023, "an arbitral tribunal seated in London and convened under the arbitration rules of the London Court of International Arbitration issued [the Award] in ArcelorMittal's favor and against Liberty, in the amount of €140 million, plus interest at a rate of 5% per annum, accruing on a daily basis and compounding annually from and including March 2022 to (but excluding) the date of payment." Kirby Decl. ¶ 3; *see also* Kirby Decl., Ex. 1, p. 22. The Award is enforceable pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, T.I.A.S. No. 6997 (the "**New York**

4

Convention"). The United States of America, Singapore, and the United Kingdom of Great Britain and Northern Ireland are among the 170+ contracting states to the New York Convention. *See, e.g.*, 9 U.S.C. § 201 *et seq.* (implementing the New York Convention in the United States).

Liberty has neither paid any part of Award nor responded to ArcelorMittal's demands for payment. Kirby Decl. ¶¶ 5-8. Moreover, Liberty "has still not produced" its audited, consolidated financial statements to ArcelorMittal. Kirby Decl. ¶ 5.

## II.    The Singapore High Court Enforced the Award and Issued a Freezing Injunction Against Liberty Due to the Real Risk of Dissipation of Assets

As a result of Liberty's refusal to pay, Petitioner commenced enforcement proceedings in Singapore and the United Kingdom. "On September 15, 2023, ArcelorMittal filed an application for enforcement of the Award . . . [in the Singapore High Court] in the same manner as a judgment pursuant to Section 29 of Singapore's International Arbitration Act (2020 Rev Ed) and Order 48 Rule 6 of Singapore's Rules of Court 2021." Kirby Decl. ¶ 14.

At the same time, ArcelorMittal filed an application for an injunction freezing Liberty's assets in Singapore. Kirby Decl. ¶ 14. "The Singapore High Court has discretion to grant a domestic freezing injunction if: (1) there is good reason to believe that the defendants have assets in Singapore that could be subject to the

injunction; and (2) there is a real risk of dissipation of those assets so as to render nugatory any judgment which the applicant may obtain. The Singapore High Court may also consider, among other things, the nature and location of any assets, dishonest or fraudulent conduct on a large scale, the ability to transfer large sums of money around several jurisdictions swiftly, and the ability to hide assets behind complex corporate structures in jurisdictions where enforcement of judgments is difficult." Kirby Decl. ¶ 15. ArcelorMittal detailed the reasons why there was a real risk of dissipation of assets and included almost 2,000 pages of supporting documentation. Kirby Decl. ¶ 16 and n.1.

First, "the GFG Alliance is under investigation by the UK Serious Fraud Office for suspected fraud, fraudulent trading, and money laundering in relation to the conduct of its business, including the financing arrangements with Greensill Capital." Kirby Decl. ¶ 17. Greensill Capital financed the GFG Alliance's acquisition of steel assets, including the assets sold under the SPA at issue in the arbitration. Kirby Decl. ¶ 18. Greensill Capital filed for administration (*i.e.,* bankruptcy protection) in the UK courts "for severe financial problems, including a reported $5 billion credit exposure to the GFG Alliance." Kirby Decl. ¶ 18. After reviewing various documents arising out of Greensill Capital's collapse, the England and Wales High Court of Justice Wales ("**EWHC**") found that: "(1) the GFG

6

Alliance's claim that it was unable to meet its obligations to Greensill Capital due to the onset of the coronavirus pandemic was unsupported by evidence; (2) it was reasonably likely that the companies would have defaulted even without pandemic conditions; (3) absent Greensill Capital's financing, the GFG Alliance did not have a viable financial future; and (4) the GFG Alliance received advance payments on prospective invoices from parties who had never dealt with, and did not intend to deal with, the GFG Alliance." Kirby Decl. ¶ 19.[1]

Second, "the GFG Alliance is an opaque and ever-changing web of companies used to pursue the GFG Alliance's interests, regardless of applicable law."  Kirby Decl. ¶ 20. "For example, the LH Group moved at least five companies out of its group in an effort to skirt regulations that prohibited any single group from receiving more than £50 million from one lender for pandemic-related financial assistance." Kirby Decl., ¶ 20.

