UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| In re application of ArcelorMittal Holdings AG for an order directing discovery pursuant to 28 U.S.C. § 1782 <br><br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    CIVIL ACTION: <br><br>   Declaration of Charity R. Kirby in Support of Ex Parte Petition for Assistance in Aid of a Foreign Proceeding Pursuant to 28 U.S.C. § 1782 |

I, Charity R. Kirby, declare as follows:

1.      I am a Solicitor of the Senior Courts of England and Wales.  I am a Senior Associate with the law firm of King & Spalding International LLP.  I, along with a team of lawyers in King & Spalding LLP's London office, am conducting litigation in the High Court of Justice of England and Wales (**"EWHC"**) and supervising litigation in the High Court of Singapore for ArcelorMittal Holdings AG (**"ArcelorMittal"**). My colleagues in King & Spalding LLP's Atlanta office are attorneys of record for ArcelorMittal in connection with the Petition for Assistance in Aid of a Foreign Proceeding filed in this matter (**"Petition"**).

2.      Except where stated otherwise, the facts set forth herein are personally known to me, and if called as a witness, I could and would testify completely thereto. Capitalized terms used but otherwise not defined in this Declaration have the meaning ascribed to them in the Petition.

3.      On January 24, 2023, an arbitral tribunal seated in London and convened under the arbitration rules of the London Court of International Arbitration issued a Partial Final Award in ArcelorMittal's favor and against Liberty, in the amount of €140 million, plus interest at a rate of 5% per annum, accruing on a daily basis and compounding annually from and including March 2022 to (but excluding) the date of payment ("**Award**"). A true and correct copy of the Award is attached hereto as Exhibit 1.

4.      The amount awarded to ArcelorMittal in the Award was based on the arbitral tribunal's finding that Deferred Compensation in the amount of €140 million was accelerated and due upon Liberty's failure to provide ArcelorMittal with its audited financial statements in accordance with the terms of the parties' agreement. *See* Exhibit 1, pp. 19-22.

5.      Liberty has not paid any part of the Award. To date, Liberty has still not produced any audited, consolidated financial statements to ArcelorMittal.

6.      On January 27, 2023, ArcelorMittal wrote to Liberty referring to the Award, demanding payment and providing details of the bank account for payment to be made into. A true and correct copy of that letter is attached hereto as Exhibit 2.

7.      ArcelorMittal's counsel of record for the arbitration, Cleary Gottlieb Steen & Hamilton LLP, wrote to Liberty's counsel of record in the arbitration, Clyde & Co LLP, on the same date also demanding payment. A true and correct copy of that letter is attached hereto as Exhibit 3.

8.      Neither Liberty nor its counsel replied to either letter.

9.      As a result of Liberty's refusal to pay any part of the Award, ArcelorMittal commenced judicial proceedings to enforce the Award in the EWHC. Specifically, on February 17, 2023, ArcelorMittal applied without notice (as permitted under the applicable law) to the EWHC for permission to enforce the Award in the same manner as a judgment or order of the court to the same effect pursuant to Section 66 of the English Arbitration Act 1996. The EWHC granted that application on February 24, 2023, recognizing the Award and granting leave to the Applicant to enforce it (the "**English Order**"). In effect, the Award has been reduced to judgment in England and Wales. A true and correct copy of the English Order is attached hereto as Exhibit 4.

3

10.     Liberty has not moved to set aside the English Order and has not raised any objections to the enforcement of the Award within the time period to do so (which expired by mid-April 2023 at the latest). Accordingly, the Award is enforceable in the same manner as a judgment or order of the court to the same effect.

11.     If Liberty refuses to satisfy the Award, ArcelorMittal is now entitled under English law to apply to attach and execute Liberty's assets located in the United Kingdom in satisfaction of the Award. ArcelorMittal intends to seek such relief in the EWHC if Liberty persists in its refusal to pay the Award.

12.     In addition, English courts are empowered to issue freezing orders, preventing the dissipation of assets in any jurisdiction. Specifically, the EWHC has the authority to issue a freezing injunction upon a showing that (1) there is a real risk of dissipation of the debtor's assets, (2) the creditor has a good arguable case against the debtor, and (3) all things considered, the Court believes it is just and right to grant the order. ArcelorMittal believes that evidence will show that these requirements are met.

13.     The EWHC may also freeze assets outside of the United Kingdom in a worldwide freezing order upon a showing that there are insufficient assets within England & Wales to satisfy the judgment. That authority is derived from section

4

37(1) of the Senior Courts Act 1981 and was recognized in *Derby & Co Ltd and others v Weldon and others* (No 6) [1990] 3 All ER 263. Based on information available to ArcelorMittal, Liberty's assets in the United Kingdom not subject to attachment by other creditors fall far short of the amount Liberty owes in the Award. Thus, ArcelorMittal reasonably contemplates filing a worldwide freezing order in the English courts to prohibit the transfer of any of Liberty's assets anywhere in the world up to €140 million.

