# EXHIBIT 14



<u>Neutral Citation Number: [2022] EWHC 1359 (Ch)</u>

<u>Case No: CR-2021-000595</u><br>
<u>Case No: CR-2021-000597</u><br>
<u>Case No: CR-2021-000622</u>

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**COMPANIES COURT**

<u>Rolls Building</u><br>
<u>Fetter Lane</u><br>
<u>London</u><br>
<u>EC 4A 1NL</u>

<u>Date: 07/06/2022</u>

**Before** :

**CHIEF INSOLVENCY AND COMPANIES COURT JUDGE BRIGGS**

- - - - - - - - - - - - - - - - - - - - -

**Between :**

|  |  |
|---|---|
| **CITIBANK, N.A., LONDON BRANCH** | **Petitioner** |
| **- and -** | |
| **(1) SPECIALITY STEEL UK LIMITED** | **Respondents** |
| **(2) LIBERTY MDR TREASURY COMPANY UK LIMITED** | |
| **(3) LIBERTY COMMODITIES LIMITED** | |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Richard Fisher QC, Charlotte Cooke** (instructed by **Baker & McKenzie LLP**) for the **Petitioner**
**Jeremy Goldring QC, Marcus Hayward** (instructed by **Mishcon de Reya LLP** for the **Respondents**

Hearing dates: 10, 11 May 2022

# If this Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this Judgment and that copies of this version as handed down may be treated as authentic.

.............................

This judgment was handed down remotely by consent of the parties with circulation to the parties' representatives by email. It will also be released to the National Archives for publication. The date and time for hand-down is deemed to be 10:00 hrs on 7 June 2022.

**CICC Judge Briggs:**

**Introduction**

1. The court has before it three petitions presented by the Petitioner against three separate companies that are linked. The companies do not form part of a group as defined by section 1261 of the Companies Act 2006 but are said to form part of an "informal group".

2. The Petitioner claims that the three companies in question are unable to pay their debts as they fall due and seek a winding up order in respect of each. The Petitioner served a demand for payment against each company pursuant to a contractual provision within a financial instrument and the companies have failed to meet the demand made.

3. The petitions were served in March 2021 when Parliament had imposed restrictions on winding up a company through the Corporate Governance and Insolvency Act 2020 (the Act), Schedule 10 (Schedule 10). A practice direction (the CIGA PD) provided procedural guidance that included a requirement that petitions presented within a specific time frame should not be advertised and the court file should be kept private unless the court had determined that it was likely that a winding up order would be made.

4. This hearing is the determination of that question: is it likely that a winding up order will be made? If the court answers that question in the negative the petitions will be struck out. If the court answers the question in the affirmative permission to advertise will be given, directions for the hearing of the petition, or any argument about whether the debt is due, will be provided and the court file will be open to inspection.

**Background**

5. The Petitioner in respect of each of the petitions is Citibank, N.A., London Branch (the "Petitioner" or "Citibank"). The respondent companies are (i) Speciality Steel UK Limited ("SSUK"), Liberty MDR Treasury Company UK Ltd ("MDR"), and Liberty Commodities Limited ("LCL"). I shall refer to the individual companies as I have defined them or together as the "Companies".

6. Citibank is the Note Trustee for a number of Notes that were issued by Greensill Capital (UK) Limited ("GCUK") under various note programmes which were substantially supported by funds managed by Credit Suisse Asset Management ("Credit Suisse"). Credit Suisse is the majority bond holder. The note programmes related to two broadly divisible note issuances. The first for receivables and the second for future receivables.

7. The Companies are described as members of the GFG Alliance which is the "informal group" referred to in paragraph 1 above. Entities within the GFG Alliance are also referred to as "underlying sellers" in the various instruments. It is not clear that each of the companies in the GFG Alliance sold receivables. The companies forming the GFG Alliance are owned and operated by an individual known as Mr Sanjeev Gupta. Mr Gupta provides witness evidence in these proceedings and says that he is currently the sole director of the Companies.

8.  A receivable purchase agreement ("RPA") was entered into between the Companies and GCUK. The RPA between SSUK and GCUK is dated 17 April 2017. The RPA (amended) between LCL and GCUK is dated 29 October 2018. It was "restated" on 6 December 2019. MDR's transaction in respect of its receivables was made pursuant to an Amended and Restated receivables purchase deed dated 20 June 2018, amended and restated on 29 August 2018, 12 April 2019, and 4 May 2020.

9.  There were a series of assignments, for example GCUK assigned the benefits of its rights to Hoffman S.a.r.l ("Hoffman"), and a Master Agreement was agreed, but as assignments do not feature in this case there is no need to go into the detail.

10. The financing provided by GCUK provided the primary source of working capital for the Companies. Mr Hudson has produced a witness statement for the Petitioner. His undisputed analysis is as follows [61]:

> "Note Programmes were backed by receivables sold by the Companies. The balance of a company's receivables is driven by both (1) its turnover / order book (as credit sales would increase the balance of receivables and orders would increase the balance of future receivables expected) and (2) collection of receivables (as collections would decrease the balance of receivables)."

11. GCUK relied on credit insurance to assign and sell the receivables to other parties. Its main policies expired on 1 March 2021. I shall deal with this more later. For now, it is useful to note that GCUK was not able to renew the main policies or obtain alternative insurance. Its demise was sharp. On 2 March 2021 GCUK ceased trading entering administration on 8 March 2021. The evidence that follows will determine if there was a strong connection between: (i) the expiry of the policies and the inability to obtain alternative insurance and (ii) the cessation of trade and administration.

**Legal analysis**

The statutory provisions

12. The Act came into effect on 25 June 2020. Schedule 10 ("Schedule 10"), paragraph 2 provides (where relevant):

> "(1) A creditor may not during the relevant period present a petition under section 124 of the 1986 Act for the winding up of a registered company on a ground specified in section 123(1)(a) to (d) of that Act ('the relevant ground'), unless the condition in subparagraph (2) is met.
>
> (2) The condition referred to in subparagraph (1) is that *the creditor has reasonable grounds for believing* that –
>
> (a) Coronavirus *has not had a financial effect* on the company, or

> (b) the facts by reference to which the *relevant ground applies
> would have arisen even if Coronavirus had not had a financial
> effect* on the company." (emphasis supplied)

13. Paragraph 5 of Schedule 10 provides a further test to be satisfied before the court may make a winding up order:

> "(1) This paragraph applies where –
>
> (a) a creditor presents a petition for the winding up of a registered company under section 124 of the 1986 Act in the relevant period,
>
> (b) the company is deemed unable to pay its debts on a ground specified in section 123(1) or (2) of that Act, and
>
> (c) it *appears* to the court that *Coronavirus* had *a financial effect* on the *company before the presentation of the petition*.
>
> (2) The court may wind the company up under section 122(1)(f) of the 1986 Act on a ground specified in section 123(1)(a) to (d) of that Act only if the court is satisfied that the facts by reference to which that ground applies would have arisen even if Coronavirus had not had a financial effect on the company.
>
> (3) The court may wind the company up under section 122(1)(f) of the 86 Act on the ground specified in section 123(1)(e) or (2) of that Act *only if the court is satisfied* that the ground w*ould apply even if Coronavirus had not had a financial effect* on the company." (emphasis added)

14. The meaning of a 'financial effect' for the purposes of paragraph 5 is prescribed by paragraph 21(3), the material parts of which provide:

> "coronavirus has a 'financial effect' on a company if (and only if) the company's financial position worsens in consequence of, or for reasons relating to, coronavirus".

15. Before turning to some of the case-law arising from these provisions, I make a few observations. First, the provisions of Schedule 10 should be read together with the explanatory notes to gain an understanding of the policy rationale and the intentions of the legislators. Secondly, although the definition of "a financial effect" is the same throughout the Schedule, the procedural point in time when the parties address whether a "financial effect" has been caused by Coronavirus is different. The Petitioner is required to reasonably believe that Coronavirus did not have an effect when filing the petition with the court. And the respondent company must provide evidence to the contrary to demonstrate that Coronavirus "appears" to have had the prescribed effect in response to the petition. Paragraph 5(1) provides that only after the respondent company has shown that Coronavirus "appears" to have had "a financial effect", is paragraph 5 engaged. Lastly, once paragraph 5 is engaged, the question is to be decided having regard to the

counterfactual, if the company (or companies) are likely to be wound up regardless of the effects of Coronavirus: "*even if Coronavirus had not had a financial effect*".