Third, "the LH Group regularly moves sums of money across, and outside of, the LH Group as and when it suits Mr. Gupta, with little respect for corporate

---

[1] "Other governments have also launched investigations into GFG Alliance entities. For example, the Czech government ordered the Minister for Industry and Trade to conduct 'financial checks' at Liberty Ostrava, and the Paris Prosecutor's Office launched an investigation into the GFG Alliance's French business over allegations of money laundering and the misuse of corporate assets." Kirby Decl. n.2.

formalities." Kirby Decl. ¶ 21. "For example, Liberty Ostrava loaned €220 million to Liberty Finance Management (LIG) ("**LFM**"), at least €84 million of which was passed on to the account of a creditor in the process of seizing a major smelter owned by Mr. Gupta personally, but not the LH Group." Kirby Decl. ¶ 21.

Fourth, the LH Group is "highly interdependent and relies heavily on related companies for day-to-day operations, allowing the Group to present a far healthier financial outlook than reality." Kirby Decl. ¶ 22.  For example, in April 2021, "*The Times* described the 'circular trading scheme' under which Liberty House Group companies were able to raise funds against multiple sales of the same steel from Greensill Capital, which provided supply chain finance. According to that article, Liberty Steel Newport would sell millions of pounds' worth of steel coils and tubes to VS International ("**VSI**"). Greensill Capital provided finance against the invoice from VSI.  VSI sold the steel to CS Management Services, a further company in the GFG Alliance. CS Management Services sold the steel back to Liberty Steel Newport, and Liberty Steel Newport then sold the same steel for a second time to a third party. Greensill Capital provided finance against the invoice from the third party. Moreover, Liberty Steel Newport was therefore able to raise millions of pounds of cash from Greensill Capital on a single shipment of steel. It is unclear

whether the steel was ever physically delivered to VSI. Liberty Steel Newport was moved outside the ownership of the [LH] Group in 2020."  Kirby Decl. ¶ 22.

Fifth, "available financial statements of LH Group companies raise more questions than they answer." Kirby Decl. ¶ 23. "Despite media reports that Liberty Czestochowa produced over 900,000 tons of steel to date, the company's 2021 annual report suggested that all of the company's revenue was earned from services, rather than selling inventories. It is not clear what became of the tons of steel produced by Liberty Czestochowa." Kirby Decl. ¶ 23.

Sixth, "the LH Group's true financial health is impossible to verify. The UK Parliament's Business, Energy and Industrial Strategy Committee investigated Liberty Steel and the GFG Alliance. Their report quoted Dr. Javed Siddiqui, Professor of Accounting, Alliance Manchester Business School, The University of Manchester, who observed that there were different auditors for different GFG Alliance companies, meaning that no auditor had a 'complete picture of [how the Liberty Steel companies] group is performing or how this alliance is performing.'" Kirby Decl. ¶ 24 (citing Kirby Decl., Ex. 37). "GFG Alliance companies changed their accounting period on at least two occasions . . . a 'huge red flag.'" *Id.* (quoting Cynthia O'Murchu, Investigative Reporter at the *Financial Times* in Ex. 37). "The Committee's report concluded that it was 'utterly unconvincing' that King & King,

a small audit firm without steel industry experience which audited 60 companies in the GFG Alliance, had the capacity, expertise[,] and resources to audit the GFG Alliance or the LH Group." Kirby Decl. ¶ 24. Shortly thereafter, King & King resigned because "it was unable to complete its audits." Kirby Decl. ¶ 25.[2] "Based on these facts and further details provided by ArcelorMittal, the Singapore High Court concluded that there is a real risk of dissipation of Liberty's assets in connection with ArcelorMittal's application" for a freezing injunction.  Kirby Decl. ¶ 26.