14.    On September 15, 2023, ArcelorMittal filed an application for enforcement of the Award in the High Court of the Republic of Singapore ("**Singapore High Court**") in the same manner as a judgment pursuant to Section 29 of Singapore's International Arbitration Act (2020 Rev Ed) and Order 48 Rule 6 of Singapore's Rules of Court 2021. At the same time, ArcelorMittal filed an application for an injunction freezing Liberty's assets in Singapore (known as a *Mareva* injunction). I supervised the Singaporean law firm, Rev Law, in preparing ArcelorMittal's applications before the Singapore High Court, and I personally submitted two affidavits in those proceedings detailing the reasons why there was a real risk of dissipation of assets. True and correct copies of my affidavits before the

5

Singapore High Court are attached hereto as Exhibit 5 and Exhibit 6. I included almost 2,000 pages of supporting documentation with my affidavits.[1]

15.    Based on my involvement in proceedings before the Singapore High Court, it is my understanding that the Singapore High Court has discretion to grant a domestic freezing injunction if: (1) there is good reason to believe that the defendants have assets in Singapore that could be subject to the injunction; and (2) there is a real risk of dissipation of those assets so as to render nugatory any judgment which the applicant may obtain. The Singapore High Court may also consider, among other things, the nature and location of any assets, dishonest or fraudulent conduct on a large scale, the ability to transfer large sums of money around several jurisdictions swiftly, and the ability to hide assets behind complex corporate structures in jurisdictions where enforcement of judgments is difficult.

16.    As I explained in my affidavits in support of ArcelorMittal's application for a freezing injunction, I am aware of the following facts in the public domain that, in my view, give rise to a real risk of dissipation of assets.

---

[1]    In this Declaration, I have cited the most relevant selection of the documents exhibited in my previous affidavits.  If the court would like the full copy of the exhibits cited in my two prior affidavits (over 2,000 pages), I can provide those materials upon request.

17.     *First*, the GFG Alliance is under investigation by the UK Serious Fraud Office for suspected fraud, fraudulent trading, and money laundering in relation to the conduct of its business, including the financing arrangements with Greensill Capital. A true and correct copy of the Serious Fraud Office's confirmation of the investigation is attached hereto as Exhibit 7.[2]

18.     Greensill Capital, which specialized in supply finance, financed the GFG Alliance's acquisition of steel assets, including those sold under the SPA at issue in the arbitration, but, as reported by the *Financial Times*, filed for administration in the UK courts for severe financial problems, including a reported $5 billion credit exposure to the GFG Alliance. True and correct copies of the *Financial Times* news reports are attached hereto as Exhibit 11 and Exhibit 12.

---

[2]  Based on publicly available news reports, other governments have also launched investigations into GFG Alliance entities. For example, the Czech government ordered the Minister for Industry and Trade to conduct "financial checks" at Liberty Ostrava, and the Paris Prosecutor's Office launched an investigation into the GFG Alliance's French business over allegations of money laundering and the misuse of corporate assets. True and correct copies of these news reports are attached hereto as follows: Exhibit 8, Reuters, "French prosecutors widen investigation into Gupta's GFG group," November 8, 2021; Exhibit 9, Eurometal, "Czech government probes Liberty Steel Ostrava's financial conduct," May 5, 2021; Exhibit 10, Financial Times, "Czechs demand probe into carbon credits sale by Sanjeev Gupta steel plant," April 30, 2021.

19.     In various news reports, investigations, and court decisions arising out of Greensill Capital's collapse, the EWHC found that: (1) the GFG Alliance's claim that it was unable to meet its obligations to Greensill Capital due to the onset of the coronavirus pandemic was unsupported by evidence; (2) it was reasonably likely that the companies would have defaulted even without pandemic conditions; (3) absent Greensill Capital's financing, the GFG Alliance did not have a viable financial future; and (4) the GFG Alliance received advance payments on prospective invoices from parties who had never dealt with, and did not intend to deal with, the GFG Alliance. True and correct copies of the news reports, investigations, and court decisions are attached hereto as Exhibits 13 through 18.