16. Naturally the jurisprudence in connection with Schedule 10 has evolved at the time when new issues have arisen for consideration.

<u>Three stages of decision identified by the Court</u>

17. It is apparent from the scheme of Schedule 10 that the main issue to be decided at the preliminary hearing is that posed by Schedule 10 paragraph 5(3). This is because the court will have been satisfied from the face of the petition that a reasonable belief was held by the petitioner as required by Paragraph 2(2) of Schedule 10; and at the non attendance pre-trial review the respondent company has demonstrated that it "appears to the court that Coronavirus had a financial effect on the company before the presentation of the petition" as stated in Paragraph 5(1)(c). However the Court has adopted the approach of permitting each of these preliminary grounds to be challenged at the preliminary hearing before tackling the Schedule 10, paragraph 5(3) issue. In a fully contested case the evidence will be the same leading to a repeat of argument at most of the three stages.

18. It has been held that the persuasive burden that reasonable grounds existed to demonstrate that either the respondent company experienced no financial effect as a result of Coronavirus or that the company would be wound up regardless of that financial effect lies with the petitioner. It is reasonable to imply that when assessing whether a reasonable belief was held the court should confine its search to the information held by the petitioner at the time of the petition, accepting that any petitioner would not have available the same financial information held by the respondent company; it is an outsider: *Re A Company (Injunction to Restrain Advertisement)* [2020] BCC 773 at [28] to [29] and [31].

19. As regards the second stage Judge Barber observed in *Re A Company (A v B)* [2020] EWHC 1551 [43]:

> "['Appears'] is clearly intended to be a low threshold; the requirement is simply that 'a' financial effect must be shown: it is not a requirement that the pandemic be shown to be the (or even a) cause of the company's insolvency. Moreover the language of this provision, which requires only that it should 'appear' to the court that coronavirus had 'a' financial effect on the company before presentation of the petition, is in marked contrast to that employed in paragraph 5(3), where the court is required to be 'satisfied' of given matters. The term 'appears' must be intended to denote a lower threshold than 'satisfied'. (emphasis added)

20. In *Re A Company* [2021] EWHC 2905 the same Judge said that it is for the respondent company to show that coronavirus [30-31]:

> "prima facie had a financial effect, and if it does so the question is then whether, on the balance of probabilities, the Petitioner can show that the ground for winding up would apply even absent that effect".

21. There is no dispute in this case that the persuasive burden rests with the petitioner in respect of Paragraph 5(3) of Schedule 10.

Burden of proof

22. I briefly mention the burden of proof. The legal burden of proof describes the duty which lies on one or other of the parties, either to establish a case or to establish the facts upon a particular issue. It is also sometimes referred to as the persuasive burden. The phrase "standard of proof" is used to describe the degree to which the proof must be established: Phipson on Evidence [601]. The only standard of proof for civil trials is the civil standard the balance of probabilities: *Re S-B (Children) (Care Proceedings: Standard of Proof)* [2009] UKSC 17.

23. The legal burden of proof is rarely decisive but is informative when none of the versions of events presented satisfy the balance of probabilities: *Stephens v Cannon* [2005] EWCA Civ 222.

Date of assessment

24. The question of when the assessment is made is dealt with by Paragraph 5(1) of Schedule 10 which states that 'a financial effect' on the company is to be considered "*before presentation* of *the* petition" (emphasis added). Applying a plain reading to Paragraph 5(1), *the* petition had to be in existence for it to be presented. In my judgment the words "*the* petition" mean a petition that satisfies the requirements of paragraph 3.1 of the CIGA PD. It was agreed by the parties that it would be impracticable and disproportionate to investigate the precise time and date of creation, and the date of filing of the petition provides a practical and unarguable time and date.

A *de minimis* "financial effect"?

25. The magnitude of "worsens" (paragraph 21(3)) of a company's financial position "as a consequence of" or "for reasons relating to Coronavirus" is in issue. Does the Court need to be satisfied that the "financial effect" caused a company to be unable to pay a petition debt or is it sufficient to find that "a financial effect", that "worsens" the financial position, no matter how insignificant, may prevent a company from being wound up where the Schedule applies?

26. The Companies submit that any worsening of a company's financial position as a consequence of Coronavirus would be sufficient for Paragraphs 5(1) and 5(3). To take an extreme example, if a pharmacist in a retail pharmacy selling other items fell ill to Covid-19 and the pharmacy component of the retail pharmacy had to close for half a day or a day while the management found a locum, but the retail shop remained trading, would that be sufficient to satisfy the test of a worsening of the position? The pharmacy would have lost revenue and is likely to have lost profit. It may have had to pay more for the locum than it would have for an employee. The Companies argue that such an extreme situation is sufficient from a plain reading of the legislation.

27. The Petitioner argues that there must be some *de minimis* financial effect otherwise the legislative purpose of assisting viable businesses could be thwarted.

CRK-2/1973

28. In my judgment the issue is to be decided not by implying words to Schedule 10 but by construction where it is legitimate to have regard to the purpose of the Schedule.

29. It is not in dispute that an explanatory note accompanying an Act of Parliament provides both guidance and assistance as to the policy behind the enactment: *R (on the application of Westminster CC) v National Asylum Support Service* [2002] 4 All ER 654. It was explained by Lord Steyn in *R (on the application of Westminster CC)* that explanatory notes to legislation "cast light on the objective setting and the mischief at which [the Act] is aimed…[and] is therefore [an] admissible aid to construction (paragraph 5 of the judgment). It is relevant, therefore, to look at the explanatory note to "cast light on the objective" and understand the "mischief" behind Schedule 10 to assist with construing the provisions purposefully.

30. The explanatory note published on the introduction of CIGA 2020 explains the mischief and objective at paragraph 3:

> "Due to the COVID-19 pandemic, many otherwise economically viable businesses are experiencing significant trading difficulties. In addition, the Government-enforced social distancing measures and reduced resources are making it hard for many businesses to continue to trade and meet their legal duties. This Act is aimed at ensuring businesses can maximise their chances of survival."

31. The purpose and mischief can be further gleaned from paragraphs 22, 24 and 25:

> "22. The Government is legislating to temporarily prevent winding-up proceedings being taken on the basis of statutory demands and to *temporarily stop winding-up proceedings where COVID-19 has had a financial effect on the company which has caused the grounds for the proceedings*.
>
> 24. The *Act also creates an additional condition that must be satisfied* before a creditor can obtain a winding-up order against a company on the grounds that it is unable to pay its debts. During *the restriction period*, any *creditor* asking the court to make a winding-up order on those grounds *must first demonstrate* to the court that *the company's inability to pay its debts was not caused by the Coronavirus pandemic*.
>
> 25. The measure will apply to any winding-up petition presented in the period from 27 April 2020 to 30 September 2020, and it includes provision to rectify situations where, following the announcement of the measure but in advance of its enactment, a petition has been brought under the pre-existing law." (emphasis added)

32. Having regard to the explanatory note the submission of the Companies would be tantamount to replacing the article "a" before "financial" with "any". That is not the chosen language of the legislators nor is it consistent with the purpose described in the explanatory note. The purpose of the legislation which read in context is to protect "otherwise

economically viable businesses…experiencing significant trading difficulties" which is to be achieved by "temporarily prevent[ing] winding-up proceedings" in respect of those otherwise economically viable businesses, if the court is satisfied that Coronavirus "had a financial effect on the company which has caused the grounds for the proceedings". This in my view helps explain the structure of Schedule 10 and negates any argument that "any" financial effect caused by Coronavirus is sufficient. Read as a whole, the objective of the legislation is to provide a temporary safe harbour for companies weathering a financial storm caused by Coronavirus only. If a company is suffering financial difficulties and would not be able to meet its debts as they fell due or was otherwise balance sheet insolvent the temporary safe harbour would not assist. This is the essence, in my judgment, of Paragraph 5(3) of Schedule 10.

33. I turn to the petitions.

**The Petitions**

34. SSUK is the largest operating entity within the Liberty Steel UK division of the GFG Alliance. Its forecast turnover for the year to March 2021 was £267m and it has 1,815 employees. SSUK has headquarters in Rotherham and operates through four divisions in five locations. It manufactures specialist steel products, which it supplies, principally, to the aerospace automotive and engineering industries.