"On September 19, 2023, the Singapore High Court granted both of ArcelorMittal's applications." Kirby Decl. ¶ 27. It issued an order that enforces the Award as a judgment of the courts of Singapore. The Singapore High Court also issued a freezing injunction "prohibiting Liberty from removing from Singapore any assets located in Singapore up to the value of the Award (*i.e.*, €140 million plus applicable interest)." Kirby Decl. ¶ 27; *see* Kirby Decl., Ex. 46.

---

[2]  "Various other auditors have also either qualified, or refused to sign off on, LH Group accounts. For example, Deloitte gave a qualified audit opinion of Liberty Ostrava's 2020 financial statements because the company misregistered loans received from its parent (which its parent had written off) as income. BDO, the auditor for Liberty Liege-Dudelange, declined to give an audit opinion on the company's 2020 annual report, stating that it was 'unable to obtain sufficient audit assurance to conclude that the preparation of the annual accounts in accordance with the going concern principle is appropriate….'" Kirby Decl., n.3

"Liberty had between 14 and 21 days to apply to set aside the decisions of the Singapore High Court." Kirby Decl. ¶ 28. Liberty made no application to set aside the order upon the applicable deadline. Kirby Decl. ¶ 31.

The Singapore High Court further ordered Liberty to furnish a sworn affidavit of "all their assets in Singapore where in their own name or not and whether solely or jointly owned, and whether [Liberty] are interested in them legally, beneficially or otherwise, giving the value, location and details of all such assets." Kirby Decl., Ex. 47. Liberty requested an extension of the disclosure deadline, which was granted until October 20, 2023. Kirby Decl., ¶ 29.

However, on October 20, 2023, Liberty simply failed to make any disclosures to the Singapore High Court. Kirby Decl., ¶ 31. Liberty's decision to ignore the Singapore High Court's disclosure order is "in contempt of court." *See* Kirby Decl. ¶ 31. Moreover, Liberty's conduct in Singapore illustrates the lengths to which Liberty is prepared to go to prevent ArcelorMittal from being made whole. *See* Kirby Decl. ¶ 30.[3]

---

[3] "Liberty has suggested that it will make an application regarding the [freezing] injunction and the disclosure affidavit . . . by Tuesday, October 24, 2023," but any such filing – if made, which is uncertain – would be "out of time." Kirby Decl. ¶ 31. It is not reasonable to infer, having taken an extension and missed the extended deadline, that any such filing would be complete.

### III.    The English High Court has Recognized and Enforced the Final Award

As explained in the Kirby Declaration, ArcelorMittal has also "commenced judicial proceedings to enforce the Award in the EWHC." Kirby Decl. ¶ 9. On February 17, 2023, ArcelorMittal applied for leave "to enforce the Award in the same manner as a judgment or order of the court to the same effect pursuant to Section 66 of the English Arbitration Act 1996." Kirby Decl. ¶ 9. On February 24, 2023, the EWHC granted that application "recognizing the Award and granting leave" to ArcelorMittal to enforce it (the "**English Order**"). Kirby Decl. ¶ 9; Kirby Decl., Ex. 4.

"Liberty has not moved to set aside the English Order and has not raised any objections to the enforcement of the Award." Kirby Decl. ¶ 10. Accordingly, "the Award is enforceable in the same manner as a judgment or order" of the EWHC. Kirby Decl. ¶ 10.  In effect, the Award has been reduced to judgment in England and Wales.

Petitioner is now entitled under English law to move to attach and execute the Liberty's assets located in the United Kingdom in satisfaction of the Award and Petitioner "intends to seek such relief in the EWHC if Liberty persists in its refusal to pay." Kirby Decl. ¶ 11.