20.     *Second*, the GFG Alliance is an opaque and ever-changing web of companies used to pursue the GFG Alliance's interests, regardless of applicable law. For example, the LH Group moved at least five companies out of its group in an effort to skirt regulations that prohibited any single group from receiving more than £50 million from one lender for pandemic-related financial assistance. True and correct copies of materials showing Liberty's changes in ownership are attached hereto as Exhibits 19 through 30. A true and correct copy of the UK's National Audit Office "*Investigation into the British Business Banks accreditation of Greensill Capital*," dated July 7, 2021, is attached hereto as Exhibit 31 (*see* pp. 8 and 36).

21.     *Third*, the LH Group regularly moves sums of money across, and outside of, the LH Group as and when it suits Mr. Gupta, with little respect for corporate formalities. For example, Liberty Ostrava loaned €220 million to Liberty Finance Management (LIG) ("**LFM**"), at least €84 million of which was passed on to the account of a creditor in the process of seizing a major smelter owned by Mr. Gupta personally, but not the LH Group, according to the *Financial Times*. A true and correct copy of Liberty Ostrava's 2021 annual report showing Liberty Ostrava's loans to LFM, as well as a translation of the relevant excerpt, is attached here as Exhibit 32 , p. 14. A true and correct copy of the *Financial Times* article, "*Sanjeev Gupta's GFG shifted funds from steelworks to try to settle debt*," dated 4 May 2022, is attached hereto as Exhibit 33.

22.     *Fourth*, the LH Group appears to be highly interdependent and relies heavily on related companies for day-to-day operations, allowing the LH Group to present a far healthier financial outlook than reality.  For example, in April 2021 *The Times* described the "circular trading scheme" under which Liberty House Group companies were able to raise funds against multiple sales of the same steel from Greensill Capital, which provided supply chain finance. According to that article, Liberty Steel Newport would sell millions of pounds' worth of steel coils and tubes to VS International ("**VSI**"). Greensill Capital provided finance against the invoice

9

from VSI. VSI sold the steel to CS Management Services, a further company in the GFG Alliance. CS Management Services sold the steel back to Liberty Steel Newport, and Liberty Steel Newport then sold the same steel for a second time to a third party. Greensill Capital provided finance against the invoice from the third party. Moreover, Liberty Steel Newport was therefore able to raise millions of pounds of cash from Greensill Capital on a single shipment of steel. It is unclear whether the steel was ever physically delivered to VSI. Liberty Steel Newport was moved outside the ownership of the Liberty House Group in 2020. A true and correct copy of *The Times* article, "Revealed Sanjeev Guptas circular money trail," dated April 17, 2021 is attached hereto as Exhibit 34.

23.    *Fifth*, available financial statements of LH Group companies raise more questions than they answer. Despite media reports that Liberty Czestochowa produced over 900,000 tons of steel to date, the company's 2021 annual report suggested that all of the company's revenue was earned from services, rather than selling inventories. It is not clear what became of the tons of steel produced by Liberty Czestochowa. A true and correct copy of Liberty Czestochowa's 2021 Financial Statement is attached hereto as Exhibit 35. A true and correct copy of Liberty Czestochowa's production figures for 2021 to 2022 as reported in the media is attached hereto as Exhibit 36.

24.     *Sixth*, the LH Group's true financial health is impossible to verify. The UK Parliament's Business, Energy and Industrial Strategy Committee investigated Liberty Steel and the GFG Alliance. Their report quoted Dr. Javed Siddiqui, Professor of Accounting, Alliance Manchester Business School, The University of Manchester, who observed that there were different auditors for different GFG Alliance companies, meaning that no auditor had a "complete picture of [how the Liberty Steel companies] group is performing or how this alliance is performing." GFG Alliance companies changed their accounting period on at least two occasions, which Cynthia O' Murchu, Investigative Reporter at the Financial Times, also quoted by the Committee's Report, identified as a "huge red flag." The Committee's report concluded that it was "utterly unconvincing" that King & King, a small audit firm without steel industry experience which audited 60 companies in the GFG Alliance, had the capacity, expertise and resources to audit the GFG Alliance or the LH Group.  A true and correct copy of the UK Parliament's Business, Energy and Industrial Strategy Committee's report, Fourth Report, is attached hereto as Exhibit 37. *See id.*, ¶¶ 43, 47, 49.

25.     As detailed in its various resignation letters and the *Financial Times*, King & King shortly thereafter resigned, stating that it was unable to complete its audits. True and correct copies of the resignation letters are attached hereto as

11

Exhibits 38 through 41.[3] A true and correct copy of the *Financial Times* article, "*Sanjeev Gupta's auditor quit after lack of evidence to complete work*," dated September 20, 2022 is attached hereto as Exhibit 42.

26.     Based on these facts and further details provided by ArcelorMittal, the Singapore High Court concluded that there is a real risk of dissipation of Liberty's assets in connection with ArcelorMittal's application for a Mareva injunction.