35. The petition presented on 27 March 2021 states:

> "5. The Company is indebted to the Petitioner in the total sum of £46,860,465.59 which is presently due and payable (the Petition Debt), full details of which are shown below ....
>
> a. The Petition Debt arises under a Receivables Purchase Agreement dated 9 April 2019 between, among others, Greensill Capital (UK) Limited (Greensill) as buyer of receivables and the Company as seller, servicer and seller representative (the RPA). Pursuant to the RPA:
>
> b. Receivables were sold to Greensill and the Company has acted as Seller and/or Seller Representative and/or Servicer in respect of those transactions (the Purchased Receivable(s));
>
> c. In respect of each Purchased Receivable:
>
> i. the Company (as Seller and Servicer), has an obligation pursuant to clause 5.5 of the RPA, to pay an amount equal to all proceeds of any collections received by the Company on or prior to the date specified in the RPA; and/or
>
> ii. if an Event of Repurchase as defined in clause 7 of the RPA occurs in respect of a Purchased Receivable, the Company is under an obligation to repurchase the Purchased Receivable on demand, and pay (in immediately available funds) an amount equal to the total amount outstanding in in respect of the Purchased Receivable;

> d. By a Receivables Repurchase Notice dated 20 March 2021 …(the Notice), Greensill, acting by its administrators:
>
> i. gave notice that the Purchased Receivables listed in the Schedule to the Notice were each the subject of an Event of Repurchase (as defined in the RPA); and
>
> ii. demanded that the Company promptly repurchase and pay for the Purchased Receivables in immediately available funds in accordance with clause 7 of the RPA;
>
> e. The Company has failed to pay sums due and payable under the Notice amounting to £46,860,465.59 pursuant to clause 5.5 and/or clause 7 of the RPA.
>
> f. All the rights of Greensill under the RPA to sums due from the Company were assigned:
>
> i. by Greensill to Hoffman S.à.r.l. (Hoffman) pursuant to a Master Assignment Agreement dated 21 December 2017; and
>
> ii. by Hoffman to the Petitioner under a Master Trust Deed dated 13 October 2017 (as amended and supplemented from time to time) (the MTD); and are held by the Petitioner, as Note Trustee, under the MTD as security on behalf of a number of noteholders.
>
> g. In the circumstances, as at the date of the Petition, the Petitioner is a creditor of the Company in respect of the Petition Debt."

36. Citibank claims that the source of financing from GCUK was essential to the working capital of the GFG Alliance, and the Companies have not been able to refinance or replace the facilities so that "payments have fallen due under the Notes programmes as particular contracts have matured and they have not been paid." There is strong evidence to support the assertion, and I do not understand that it is contested or seriously contested.

37. Jillian Hamblin as trust officer of the Petitioner explains in her witness statement in support:

> "Having taken advice from my lawyers, I believe that, as noted in the Petition, there are reasonable grounds for believing that either Coronavirus has not had a financial effect on the Company or that section 123(1)(e) of the Insolvency Act 1986, as relied upon, would apply even if Coronavirus had a financial effect on the Company. In this regard the Petitioner relies upon the background described above in respect of [Informal Group's] financial instability and in particular the timing of the Company's defaults. Despite the Covid-19 pandemic having been going on for over a year, on the basis of the information provided to me by Credit Suisse, I understand it to be the case that the defaults have arisen more recently following the appointment of administrators in respect of [the Finance

Company] and the attendant collapse of its financing arrangements."

38. The second petition was presented on 27 March 2021 in respect of MDR. The petition states:

> "5. The Company is indebted to the Petitioner in the total sum of EUR 23,254,779.68 (or £19,913,081.97, the sterling equivalent at the time of the Petition1) which is presently due and payable (the Petition Debt), full details of which are shown below …
>
> a. The Petition Debt arises under an Amended and Restated Receivables Purchase Deed dated 20 June 2018, as amended and restated on 29 August 2018, 12 April 2019, and 4 May 2020 between Greensill Capital (UK) Ltd (Greensill) as Buyer of receivables, the Company as Seller and Liberty House Group Pte as Parent (the RPD). Pursuant to the RPD:
>
> b. Receivables were sold to Greensill and the Company has acted as Seller in respect of those transactions (the Purchased Receivable(s)
>
> c. In respect of each Purchased Receivable:
>
> i. the Company (as Seller), has an obligation pursuant to clause 5(f) of the RPD, to pay an amount equal to all proceeds of any collections received by the Company on or prior to the date specified in the RPD; and/or
>
> ii. if an Event of Repurchase as defined in clause 6(a) of the RPD occurs in respect of a Purchased Receivable, the Company is under an obligation to repurchase the Purchased Receivable immediately and pay (in immediately available funds) an amount equal to the total amount outstanding in respect of the Purchased Receivable within one (1) business day of the Event of Repurchase;
>
> d. By two Receivables Repurchase Notices respectively dated 20 March and 22 March 2021 as appended at Annexes 1 to 2 of this Petition (each, a Notice and together, the Notices), Greensill, acting by its administrators:
>
> i. gave notice that the Purchased Receivables listed in the Schedule to each Notice were each the subject of an Event of Repurchase (as defined in the RPD); and
>
> ii. demanded that the Company promptly repurchase and pay for the Purchased Receivables in immediately available funds in accordance with clause 6(a) of the RPD;

e. The Company has failed to pay sums due and payable under the Notices amounting to EUR 23,254,779.68 pursuant to clause 5(f) and/or clause 6 of the RPD.

f. All the rights of Greensill under the RPD to sums due from the Company were assigned:

i. by Greensill to Hoffman S.à.r.l. (Hoffman) pursuant to a Master Assignment Agreement dated 21 December 2017; and

ii. by Hoffman to the Petitioner under a Master Trust Deed dated 13 October 2017 (as amended and supplemented from time to time) (the MTD); and are held by the Petitioner, as Note Trustee, under the MTD as security on behalf of a number of noteholders.

g. In the circumstances, as at the date of the Petition, the Petitioner is a creditor of the Company in respect of the Petition Debt.

39. Jillian Hamblin confirms that the ground for winding up is that the company is unable to pay its debts within the meaning of section 123(1)(e) of the Insolvency Act 1986, the EC regulations applies in so far as it applies in the UK and the Coronovirus has not had a financial effect on the Company or that the Company would be unable to pay its debts as they fell due even if Coronavirus did have a financial effect.

40. The third petition was presented against LCL on 31 March 2021 stating that the "company is indebted to the Petitioner in the total sum of USD$ 131,615,184.95". In a similar way to the first two petitions notice was given by GCUK acting through its administrators on 23 March 2021 that the purchased receivables were overdue, giving rise to an event of repurchase and demanded repurchase. LCL did not pay the sums due under the notice.

41. I do not see the need to set out the whole of the petition in respect of LCL but mention that Viola Joyce Deloris Japaul, who provides a witness statement in support of the petition, states that Credit Suisse Asset Management directed Citibank to take steps as note trustee to commence winding up proceedings. She says that Coronovirus did not have a financial effect on LCL and that LCL would be insolvent in any event were it to be found that it did have a financial effect.

**The evidence**

42. In his first witness statement Mr Gupta says [19]:

"I believe Citibank (who, so far as I am aware, have no first-hand knowledge of the affairs of the GFG Alliance) is wrong to assert that the Coronavirus has not had a financial effect on the Companies. I believe it is equally incorrect for Citibank to assert that the Companies alleged insolvency was not caused by the Coronavirus pandemic. On the contrary, the pandemic has had a significant adverse financial effect on each of the Companies. If the Companies, or any of them, is now unable to pay their debts, which I do not accept, that inability was caused by Coronavirus.

> To put it the other way round, if there had been no pandemic, then I believe the Companies would have continued to trade successfully as they had before with financing either from GCUK (which would have continued in operation) or from alternative sources of funding. I believe the Petitioner is wrong to assert, in effect, that the Companies would have been unable to pay their debts even if there had been no pandemic."

43. He states that the whole industry received a shock due to the pandemic and that the GFG Alliance was not immune [20-21]:

> "20. Coronavirus had an almost existential effect on the GFG Alliance's operations globally.There was not a single part of the numerous businesses that was not impacted, although there were various degrees of impact. Across the board, production was severely hindered and a number of the plants had to shut or production was substantially curtailed. The damage looked to be substantial and we had to take extraordinary steps to try to keep the businesses running.  This was made all the more difficult by absenteeism due to employees' sickness; production being severely curtailed; and the need to shut plants suddenly.