Petitioner may also be entitled to seek an order from the EWHC freezing Liberty's assets outside the United Kingdom. Kirby Decl. ¶ 13. In particular, "the EWHC has the authority to issue a freezing injunction upon a showing that (1) there is a real risk of dissipation of the debtor's assets, (2) the creditor has a good arguable case against the debtor, and (3) all things considered, the Court believes it is just and right to grant the order." Kirby Decl. ¶ 12. "ArcelorMittal believes that evidence will show that these requirements are met." Kirby Decl. ¶ 12. "The EWHC may also freeze assets outside of the United Kingdom in a worldwide freezing order upon a showing that there are insufficient assets within England & Wales to satisfy the judgment." Kirby Decl. ¶ 13. Based on information available to ArcelorMittal, "Liberty's assets in the United Kingdom not subject to attachment by other creditors fall far short of the amount Liberty owes in the Award." Kirby Decl. ¶ 13. Thus, "ArcelorMittal reasonably contemplates filing a worldwide freezing order in the English courts to prohibit the transfer of any of Liberty's assets anywhere in the world up to €140 million." Kirby Decl. ¶ 13.

## IV. Reibus Is a Digital Metals Marketplace with Ties to Liberty

Reibus touts itself as the "digital marketplace for the metals industry." White Decl., Ex. 6. It also has offices in nine countries, and operates in more than 25 countries. White Decl., Ex. 8.

Reibus primarily buys, sells, finances, and ships carbon steel, stainless steel, aluminum, red metals (copper, brass, bronze), and various alloys and treatments of each. White Decl., Ex. 5. On its website, Reibus explains that it buys: (1) prime materials "direct from vetted and approved global manufacturers," (2) excess prime materials from a large and undefined "'circulating' supplier base," (3) secondary material "from [its] entire supplier base." White Decl., Ex. 6. In addition, Reibus offers various financial products to buyers and sellers on its metals marketplace. White Decl., Ex. 7.

News reports have documented that Liberty Steel used services provided by Reibus. White Decl. ¶ 12.  For example, a news report from March 2023 stated that "Reibus . . . financed a cargo of imported hot-rolled coil for Liberty Steel to Italy in recent months." White Decl., Ex. 10.

Liberty is the eighth largest steel manufacturer outside of China, having over 200 manufacturing locations.  White Decl., Ex. 9. That fact, coupled with news reports that Liberty received financing from Reibus, render it reasonable to believe that Liberty participates in Reibus's digital metals marketplace and/or may sell metals to Reibus. Thus, Liberty may have assets available to satisfy payment of the Partial Final Award and of which ArcelorMittal is not aware, absent Section 1782 discovery.

It is likely that Reibus has documents and information concerning assets belonging to Liberty in Singapore, the United Kingdom, or other jurisdictions that may be subject to a freezing injunction from the EWHC. Accordingly, this Petition seeks documents and information concerning any of Liberty's assets of which Reibus may be aware in any jurisdiction.

## ARGUMENT

### I. Each of the Three Statutory Requirements Is Met

28 U.S.C. § 1782 provides, in pertinent part, as follows:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal….The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court.

Each of the statutory requirements is met here. First, ArcelorMittal seeks discovery from a person who "resides or is found" in this district. Arcelor Mittal seeks discovery from three entities, Reibus International, Inc., Reibus Logistics LLC, and Reibus Financial LLC, each of which has a business address at 1 Glenlake Parkway NE, Suite 300, Atlanta, Georgia 30328. White Decl., Exs. 1, 2, and 3.

Second, the requested discovery is "for use in a proceeding in a foreign or international tribunal." As set forth above, Liberty is under investigation by multiple government authorities around the world, including the UK Serious Fraud Office. Its true financial health is unknown because it has not filed consolidated, audited financial statements. It hides behind a complicated corporate web to move assets and indeed whole companies as and when it suits Liberty, the GFG Allliance, or Mr. Gupta. Moreover, Liberty is undeterred by court orders to provide disclosure on its assets, such as the order of the Singapore High Court to provide disclosure on its assets in Singapore. Accordingly, Section 1782 discovery is needed to obtain reliable information on the whereabouts of Liberty's assets to satisfy the Award, and will be used in ongoing enforcement proceedings in England and Singapore and in a reasonably contemplated worldwide freezing orders in England. *See Intel*, 542 U.S. 241, 243 (2004) (finding that foreign proceedings must be pending or "reasonably contemplat[ed], but need not be 'pending' or 'imminent'"); *see also Application of Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc*., 747 F.3d 1262, 1271 (11th Cir. 2014) (discerning "no error in the district court's determination" that foreign proceedings were within reasonable contemplation where, "under Ecuadorian law, [petitioner] must submit its evidence with the pleading at the time it commences the civil action" and was "still waiting" for such