27.     On September 19, 2023, the Singapore High Court granted both of ArcelorMittal's applications. The Singapore High Court issued an order that enforces the Award as a judgment of the courts of Singapore. A true and correct copy of this order is attached hereto as Exhibit 45. The Singapore High Court also issued a Mareva injunction prohibiting Liberty from removing from Singapore any assets located in Singapore up to the value of the Award (i.e., €140 million plus

---

[3] Various other auditors have also either qualified, or refused to sign off on, LH Group accounts. For example, Deloitte gave a qualified audit opinion of Liberty Ostrava's 2020 financial statements because the company misregistered loans received from its parent (which its parent had written off) as income. BDO, the auditor for Liberty Liege-Dudelange, declined to give an audit opinion on the company's 2020 annual report, stating that it was "unable to obtain sufficient audit assurance to conclude that the preparation of the annual accounts in accordance with the going concern principle is appropriate…" True and correct copies of these qualified opinions are attached hereto as Exhibits 43 and 44.

12

applicable interest). A true and correct copy of this injunction is attached hereto as Exhibit 46.

28.     Liberty had between 14 and 21 days to apply to set aside the decisions of the Singapore High Court, as well as 14 days to provide required disclosures in the form of a sworn affidavit on "all their assets in Singapore whether in their own name or not and whether solely or jointly owned, and whether [Liberty] are interested in them legally, beneficially or otherwise, giving the value, location and details of all such assets."[4] A true and copy of that order is attached hereto as Exhibit 47.

29.     Liberty requested an extension of the disclosure deadline, which was granted until October 20, 2023. However, on the eve of the extended deadline, October 19, 2023, Liberty notified ArcelorMittal of its intent to file an application to set aside the freezing injunction and requested that the deadline to disclose its assets be stayed, pending resolution of the set aside application. A true and correct copy of that letter is attached hereto as Exhibit 48. ArcelorMittal did not consent to Liberty's request for a further extension to provide disclosure.

---

[4]   The date varies depending on the specific Liberty entity and whether the set aside relates to recognition or the freezing injunction.

30.     Liberty's disclosure obligation is independent of any application to set aside the freezing injunction, and an application to set aside the injunction does not stay Liberty's disclosure deadline. Moreover, the fact that Liberty waited until the eve of the deadline – once extended – to ask ArcelorMittal to consent to a stay is yet another example of Liberty's strenuous efforts to date to hide its finances from ArcelorMittal and prevent ArcelorMittal from being made whole.

31.     Liberty failed (i) to make any application to set aside the recognition order; or (ii) to file and serve its asset disclosure affidavit on or before October 20, 2023. As such the Award is enforceable in the same manner as a judgment or order of the Singapore court to the same effect and Liberty is currently in contempt of court. Liberty has suggested that it will make an application regarding the Mareva injunction and the disclosure affidavit out of time, by Tuesday, October 24, 2023.

32.     Liberty's repeated failures to disclose its true financial position to ArcelorMittal – exemplified most recently through its brazen decision to ignore the Singapore High Court's disclosure order – encapsulates the need for Section 1782 discovery. This Court's judicial assistance is critical to remedy Liberty's efforts to conceal its assets from ArcelorMittal. ArcelorMittal would use information obtained through this Court's grant of judicial assistance to identify assets for purposes of attachment and execution applications in pending proceedings in England and

14

Singapore, as well as in support of its contemplated application for a worldwide freezing order to the EWHC.

33.     Reibus is not a participant in the English or Singapore proceedings.

34.     ArcelorMittal has no reason to believe that the courts of England and Wales would not be receptive to the judicial assistance requested herein, and the request does not seek to circumvent foreign proof-gathering restrictions or other policies in the United Kingdom. English law recognizes a strong public policy in favor of the recognition and enforcement of international arbitration awards and the expeditious resolution of international disputes.

35.     Based on my involvement in the Singapore High Court proceedings to enforce the Award, and the fact that Singapore, like the United Kingdom, is a party to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958 (also referred to as the New York Convention), I have no reason to believe that the Singapore High Court would not be receptive to this Court's grant of judicial assistance. For the same reasons, Singapore law recognizes a strong public policy in favor of the recognition and enforcement of international arbitration awards and the expeditious resolution of international disputes.

36.     In addition, the request does not seek to circumvent foreign proof-gathering restrictions or other policies in Singapore. Indeed, Liberty has refused to

comply with its obligation to provide disclosure ordered by the Singapore High

Court on its Singaporean assets, such that third-party discovery is necessary to obtain

the information that Liberty resisted providing.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on this 23rd day of October 2023 at
London, England

Charity R. Kirby

16