> 21. Demand in many of our sectors almost evaporated for a significant period of time, which had a massive impact, and prices came under severe pressure.  It was inevitable that some of our sectors would be the ones most impacted by the crisis. The automotive, air travel industries ceased almost completely during the lockdown and the construction industry was severely impacted.  Each of these industries are significant consumers of steel."

44. He relies on a published report as evidence of a decline in the demand for steel in Europe during the Coronavirus period:

> "In terms of the impact of the pandemic on the steel industry in Europe, a report published by the European Steel Association in May 2021 (page 37) records that total production activity across the EU steel-using sectors fell by -10.4% over the full year 2020.1  The decline in steel-using industrial output was most pronounced (at -25%) in the second quarter of 2020, which was attributable to the industrial stoppages caused by the severe lockdown measures imposed in March and April 2020. Although the gradual easing of lockdown measures over the third quarter of 2020 enabled industrial activity to restart, activity nevertheless remained low by reference to previous years and output fell in both the third and fourth quarters of 2020 compared to previous year."

45. He states that the GFG Alliance was in good shape prior to the pandemic and was looking to restructure and refinance:

> "At this time, the GFG Alliance was in good financial shape
> overall, and was well placed to attract new finance. It was
> certainly doing well compared to others in our industries. The
> plans for consolidation and finance diversification would have
> put the GFG Alliance in an even stronger position. In particular
> Infra Build (a sister company to Onesteel) was working towards
> an initial public offering ("IPO") of its shares in Australia for its
> local distribution and recycling divisions. The IPO would have
> enabled us to raise additional finance for use by the GFG
> Alliance to fund acquisitions and expansion. However, the
> uncertainty arising from Coronavirus meant that the financial
> markets were in a prohibitively terrible state... Ultimately,
> Coronavirus throttled the plans to consolidate the business of the
> GFG Alliance and have significantly affected our plans for
> finance diversification"

46. Mr Gupta says that SSUK supplied steel to the aerospace, automotive and engineering
sectors. During the pandemic there was a slowdown, staff were furloughed, production
halted altogether for one-month, liquid steel production for the year of 2020 reduced by
5.4%. The three other divisions of SSUK were "to some extent" reliant on liquid steel
production. Mr Gupta provides a graph to demonstrate the reduction in revenue during the
pandemic and the effect on the "underlying sellers":

> "the revenues in Q2-Q4 2020 were £121.4m. During the same
> period in 2019, revenues stood at £162.3m. Therefore, revenues
> were £40.9m lower in Q2-Q4 2020 than in the same period in
> 2019, representing a 25% fall."

47. His evidence is that the greatest losses immediately followed the first imposed lock down
measures in the UK (April to June 2020). He asserts (without documentary evidence to
support) that it will take between 3-4 years for the steel market to recover: "the aerospace
market declined sharply and remained depressed." I need not decide about the accuracy of
this statement at this preliminary hearing.

48. MDR is a special purpose vehicle established for the purpose of entering into financing
arrangements with Greensill. It has four associated companies: Liberty Merchant Bar Plc;
Liberty Pressing Solutions (Coventry) Limited; Liberty Steel Dalzell Limited and Liberty
Steel Newport Limited. These associated companies are all based in and manufacture from
the UK.

49. Mr Gupta says that there was a £30.8m reduction in revenues in the second quarter of 2020
(compared with the same period in 2019). Pressing Solutions suffered a 43% reduction in
revenue in the first lock down quarter. A key customer who purchased £12m of steel, wrote
to Pressing Solutions on 20 March 2020 to "confirm a suspension of production in all UK
manufacturing facilities".

50. The steel plate manufacturer Liberty Dalzell had a reduction of 9% or £1.6m in revenue
during the second to fourth quarters of 2020. Merchant Bar who manufactured hot rolled
steel suffered a 14% reduction in the same period. And Liberty Newport who supplied hot
rolled coil suffered a 34% fall in revenue in this period.

51. As regards the wider market Mr Gupta states that the Companies suffered because of the slowdown in demand: "The automotive sector, which is a primary market for [the GFG Alliance]…was particularly badly affected during the initial phases of the pandemic and the impact continued to be felt through the whole of 2020."

52. LCL specialises in trading in base metals and steel products. He says turnover fell by 30% from the year ending 31 March 2020 to the year ending 31 March 2020; operating profits had been USD$8.1m and fell to USD$(17.6m) giving rise to a reduction in gross profit of 59%:

> "I attribute the decline in performance to the disruption that Coronavirus has caused to the global supply chain in the sectors in which LCL operates… In particular, it was apparent that many of LCL's customers had lost their ability to finance trades through banks as a result of Coronavirus. At various points in the supply chain, there will be a need for financing, which may be through a letter of credit, use of cash or payment by way of overdraft or term loan.  In 2020 we saw a huge reduction in the amount of global trade finance.  As a result, it was very difficult for counterparties to obtain new facilities or develop existing facilities.  Funders all became much more risk averse and looked to exit more volatile markets. In addition, banks and financiers across the board have been delaying the provision of new money until the pandemic eases.  The inability to travel has also meant that the interaction with banks and funds and finance providers reduced significantly."

53. He relies on certain articles such as a publication from the United Nations, Global Trade Review Report, the International Chamber of Commerce and others to support his statement that global trade reduced during the pandemic. He asserts [30]:

> "In relation to refinancing opportunities, Coronavirus has had a number of effects. Firstly, having been materially impacted by Coronavirus, the businesses within the GFG Alliance became, at the time, less attractive to financiers offering refinance than they were pre-pandemic. Secondly, the market crashed and refinancing per se was more challenging than it was pre pandemic. More recently, the markets have rebounded. Despite the very significant blow that was suffered during the Coronavirus crisis, the GFG Alliance's prospects of refinancing have recently improved and, in fact, progress is being made. However, had it not been for the pandemic that a refinancing would have been achieved considerably sooner."

54. And

> "Coronavirus has hindered opportunities for refinancing. LCL has experienced that the ability to attract new funds and even retain existing lenders was and remains difficult for reasons related to Coronavirus."

55. Citibank and the Companies rely on statements (with each party applying different emphasis on different passages) given to the Treasury Select Committee by Alexander Greensill. The Companies rely on the answer provided to Q104. The submission made is that the testimony of Mr Greensill to the Treasury Committee demonstrates that the "material reason for the loss of that insurance was the effect of the Pandemic on the credit insurance market. To put it another way, coronavirus was an indirect cause of the collapse of GCUK." Mr Greensill said to the Select Committee:

> "It is important also, if I can remind the Committee, that for the credit insurance market, Covid was an extraordinarily frightening time, when there was an expectation of very, very significant losses. Indeed, many Governments, including the British Government, announced support arrangements for credit insurers to try to help and encourage them to continue to provide capacity to the markets. So actually Tokio Marine [credit insurer] were not the only insurer to indicate that they would not renew, but in fact the others did renew, driven largely by concerns about regulation."

> "If I may, Ms Buchan, it strikes me that one of the key regulatory shortcomings shown by the failure of my firm—and to be clear, I take responsibility for the failure. But one of the key learnings is that the credit insurance regulation structure works in a countercyclical manner—that is, when the market turns down and the probability of defaults of businesses increases, in order for the solvency requirements of the insurer to be met, they must provide more capital, because the probability of default of the businesses they have insured goes up in a crisis. And that is what happened during Covid. So what happened was that many insurers either needed more capital to provide the same amount of cover or needed to cut cover in order to fit within the limited amount of capital that they had."

56. I am unable to accept this submission. It can be observed that Mr Greensill was not commenting specifically on the fate of GCUK nor was he saying that Tokio Marine was an insurer that required more capital to provide the same amount of cover or needed to cut cover. He was making a more general point about the effects of market shocks and how the insurance market operated. He makes no connection between Coronavirus and the refusal to renew the credit insurance to GCUK.

57. Mr Gupta (who in part relies on press releases) said in an interview to the Financial Times in early March 2021:

> "The crisis at Greensill comes amid a booming metals market, driven by a rebound in Chinese demand and optimism that the rollout of vaccines will allow the global economy to recover."

58. If the evidence has any weight, it is evidence of Mr Gupta's view that there was a "booming metals market" at the time GCUK lost its insurance, which would lead a reasonable observer to ask the reason for the Companies inability to obtain alternative financing.