16

evidence "pursuant to the instant [1782] discovery application").[4] Because ArcelorMittal reasonably contemplates a worldwide freezing order, it seeks information on Liberty's assets anywhere in the world.[5]

Third, the petitioner is an "interested person" within the meaning of Section 1782 because it is the plaintiff in enforcement proceedings underway, or reasonably contemplated, in Singapore and England.[6]

## II.    Each of the Discretionary Factors Favors Discovery

Once a district court has determined that it is authorized to grant relief, it is free to grant relief in its broad discretion. The court's discretion is guided by factors recited by the Supreme Court in *Intel*:

> (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding," because "nonparticipants in the foreign proceeding may be outside

---

[4] The Eleventh Circuit has expressly "decline[d] to impose a requirement that the foreign proceeding be adjudicative in nature." *In re Clerici*, 481 F.3d 1324, 1333 and n.10 (11th Cir. 2007). In any event, other courts have found that English proceedings regarding enforcement of arbitral awards are in fact adjudicative in nature. *See Union Fenosa Gas, S.A. v. Depository Tr. Co.*, No. 20 MISC. 188 (PAE), 2020 WL 2793055, at *5 (S.D.N.Y. May 29, 2020).

[5] Notably, while a 1782 Petition must be directed to "a person who resides or is found" in this District, the Respondent must produce all responsive documents in its possession custody or control whether they are located within or without the United States. *See Sergeeva v. Tripleton Int'l Ltd.*, 834 F.3d 1194, 1200 (11th Cir. 2016).

[6] The Eleventh Circuit has affirmed *ex parte* applications for Section 1782 discovery. *See, e.g.*, *In re Clerici*, 481 F.3d 1324, 1337 (11th Cir. 2007).

the foreign tribunal's jurisdictional reach" and therefore their evidence may be "unobtainable absent § 1782(a) aid";

(2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance";

(3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and

(4) whether the § 1782(a) request is "unduly intrusive or burdensome."

*Intel*, 542 U.S. 241, 264-65 (2004).

Each of the *Intel* factors favors discovery. First, Reibus is not a participant in either the English or Singapore proceedings. Kirby Decl. ¶ 33.

Second, both the Singaporean and English courts are receptive to Section 1782 discovery. *See, e.g.*, *In re Batbold*, 2021 WL 4596536, at *4 (S.D.N.Y. Oct. 6, 2021), aff'd, No. 21-MC-218 (RA) (OTW), 2023 WL 2088524 (S.D.N.Y. Feb. 17, 2023) (collecting cases finding that both English and Singaporean courts are receptive to Section 1782 discovery).

Third, ArcelorMittal's request for Section 1782 discovery "does not seek to circumvent foreign proof-gathering restrictions or other policies" of a foreign country or the United States. Kirby Decl. ¶¶ 34, 36. Although the Singapore High Court required Liberty to disclose information on its assets, consistent with its