59. In his witness statement [122] Mr Gupta comments that the insurer had become aware "of the extent of the future receivables GCUK purchased from GFG Alliance and it does not want to keep underwriting them…". It is an important statement. Mr Gupta is acknowledging that he was aware GCUK was not going to continue to underwrite future receivables. If GCUK had stopped underwriting, the Companies (and GFG Alliance) would have been exposed. It is apparent from the documentation that Mr Gupta knew, or has since the administration of GCUK, come to learn, that investigations into GCUK affairs led to insurance polices having been "reserved" from at least mid-2020. This is borne out by a letter to the Chair of the Treasury Committee from BCC Trade Credit Pty Ltd dated 18 June 2021:

> "Notwithstanding the above, as is clear from the Proceedings, BCC and TMNF did *by July 2020* and continuing through the remainder of 2020 start to develop particular concerns about Greensill which *made them very reluctant to provide any cover*. All rights under and in relation to any and all policies (purportedly) issued by BCC to Greensill have been reserved by BCC since that date. Other concerns as to the structure and placement of the purported insurances are also developing and in, this regard, our investigations are ongoing and we are observing the unfolding facts with interest under full reservation of rights. In the circumstances, no terms of cover could be agreed between Greensill and BCC Insurance or other regulatory requirements of the United Kingdom, and *general market conditions, were not significant factors* that BCC considered in taking the decision regarding coverage of Greensill…we cannot speculate as to the reasons that Greensill was unable to secure replacement or alternative coverage from other insurers."

60. Mr Greensill provided a witness statement dated 8 March 2021 in support of the application for an administration order to be made in respect of GCUK. The document is held on the court file and is in the public domain since it was read in open Court. He refers to a letter sent by Mr Gupta:

> "I understand from GFG's CEO, Mr Sanjeev Gupta, that GFG would almost certainly become insolvent if GCUK did not continue to provide financing for its future receivables. He confirmed this in a letter to BaFin, in the context of Greensill Bank's discussions with BaFin described below. This is a problem not only for the investors in receivables or receivable-backed assets linked to GFG entities, but also for GCUK itself which (i) is owed material fees by GFG, (ii) has taken GFG receivables onto its own balance sheet, and (iii) has a large contingent first loss deductible liability to TBCC of an estimated $484 million if claims were made by investors under the TBCC Policies following a default by GFG entities."

61. The letter is dated 7 February 2021:

> "This is the first such call for me and I was very troubled to hear the urgency of Greensill Ban to reduce their exposure to the GFG Alliance. The credit ban you have proposed would result in an immediate liquidity crisis for my Group – and almost certainly precipitate insolvency"

62. Mr Gupta is acknowledging in this letter that if GCUK purchased less receivables it "would result in an immediate liquidity crisis". The liquidity crisis foreseen by Mr Gupta became a reality. GCUK could not purchase any receivables from early March since it had stopped trading on 2 March. Mr Gupta says that either the collapse of GCUK did not cause the purported inability to pay debts as they fell due or the withdrawal of insurance to GCUK was a result of Coronavirus or that GCUK could not obtain alterative insurance because of Coronavirus. He says:

> "if there had been no Coronavirus the Companies would have continued to trade successfully with financing from GCUK or an alternative financer".

63. I comment that the statement is challenging evidentially as the words "continued to trade successfully" presuppose that the Companies had been trading successfully before Coronavirus, yet there is little evidence that this was the case, and I was not taken to evidence that supported the premise. This statement also works on the assumption that GCUK would not have reduced its exposure to the GFG Alliance or that alternative funders were a realistic prospect. The failure to provide evidence of GFG Alliance's financial strengths (and weaknesses) prior to the relevant period, evidence of how the Companies were reacting to the threat to GCUK's attempts to reduce its exposure, GCUK's own financial position or evidence of likely alternative funders is sufficiently stark to draw an adverse inference that the Companies were not trading successfully prior to March 2020 even with the support of GCUK.

64. To bolster the inference, I note that there are no recent audited accounts. The accounts for the year ending 31 March 2020 have not been filed in respect of SSUK; MDR has failed to file its accounts on time, with the last accounts having been filed for the year ending 20 June 2020 and the last filed accounts in respect of LCL is for the year ending 31 March 2020. Mr Gutpa gives evidence as to why the auditors have not completed relevant accounts and expresses the hope that the auditors will complete their task if refinancing (funding) is found.

65. In his second witness statement Mr Gupta returns to the theme of a global downturn in trade saying: "It is self-evident that the pandemic led to an unprecedented disruption of the global economy." He relies on reports produced from institutions such as the World Steel Association and the European Steel Association, commenting:

> "The pandemic had an 'existential' financial effect on both the supply and demand sides of the steel industry and the markets for steel products. In short, the pandemic caused both demand and supply shocks. Lockdowns in the UK (and worldwide) shut plants and hindered production. At the same time, demand for steel fell drastically. Travel bans and lockdowns caused demand

> for automobiles, aeroplanes and other products requiring steel for
> their manufacture, to plummet."

66.    In my judgment this is evidence I may properly have regard to.

67.    As regards GCUK's loss of insurance, critical to its business, third-party evidence has
       been produced from the insurance broker owned by Tokio Marine who refused to renew
       GCUK's insurance. The broker wrote to the Treasury Committee to express the view
       that "general market conditions, were not significant factors that [the broker] considered
       in taking the decision [rejecting] coverage for Greensill".

68.    In its sixth report of session 2020-2021, the House of Commons Treasury Committee
       recorded that Mr Greensill had "an over-reliance on insurance generally". It also
       recorded that the Deputy Governor of the Bank of England and CEO of the Prudential
       Regulation Authority told the Committee that "the reason that insurance is withdrawn
       is very rarely" linked to the "risk environment around them." He continued [60]:

> "I think that was the case here. My understanding is that Tokio
> Marine had a look at what was going on in the Bond and Credit
> Company in Australia, decided it did not like the look of it- it has
> been reported that one of the underwriters exceeded its limits; I
> have no way of verifying that- and pulled the plug. Its pretty
> obvious that is what happened."

69.    In his second witness statement Mr Gupta acknowledges this evidence which is against
       him. The evidence does not favour a finding that the withdrawal of insurance provided
       to GCUK was related to Coronavirus. However, he maintains, as he must, that
       Coronavirus affected GCUK's ability to obtain alternative insurance once it had lost it
       main insurer [50]:

> "I stand by what I said. I was simply making the point, from the
> perspective of a businessman living though the crisis, that it
> became more difficult to obtain or extend insurance, when
> insurers were looking more carefully at their current exposures."

70.    On the other hand, Mr Gupta accepts the inevitable conclusion that [51]:

> "the collapse of GCUK into administration and the cessation of
> funding from GCUK to the GFG Alliance without adequate time
> for the GFG Alliance to find a suitable alternative source of
> finance, has had a significant adverse financial impact upon the
> GFG Alliance."

71.    Mr Hudson is a certified accountant, licensed insolvency practitioner and a partner in
       the firm of Ernst & Young LLP. He has produced a witness statement for Citibank. He
       says he has extensive experience of restructuring and insolvency matters and was one
       of the Special Managers of British Steel Limited, giving him direct experience of an
       insolvency in the steel industry. He now leads the UK and Ireland restructuring team at
       Ernst & Young. Since March 2021 he has been assisting Credit Suisse Asset
       Management Switzerland in its capacity as portfolio manager for the Credit Suisse
       funds.

72.    There was some debate at the hearing as to the admissibility of his evidence. No permission was given by the Court for an expert report. In my judgment Mr Hudson's evidence does not fall within the purview of CPR Part 35 expert evidence. It was not commissioned as an expert report for the purpose of these proceedings. It would have been disproportionate to give permission for a CPR Part 35 expert to opine on the issues at this hearing. The evidence is tendered as evidence of fact and is relevant to the issues to be decided. The question initially arising was whether the admissibility of the evidence was to be governed by CPR Part 35. CPR 35.4(1) provides that "no party may call an expert or put in evidence an expert's report without the court's permission". An expert report will be governed by this Rule where it is a report that complies with CPR 35. 2(1).

73.    The maker of the statement, Mr Hudson, begins his written evidence:

> "I have been asked by Citibank to provide this witness statement as part of the proceedings related to the Petitions. In particular, I have been asked to address, in the light of the factual information available to me in the context of my role, and drawing on my extensive experience in restructuring and insolvency."

74.    The parties before me agree that the evidence of Mr Hudson is not governed by CPR 35. I am mindful that the Court should be astute not to admit an expert report into evidence unless permission has been granted. I am equally mindful that a label placed on the evidence by a party is not to be treated as definitive in answering whether the evidence tendered is expert evidence for the purpose of proceedings (and therefore inadmissible).