18

previous efforts to conceal its true finances and to flout applicable law, Liberty has defied that order. Kirby Decl. ¶ 31. Thus, one purpose of this Section 1782 Petition is to "remedy Liberty's efforts to conceal its assets" and thus its circumvention of foreign proof-gathering requirements. Kirby Decl. ¶ 32. Indeed, this district has found that Section 1782 discovery is proper when the same discovery has been ordered by a foreign court and is not forthcoming. *See In re Chevron Corp.*, No. 1:10-MI-0076-TWT-GGB, 2010 WL 8767265, at *4 (N.D. Ga. Mar. 2, 2010) (granting Section 1782 application where the Ecuadorian court "ordered at least some of the discovery that Chevron now seeks [from the Northern District], but it was not forthcoming"). Courts in this circuit have likewise found that a party's failure to disclose assets or efforts to conceal assets in foreign discovery likewise favors Section 1782 discovery. *See In re Pons*, 614 F. Supp. 3d 1134, 1154 (S.D. Fla.), aff'd sub nom. *Pons v. AMKE Registered Agents*, LLC, 835 F. App'x 465 (11th Cir. 2020) (finding that order granting Section 1782 discovery was not clearly erroneous or contrary to law where the application sought to discover assets from third parties that ex-husband had failed to disclose to ex-wife in foreign divorce proceedings and took "active steps to hide ... from Applicant[]"). The same reasoning applies here.

Fourth, any burden associated with Reibus's discovery is outweighed by the importance of the evidence ArcelorMittal seeks regarding Liberty, which has a documented history of obfuscating its assets. Moreover, to minimize any such burden on Reibus, ArcelorMittal's requests are narrowly tailored. The subpoenas request documents for a 5-year period starting in May 2018. White Decl., Ex. 8. They seek documents and information that are time-limited and specific and consistent with discovery permitted under the Federal Rules of Evidence.

Granting the discovery sought hereby would also promote the strong public policy enshrined in the laws of the United States, England and Wales, and Singapore favoring the enforcement of international arbitration awards and the expeditious resolution of international disputes. *See, e.g., Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974); *see also* English Arbitration Act, § 66; Singapore International Arbitration Act, § 29. The EWHC and the Singapore High Court have recognized the Award and it is enforceable as a judgment of the court in both countries. Section 1782 discovery sought by ArcelorMittal will be used to collect on the Award and the judgments of the EWHC and the Singapore High Court.

Finally, the presumption under Section 1782 is that discovery will proceed pursuant to the Federal Rules of Civil Procedure. 28 U.S.C. § 1782; *In re Sergeeva*, 2015 WL 12866970, at *2 (N.D. Ga. Feb. 6, 2015) ("The statute plainly says that

discovery is to be produced pursuant to the Federal Rules of Civil Procedure unless otherwise limited by the Court's order; therefore, the default rule is that the Federal Rules of Civil Procedure govern § 1782 productions."). Accordingly, ArcelorMittal requests that the Court apply that presumption and order that discovery proceed under the Federal Rules of Civil Procedure.

## CONCLUSION

For the foregoing reasons, Petitioner respectfully requests that the Court grant the Petition, authorize Petitioner to issue subpoenas to Reibus in the form attached as Appendix A and Appendix B therein, and authorize Petitioner to issue additional subpoenas for the production of documents and/or depositions of Reibus as Petitioner reasonably deems appropriate and as are consistent with the Federal Rules of Civil Procedure as permitted by Section 1782.

Dated: October 23, 2023

Respectfully submitted,

Brian A. White
KING & SPALDING LLP
1180 Peachtree St, NE, Suite 1600
Atlanta, GA 30309
Tel.: +1 404 572 4739
bwhite@kslaw.com

21

## **CERTIFICATION ON TYPE AND POINT LIMITATIONS**

Pursuant to Local Rule 7.1(D), the undersigned counsel hereby certifies that the foregoing **Memorandum of Law in Support of *Ex Parte* Petition for Assistance in Aid of a Foreign Proceeding Pursuant to 28 U.S.C. § 1782** complies with the font and point selections approved by the Court in Local Rule 5.1(C).  This document was prepared on a computer using Times New Roman font (14 point).


Brian A. White
KING & SPALDING LLP
1180 Peachtree St, NE
Suite 1600
Atlanta, GA 30309
Tel.: +1 404 572 4739
bwhite@kslaw.com