75.    The evidence of Mr Hudson comes very close to inadmissibility. It is clear from the opening paragraphs of his witness evidence that his evidence was produced for the "purpose of proceedings". It is given by an expert in his field and much, if not all, of the evidence is opinion based.

76.    At the end of the two-day hearing the parties agreed, I suspect taking a pragmatic approach, that the evidence of Mr Hudson was admissible pursuant to section 3 of the Civil Evidence Act 1972. It was agreed that the court may lend such weight to his evidence as is appropriate taking account of its nature. The evidence provides: (i) a useful account of financial information that may be helpful for the purpose of understanding the finances of the Companies. This part of the evidence is unlikely to fall within the category of expert evidence; and (ii) a technical assessment of the number and financial amount of note issuance made in the Covid period to determine receivables sold by the GFG Alliance: *Rogers v Hoyle* [2014] EWCA Civ 257; *Mondial Assisstance (UK) Limited* [2016] EWHC 3494. As there has been a concession I do not need to decide the issue of admissibility but in terms of the weight to give to this evidence it should not, in my judgment, be treated the same throughout. The evidence in respect of the financial information I lend more weight to since it could have been submitted without the evidence but the technical evidence, I lend less weight since it is more akin to expert opinion.

77.    Mr Hudson observes that no information has been provided as to how attractive the Companies were from a refinancing point of view. This goes to the heart of Mr Gupta's

claim that he would have been able to obtain alternative finance but for Coronavirus. The submission has been repeated by Citibank. There is no evidence of any substance supporting his attempts to obtain alternative financing and no evidence provided by an alternative finance house as to why any application for finance was rejected or has not been advanced.

78. From an inspection of the notes beneficially held by Credit Suisse, Mr Hudson analysed that if there had been the fall in revenue, as claimed by Mr Gupta, in the period to March 2021 (which would require a 3-4 year period to recover) that fall is not reflected in a reduction in the notes issued in the relevant period. As regards the concerns raised in respect of the insurance market, he searched publicly available information and could find no evidence to support Mr Gupta's statement that "insurers had to satisfy regulatory requirements to ensure that solvency margins were increased to cover the risk". As a matter of fact, there is no evidence that a "market-wide change was made to the rules and regulations governing the calculation of solvency margin requirements for insurers".

79. To put a little more flesh on the bones in respect of the note issuances, Mr Gupta provides counter arguments. He comments that the Companies have no way of analysing the information provided by Mr Hudson because GFG Alliance was not party to the communications between GCUK and Credit Suisse Management.

80. That submission fails to deal with the issue. Mr Hudson's evidence is that the Companies were not, during the relevant period, acting as if they were financially distressed thereby countering the argument that Coronavirus had 'a financial effect'. He reverse-engineers the financial outcome starting with information obtained by Credit Suisse, namely the notes issuance. The reverse engineering only works if there is a direct connection between the note issuances, the receivable sales and redemptions, and the Companies' operating revenues. The unchallenged evidence of Mr Hudson is that the sale of receivables is "driven by [the sellers] turnover/order book…and collection of receivables". There is logic to this analysis, that as sales increased so would the balance of receivables. Once receivables had been collected the balance would decrease. It is no answer therefore to claim that Mr Gupta could not examine his own books and records (meaning that of the Companies he owns and manages) to establish the accuracy of Mr Hudson's statement. In other words there appears to be a direct correlation between the sales of receivables and the notes issued.

81. In Mr Hudson's opinion there was no significant drop in issuance and no interruption to redemptions from March 2020:

> "the total volume of Notes issued in respect of the Note Programmes do not exhibit significant downward trends during the Coronavirus Period".

82. Significantly, it is said, the first missed redemption arose when GCUK ceased to trade.

83. In respect of whether Coronavirus had an effect in the sense of Paragraph 21(3) of Schedule 10 Mr Hudson says that Mr Gupta has failed to support his contention with any cogent financial evidence. He says it would be [29]:

> "necessary to compare the financial position and performance of a company as demonstrated by these materials immediately prior to, or as close as possible to, the Coronavirus period to its financial position and performance during the pandemic. As part of this analysis, it would also be necessary to compare a company's forecasted performance as prepared prior to the Coronavirus period (including underlying assumptions) with its actual financial performance during the pandemic."

84.     He provides a table that summarises what information had been provided by Mr Gupta in respect of each of the Companies:

  84.1.   SSUK: Actual revenue by month for the period April 2019-December 2020;

  84.2.   MDR: Actual revenue by month for the period April 2019 to December 2020 for five out of eight of the underlying receivable sellers; and

  84.3.   LCL: Information included in the profit and loss account for the financial years ending 31 March 2020 and 2021, including EBITDA information.

85. The table produced has not been attacked as being incorrect.

86. Citibank submits that a possible explanation for a lack of financial information is that insufficient information was generated by the Companies in the first place.

87. Interpreting the information provided by Mr Gupta, Mr Hudson observes:

  87.1.   The difference in revenues is not a reasonable basis to conclude that there was a financial effect in the relevant sense. A relative profit report for before, during and after the Coronavirus period would provide greater transparency.

  87.2.   The SSUK information shows that revenues increased by November 2020 compared with revenues in the prior year.

  87.3.   The MDR revenues relate to 4 of the 7 underlying sellers to the relevant note programme only.

  87.4.   The revenues in LCL reduced by about 30% between March 2020 and March 2021. No further detail is provided. Mr Gupta says the reduction was due to a loss in trade, however this reduction in revenue is not reflected by a reduction in note issuances during this period.

88. Mr Hudson says [39]:

> "whilst the revenue information provided for SSUK, [and] four of the Underlying Sellers to MDR Treasury and LCL supports that the entities achieved lower overall sales in the pandemic period for which information was provided, this information alone is not sufficient to conclude that Coronavirus was the cause of lower revenues or how revenue performance impacted the financial position of these Companies."

89.    In respect of the profit and loss information available Mr Hudson can see no correlation between the costs and revenues in the years 2020 and 2021. The market evidence referred to by Mr Gupta provides details of the effect of Coronavirus on "certain markets" but "none of the information provided specifically addresses any of the Companies."

90.    In relation to the suggestion made by Mr Greensill to the Treasury Committee that insurance was more difficult to obtain due to prevailing market conditions he disagrees. The solvency margin requirements or capital requirements of insurers had not risen by reason of regulatory changes due to Coronavirus and the European Insurance and Occupational Pensions Authority had not recommended an increase in solvency capital. Mr Hudson comments:

> "…With the exception of guidance relating to the reporting of solvency margin requirements neither I nor EY Insurance Partners are aware of guidance, recommendations or other publicly available communications issued by EIOPA with regards to amendment of the solvency margin requirements that were in place pre-Coronavirus pandemic. No change was made to the rules and regulations governing the calculation of solvency margin requirements itself. No requirement was expressed that EU insurers should increase the margin that they hold in excess of the Solvency Capital Requirement…in place pre-Coronavirus pandemic"

91.    His research informs him that the Australian Regulation Authority did not recommend solvency margin increases. He concludes that there was no apparent market-wide change made to the regulations or any rule governing solvency margin requirements.

**Reasonable belief held by Citibank when issuing the petitions (Paragraph 2 of Schedule 10).**

92.    The issue raised by the Companies is whether Citibank held a reasonable belief for stating that Coronavirus did not have a financial effect or that even if it did the Companies would be wound up in any event under section 123(1)(e) of the Insolvency Act.

93.    The Companies rely on the wording used in the petitions and in particular the statements in support of the three petitions as set out above.

94.    There is no argument that the belief is to be assessed on a subjective basis. The challenge is that given the matters relied upon to support a subjective belief that the conditions in Paragraph 2(4) of Schedule 10 were met, any such belief was not objectively reasonable. In oral submissions the Companies argued that it was not reasonable for Citibank to rely on press reports provided by Credit Suisse.

95.    I can dispose of this objection reasonably shortly. Most petitioners will not have actual knowledge of a debtor company's corporate governance. Save for the contractual or other arrangements that bind a creditor and debtor where obligations flow from the relationship, petitioners may reasonably be viewed as strangers to the affairs of the counterparty. This is particularly so where complex financial arrangements are in place.

Citibank knew that in the period March 2020 to 28 February 2021 the Companies had continued to trade and continued to pay debts owed.

96.     External reports were not the only basis upon which Citibank held the stated belief. It relied on a failure to meet demands made in early March 2021. That is to pay a debt pursuant to a contractual obligation the Companies had entered freely. That failure informed Citibank that the Companies could not pay their debts as they fell due. Prior to end of March 2021 Citibank obtained information about the Companies from various sources. It is apparent from the statements of Jillian Hamblin and Viola Japaul that Citibank knew that the receivables were sold to GCUK who provided supply chain finance to the Companies. And Citibank knew that this source of finance constituted "a primary source of working capital financing".

97.     Citibank knew that GCUK had entered administration in early March 2021 and had access to or knowledge of the "papers filed in relation to" the administration. Citibank would have learnt from those papers, if it did not know already, that GCUK relied on insurance, the insurance had not been renewed and GCUK ceased to trade almost immediately. The Companies defaulting at this time was too great a coincidence to ignore.

98.     It would have been apparent that no more receivables were being sold by the GFG Alliance to GCUK and no more financing would have been provided to the Company since Credit Suisse was involved in the transactional line. The evidence is that Mr Gupta had told "senior colleagues" at Citibank that he was not intending to make payments on financing facilities received from GCUK. The administration papers provided a rich source of information for Citibank. From this information Citibank would have learned of the exposure issue raised in the letter dated 7 February 2021(above). This information would of itself be sufficient to form a reasonable belief.

99.     Against this background it is not unreasonable to identify other sources of information such as reports that other significant sums were owed to other creditors; Mr Gupta was seeking advice on restructuring; GFG Alliance was trying to find new lenders to "prop up its business" and as at 26 March the "UK plants" were "on pause".

100.    In summary the knowledge that the Companies continued to trade and operate (save for short periods of lock down) during the Coronavirus period; knowledge that the Companies were heavily reliant on financing; the loss of the "primary source" of financing in early March 2021 and failure to meet demands made shortly after the collapse of GCUK together with the other external reports lead me to conclude it was reasonable for Petitioner to hold the belief specified in Paragraph 2(4) of Schedule 10.

**Did it appear that Coronavirus had an effect (Paragraph 5(1) of Schedule 10)**

101.    Did Coronavirus appear to have a financial effect on the Companies as defined by Paragraph 21(3) of Schedule 10?

102.    The Companies primarily rely on:

102.1.   The two statements given by Mr Gupta;

102.2.   Reports on the effects of Coronavirus on world markets;

102.3.   Reports on certain industries related to or not related to the Companies; and

102.4.   Revenue reports from the Companies to December 2020.

103.   The facts known and not in dispute are that SSUK's Steel & Bar operation based in Rotherham shut down for four weeks in April 2020 and liquid steel production had reduced by some 40% between April and August 2020 compared with the same period a year earlier.

104.   Another division of SSUK, High-Value Manufacturing based in Stocksbridge reported despatches of 32% less than the same period a year later. Revenue dropped by 26% between April to December 2020 (year on year).

105.   MDR, the special purpose vehicle for entering financial arrangements with GCUK is said to have been in such a position that it would have suffered financially if the underlying sellers suffered. They experienced a reduction of revenue of 25% in the second half of 2020. The Companies point to a fall in revenues many underlying sellers including Pressing Solutions that supplied aluminium and other steel products to the car industry. One of its key customers was Jaguar Land Rover Limited which itself suspended operations for a short period.

106.   LCL, the base metal trading company, reported a 30% reduction in turnover feeding *pre-tax losses of USD$17.6m* where in the previous year it had pre tax profits of USD$ 8.8m.

107.   Citibank accepts that in principle the loss of an existing financier (GCUK) if caused by Coronavirus could have a financial effect within the meaning of Paragraph 21(3) of Schedule 10. That was a proper concession.

108.   The Companies submit that the evidence produced has gone further than is required to satisfy the relevant threshold. The Companies have provided detailed evidence relating to the effect of the pandemic on the markets on which they operate, their revenue and operations.

109.   Citibank argues that the court has insufficient evidence to make the leap from a downturn in revenues to the required financial effect.

110.   I accept the submission that there is little specific information about the Companies' financial position to make an assessment about the extent of impact of Coronavirus on their fortunes. That is generally unsatisfactory where there has been ample time to ensure good quality evidence is available: the petitions were presented 14 months ago, the parties were given permission to put in evidence and there have been adjournments made by consent.

111.   Nevertheless, the threshold test is sufficiently low for me to have regard to the external evidence, the evidence that lockdowns prevented trade, consequential closures of factories and supply chain issues.

112.   In my judgment it follows that it does "appear" that Coronavirus had a financial effect on the Companies in the period March 2020 to December 2020 with depressed revenues and in the case of LCL losses. The gap in financial information in the period December 2020 to March 2021 raises serious concerns but I am prepared to accept that it (just) "appears" from the evidence that the financial affairs of the Companies became worse as a result of Coronavirus in the period March 2020 to March 2021.

**Coronavirus causing the Companies inability to pay its debts as they fall due (Paragraph 5(3))**

113. Although Mr Gupta has demonstrated that the Companies suffered financially by reason of factory closures and demand reductions (some more temporary than others) the starting point must be, but for Coronavirus the Companies are viable businesses. In the absence of evidence to support viability but for the defined financial effect it is not safe to reach this conclusion in their favour. The court should not be left to make inferences of fact where evidence of fact is in the control and custody of the Companies and has not been disclosed or tendered in evidence.

114. I make the following specific observations:

114.1. Accepting, as I do, that Coronavirus caused Rotherham to shut down and the shutdown caused a loss of revenue over a four-week period, there is no causal link between that loss of revenue between April and August 2020 and the inability to pay the debts specified in the petition presented nearly a year later.

114.2. The drop in revenue of 26% at the Stockbridge plant in the period April to December 2020 is not linked by evidence to have caused SSUK to be unable to pay its debts as they fell due in March 2021.

114.3. Revenue started increasing by November 2020.

114.4. Mr Gupta accepts in his evidence that world crude steel production had increased by 15.2% March 2021 [World Steel Association data] and was set to "rebound" in 2021 [Economic and Steel Market Outlook].

114.5. The assertion that GCUK's administration was caused by the Coronavirus is not supported by: (1) the evidence of Mr Greensill in support of the application for an administration order where he expressly referred to the loss of credit insurance covering USD$4.6 billion of receivable assignments or sales; (2) the proposals to creditors produced by the administrators (or the later report); (3) the testimony given to the Treasury Committee as recorded in "Lessons from Greensill Capital" published on 20 July 2021; or Mr Gupta's own statement (paragraph 122-123).

114.6. There is insufficient or no evidence to connect a financial effect of Coronavirus with the inability of GCUK to obtain USD$4.6 billion credit insurance from alternative sources.

114.7. In respect of the MDR petition, Mr Gupta's evidence is that its affairs are "inextricably linked and correlate with the affairs of the underlying sellers." He says that a major steel purchasing sector (car manufacturers) saw a decline in production (in the UK) of nearly 30% in 2020. That decline is "primarily attributable to the impact of coronavirus". The source of this information is an article in SMMT News, an online website. His assertion is weakened if he intends to rely on this report to convey that Coronavirus was a sole or major reason for decline. The article reads:

> "Manufacturing operations were severely disrupted throughout 2020, with lockdown and social distancing measures restricting factory output, *Brexit uncertainty continuing until Christmas Eve*

**CRK-2/1992**

[2020] and *depressed market demand in key export destinations*." (emphasis added)

114.8. A comparison of revenues in the second to fourth quarter of 2020 with the year before, provides some interesting context, and could lead to an inference that the loss of revenues may equate to a loss of profits. Mr Gupta does not give evidence about this connection. If a company's revenue declines it could mean that profits also fall but that is not inevitable if overheads fall at the same rate. If a company has high revenues but is unable to pay its debts as they fall due from the profits gained from the revenues it will make little difference that the revenues and overhead reductions fall at the same or differential rates unless the overheads fall to such an extent that the business turns a profit. The evidence of Mr Gupta is that Pressing Solutions made 42% of its employees redundant in the year March 2020 to March 2021. That would have reduced overheads, but there is no link made in the evidence to what difference these events had on the profit line of MDR.

114.9. There is an evidential gap linking the ground for winding up and the defined financial effect.

114.10.   LCL also provides finance for purchases by extending credit or providing loans. Mr Gupta's evidence is that LCL is still trading and paying salaries, but the level of activity has reduced significantly. Evidence of a causal link between "a financial effect" and the ground in the petition is absent.

114.11.   Mr Gupta's evidence is that revenue dropped by 30% year on year (to March 2021). He goes on to say [92-93]:

> "Further, LCL experienced a drop in profitability at a gross profit level. The gross profit as at 31 March 2020 was approximately USD $87.3m whereas the gross profit as at 31 March 2021 was USD$32.5m. This equates to a drop in gross profit of 59%...I believe that most of LCL's customers will have been adversely impacted by coronavirus, although I do not have first-hand knowledge of the financial performance of those businesses"

114.12.   His evidence is that LCL operates in a market that is "heavily dependent on financing solutions" and "without finance" a trader cannot purchase, ship and deliver the commodities. He relies on a United Nations publication; the Global Trade Review Report that predicted a 13-21% drop in world trade in 2020; a International Chamber of Commerce article and podcast; and an OCED article dated 23 March 2021. He obtained a CILBIL scheme loan from GCUK where the lending limit was not to exceed 20% of losses. This would have placed more reliance on GCUK as the lender or main lender to LCL at a time when GCUK was seeking to reduce its exposure.

114.13.   Mr Gupta's evidence is that Coronavirus "hindered opportunities for refinancing". The context to this statement is important. First it suggests that refinancing was required. Secondly, that LCL attempted to obtain alternative finance when GCUK entered administration. Thirdly, that Coronavirus effected LCL's ability to obtain alternative finance at that point in time (March 2021). The evidence to support the first, second or third matters mentioned is also absent. As regards contemporaneous documentary evidence, Mr Gupta relies on an exchange of e-mails in the period

November 2019 (prior to Coronavirus) to November 2020 (prior to the collapse of GCUK). The e-mail exchange does evince a willingness of BMCE to provide finance.

114.14.   Prior to the Coronavirus period Liberty Steel had made an application for a facility "renewal" [email 27 November 2019]. A reference to "renewal" infers that there was an existing facility. It is evident from the e-mail exchange that there was little progression between November 2019 and March 2020. There were further delays after March 2020, some attributable to vacation. It can be said that the e-mail exchange provides evidence that Coronavirus caused some delay to the process; it cannot be said that Coronavirus was the only cause of delay.

114.15.   The e-mail exchange does not inform the court about whether the application for "renewal" was made in a timely manner. It does not explain if the facility was in fact renewed. There is no evidence from the exchange that BMCE withdrew any facilities whilst the renewal process took its course. If the facility was not renewed there is no evidence that Coronavirus was a cause of the refusal.

114.16.   I note that Mr Gupta has said that the reason for not producing more focussed financial information is due to his view that it is "unlikely to materially assist the Court in determining the effect of coronavirus on the Companies". He says that more detailed financial information is in draft form only or has been prepared for "internal management purposes only". As far as the state of the financial information is concerned, even if it is in draft form or prepared for internal management purposes, I do not see why that should prevent it being placed before the Court to support his assertions. He chose not to do so.

115.   Having made those observations, I consider the counterfactual. It is known that GCUK was the primary source of funding/working capital for the Companies. Prior to administration GCUK was seeking to reduce its exposure to the Companies. The Companies say they were seeking alternative finance but failed to obtain it. In February 2021 Mr Gupta acknowledged in open correspondence that the Companies faced a "challenge…in our funding concentration with Greensill" and was "troubled to hear the urgency of Greensill Bank to reduce their exposure to the GFG Alliance." In the same letter he stated: "the business is currently cashflow positive and in a relatively strong position". The phrase "relatively strong position" I read as meaning that the "current" position was "strong" relative to other times. The phrase he chose to use is an indicator that Coronavirus did not precipitate an inability to pay debts as they fell due as at February 2021. Importantly Mr Gupta acknowledged that a withdrawal of credit finance would "certainly precipitate insolvency". When asking the Paragraph 5(3) question, this evidence carries significant weight due to the named author and its contemporaneous quality.

116.   It is known that prior to administration of GCUK the Companies continued to sell receivables and received financing. The evidence supports a finding, which I make on the balance of probabilities, that GCUK was "urgently" seeking to reduce its exposure to the Companies because that exposure threatened its ability to obtain insurance and without insurance GCUK could not survive.

117.   Having regard to the evidence in the GCUK administration, the evidence of Mr Greensill and insurance industry evidence, it is more likely than not that GCUK collapsed not because of Coronavirus, but because it was no longer able to obtain credit insurance as a result of

its concentration of business with the GFG Alliance. Looking at the factual matrix from the other end of the telescope, there is scant, if any, evidence that Coronavirus was the cause of its collapse.

118. After administration the Companies sold no receivables and received no credit finance.

119. The Companies were unable to attract an alternative financier in the period before the presentation of the petitions. There is no substantial evidence provided by the Companies that Mr Gupta provided alternative funding providers with sufficient information to make financing an attractive proposition.

120. The Companies failed to meet the demands made.

121. In my judgment it is legitimate, in the context of this case, to have regard to what has happened since the demise of GCUK. As Lord Scott pointed out in *Phillips v Brewin Dolphin* [2001] UKHL 2 [26]:

> "Where the events, or some of them, on which the uncertainties depend have actually happened, it seems to me unsatisfactory and unnecessary for the court to wear blinkers and pretend that it does not know what has happened. Problems of a comparable sort may arise for judicial determination in many different areas of the law. The answers may not be uniform but may depend upon the particular context in which the problem arises".

122. Counsel did not dispute the legitimacy of taking advantage of hindsight. Taking off the "blinkers" the Court has the advantage of 20:20 vision and see that the Companies have been unable to attract alternative financing arrangements for the last 14 months.

123. It is more likely than not that the reason for not securing alternative finance is a failure to produce financial information to a funder to support finance; it being known that there are no audited accounts and if there are any cashflows or management accounts they are not available or in a satisfactory condition to be used in evidence in this case. Mr Gupta acknowledges that all its financial information is in draft form only some 14 months or more after GCUK collapsed.

124. Any financial information that has been seen by alternative funders (such as the UK Government) has been characterised as opaque (as stated in the Business, Energy and Industrial Strategy Committee Report, "Liberty Steel and the Future of the UK Steel Industry", published on 5 November 2021). That report states that there are creditors "which nobody has got to the bottom of".

125. In my judgment having regard to (i) the loss of revenues the Companies are said to have experienced due to Coronavirus; (ii) the unavailability of financial evidence to support the contention that a "financial effect" caused the Companies to be unable to meet the demands made in March 2021; (iii) the pressure GCUK was under due to its unusually high exposure to risk as a result of its trading relationship with the GFG Alliance; (iv) GCUK's reliance on insurance to back the receivable sales; (v) the insurer's refusal to renew GCUK's insurance; (vi) there being no evidence to support a systemic shock to the insurance market that forced increases to capital requirements; (vii) the

acknowledgment of Mr Gupta that liquidity issues would immediately arise if GCUK no longer provided the GFG Alliance with finance and (viii) the timing correlation of the collapse of GCUK and the failure of the Companies to meet the demands made, I find that there was no causal link between the ground for winding up and 'a financial effect' on the Companies as defined in Schedule 10. I am satisfied that the ground relied upon for winding up would have arisen even if Coronavirus had not had an effect.

126. As at the date of this hearing the demands made on the Companies over a year ago have not been met. I find, in accordance with the CIGA PD that it is likely that a winding up order will be made.

## Conclusion

127. In conclusion, Citibank succeeds on the Paragraph 2 of Schedule 10 issue. The Companies succeed in respect of the Paragraph 5(1) issue so that "paragraph 5 applies".

128. In respect of Paragraph 5(3) I am satisfied that the ground specified in section 123(1) (e) of the Insolvency Act 1986 (it is proved to the satisfaction of the court that the company is unable to pay its debts as they fall due) would apply even if Coronavirus had not had a financial effect on the Companies.

129. I shall give directions for the petition to be heard in open court and give Citibank permission to advertise.

130. As a matter of open justice creditors supporting or opposing the winding up are entitled to notice so that they may decide whether to attend and support or oppose a winding up order.

131. The Companies have submitted that they have arguments to deploy to the effect that there is a substantial dispute in respect of the sums said to be due under the demands form the basis of the petitions. I invite the parties to (a) agree directions for the exchange of evidence in respect of the argument that there is a substantial dispute (b) agree other consequential directions and (c) agree a time estimate for determination of the challenge so it may be set down at the earliest opportunity.