# EXHIBIT 37



# House of Commons

## Business, Energy and Industrial Strategy Committee

# Liberty Steel and the Future of the UK Steel Industry

## Fourth Report of Session 2021–22

*Report, together with formal minutes relating to the report*

*Ordered by the House of Commons
to be printed 2 November 2021*

**HC 821**
Published on 5 November 2021
by authority of the House of Commons

**CRK-2/1690**

## Business, Energy and Industrial Strategy Committee

The Business, Energy and Industrial Strategy Committee is appointed by the House of Commons to examine the expenditure, administration and policy of the Department for Business, Energy and Industrial Strategy.

### Current membership

Darren Jones MP *(Labour, Bristol North West)* (Chair)

Alan Brown MP *(Scottish National Party, Kilmarnock and Loudoun)*

Judith Cummins MP *(Labour, Bradford South)*

Richard Fuller MP (*Conservative, North East Bedfordshire)*

Ms Nusrat Ghani MP *(Conservative, Wealden)*

Paul Howell MP *(Conservative, Sedgefield*)

Mark Jenkinson MP *(Conservative, Workington)*

Charlotte Nichols MP *(Labour, Warrington North)*

Sarah Owen MP *(Labour, Luton North*)

Mark Pawsey MP *(Conservative, Rugby)*

Alexander Stafford MP (*Conservative, Rother Valley)*

### Powers

The Committee is one of the departmental select committees, the powers of which are set out in House of Commons Standing Orders, principally in SO No 152. These are available on the internet via www.parliament.uk.

### Publication

© Parliamentary Copyright House of Commons 2021. This publication may be reproduced under the terms of the Open Parliament Licence, which is published at www.parliament.uk/site-information/copyright-parliament/.

Committee reports are published on the Committee's website at www.parliament.uk/beis and in print by Order of the House.

### Committee staff

The current staff of the Committee are Dawn Amey (Committee Operations Manager), Zereena Arshad (Committee Specialist), Gary Calder (Media Officer), Dr Rebecca Davies (Clerk), John Hitchcock (Committee Specialist), Catherine Kisanji (Committee Specialist), Becky Mawhood (Senior Committee Specialist), Catherine Meredith (Second Clerk), Lily Stoker (Committee Specialist), Louise Whitley (Senior Committee Specialist), and Sue Wrightman (Committee Operations Officer).

### Contacts

All correspondence should be addressed to the Clerk of the Business, Energy and Industrial Strategy Committee, House of Commons, London SW1A 0AA. The telephone number for general enquiries is 020 7219 4494; the Committee's email address is beiscom@parliament.uk.

You can follow the Committee on Twitter using @CommonsBEIS

# Contents

**Summary**                                                                    **3**

**1   Introduction**                                                           **5**
     Our inquiry                                                                6

**2   Liberty Steel UK and GFG Alliance**                                      **8**
     Collapse of Greensill Capital                                             8
     Corporate Governance                                                      10
     Audit                                                                     12
     Government rejection of funding for Liberty Steel UK                      16

**3   Supply Chain Finance**                                                   **19**

**4   Coronavirus Large Business Interruption Loans Scheme**                   **25**

**5   Challenges and opportunities facing the UK steel industry**             **29**
     Energy prices                                                            30
     Public procurement                                                       36
     Trade                                                                    42
     Decarbonisation                                                          46

**6   The future of the UK steel industry**                                   **55**

**Conclusions and recommendations**                                           **62**

**Annex A: Glossary**                                                         **68**

**Annex B: List of Liberty Steel UK sites**                                  **71**

**Formal Minutes**                                                           **73**

**Witnesses**                                                                **74**

**Published written evidence**                                               **75**

**List of Reports from the Committee during the current Parliament**          **76**

**CRK-2/1692**

# Summary

Liberty Steel UK is one of six major steel companies in the UK and is controlled by GFG Alliance. The company was previously funded using supply chain finance provided by GFG Alliance through funds received from Greensill Capital. On 8 March 2021 Greensill Capital collapsed, removing GFG Alliance and Liberty Steel UK's primary source of funding, calling into question the financial viability of Liberty Steel UK and putting thousands of jobs at risk.

Corporate governance and financial arrangements within GFG Alliance are controlled by Sanjeev Gupta who makes strategic decisions through a central treasury and central committee. This structure means that members of staff within his businesses are prevented from performing their roles and duties adequately. A number of audit and corporate governance red flags became clear during this inquiry. Witnesses agreed that the audit of Liberty Steel UK businesses by audit firm King & King posed risks to the businesses including a lack of capacity to complete audits effectively. The frequent changing of accounting deadlines and the resignation of auditors also raised red flags. Furthermore, witnesses disputed GFG Alliance's assertion that its complex structure is usual for a family-owned group of businesses.

In March 2021, the Business Secretary rejected GFG Alliance's request for a £170 million grant for Liberty Steel UK businesses due to opacity around corporate governance. We commend the decision to reject this grant and urge the Government to consider formalising a fit and proper person test for private company directors within any future steel sector deal. Both Greensill Capital and GFG Alliance described a concentration risk (a high percentage of lending to a single customer) in relation to their respective companies which could have played a role in the collapse of Greensill Capital and the subsequent financial difficulties within GFG Alliance and Liberty Steel UK. A number of high-risk financial practices were used by GFG Alliance and Greensill Capital such as future receivables, a form of financing where funds are extended based on an expectation that a future invoice will be issued. The use of any high-risk financial practices is at odds with the requirements of any future steel sector deal. While we are aware of Liberty Steel UK's recent refinancing efforts, we do not agree with Sanjeev Gupta's decision to set up another corporate entity in order to fund these companies.

On 3 April 2021, the Coronavirus Large Business Interruption Loans Scheme (CLBILS) was launched. The scheme was administered through the British Business Bank and gave large businesses access to finance such as loans. Greensill Capital loaned £350 million in Government-backed loans to Liberty Steel UK companies. GFG Alliance had been treated as a single group, therefore, Greensill Capital's lending was £300 million above the lending limits applicable to it. An investigation by the British Business Bank is currently underway into the misuse of these loans and the guarantees have been suspended.

The leadership of Liberty Steel UK has highlighted the vulnerability of an industry described as a national strategic asset and a foundation industry, due to its importance to the manufacturing and construction sectors, among others, including defence. The

second part of our report begins with the premise that the UK cannot afford to lose this vital industry and examines the current health of the sector together with the opportunities and challenges it faces.

We found an industry still grappling with many of the same challenges it faced in the lead-up to the 2015–16 steel crisis and that the Government's rhetoric on the strategic importance of steel has not been matched by sufficiently supportive policy. UK steel producers are still facing some of the highest energy prices in Europe and this disparity has been transformed into an immediate crisis due to the recent surge in gas prices. We recommend that the Government take action to reduce this disparity and emphasise that any short-term bailout must not be at the expense of sustainable, long-term reductions in costs for UK producers to enable them to compete on a level-playing field with producers on the continent.

The Government is a major buyer of steel but we found that UK steel producers are still encountering barriers when attempting to supply into public projects. We recommend a range of measures are taken to drive up the public procurement of steel, including updates to the procurement policy note, a requirement for all Government projects to fully report on the value and origin of their steel requirements and setting minimum UK steel content targets for major public projects such as HS2.

As a significant contributor of greenhouse gas emissions, decarbonising the steel industry will be an important part of meeting the Government's target to bring all greenhouse gas emissions to net zero by 2050 and to cut emissions by 78% by 2035. However, while there exist a range of options for decarbonising the steel industry we found that the sector is holding off on investing in these technologies without certainty and direction from Government. We recommend that the Government step up its efforts to provide a supportive policy environment to enable the industry's transition to a low carbon future.

The UK steel industry cannot continue to lurch from crisis to crisis. Decarbonisation presents a unique opportunity to realign the sector and many of the industry's wider challenges will need to be addressed to enable the transition to net zero. We see this as a pivotal opportunity to set the industry on the path to a viable and sustainable future and call on the Government to establish a Sector Deal which will address long-running challenges to the sector's competitiveness as part of a cohesive plan for decarbonising the industry.

# 1   Introduction

1.    Liberty Steel is the third largest steel producer in the UK, employing over 30,000 people worldwide and 3,000 in the UK.[1] On 8 March 2021, following months of speculation about its financial viability, the supply chain finance firm Greensill Capital filed for insolvency.[2] As the principal financial backer of GFG Alliance, the owner of Liberty Steel, this put 5,000 UK jobs in the steel industry and related industries at risk.[3] As a consequence of this collapse, the UK taxpayer was also reported to be exposed to more than £1 billion of debt via three Government guarantees, including a state-backed COVID-19 lending scheme, which enabled Greensill Capital to advance hundreds of millions of pounds to companies linked to GFG Alliance.[4]

2.    On 28 March 2021, the UK Government rejected a request from Sanjeev Gupta, Executive Chairman of GFG Alliance, for £170 million in financial support for Liberty Steel. Rt Hon Kwasi Kwarteng MP, the Secretary of State for Business, Energy and Industrial Strategy, cited concerns over the corporate governance arrangements and opaque accounting procedures at GFG Alliance as reasons for rejecting the loan.[5] This highlighted the potential risks posed to UK industry by high-risk financing methods.[6]

3.    The vulnerability of Liberty Steel further exposed the fragility of an industry already struggling with threats to its viability and facing long-term decline in the UK. The history of the steel industry and the ongoing challenges it faces are well documented, including by our predecessor Committee in its 2015 report *The UK steel industry: Government response to the crisis*.[7] At its peak in 1970, the UK produced 28.3 million tonnes of steel,[8] four times as much as it did in 2019 (prior to the COVID-19 pandemic).[9] Today, the UK produces less steel than at any time since the early 1930s,[10] and is currently the twenty-third largest producer of steel in the world.[11] Commentators have suggested that the industry has yet to fully recover from a period of crisis in 2015–16 in what was described as a "perfect storm of falling prices and high costs."[12]

4.    The 2015–16 steel crisis began in July 2015 with the announcement by Tata Steel of job cuts at its plants in South Yorkshire and the West Midlands, due in part to the pressure of "cripplingly high electricity costs."[13] In September 2015, Sahaviriya Steel Industries (SSI), the second biggest steel producer in the UK at the time, announced they would be

---

1      Liberty Steel Group, LIBERTY Steel United Kingdom

2      Reuters, Greensill Capital files for insolvency, administrators appointed, 8 March 2021

3      BBC, Fears for 5,000 UK steel jobs as lender collapses, 8 March 2021

4      Financial Times, UK taxpayer exposed to Gupta and Greensill via £1bn debt guarantees, 12 March 2021

5      Reuters, UK ministers reject Sanjeev Gupta's bailout plea, 28 March 2021

6      Financial Times, Risk specialists draw lessons from Greensill saga, 15 April 2021

7      Business, Innovation and Skills Committee, The UK steel industry: Government response to the crisis, First Report of Session 2015–16, 21 December 2015, page 3

8      ONS, Updated: The British steel industry since the 1970s, Steel production in Great Britain, 1900 to 2015, 18 January 2016

9      World Steel Association, Steel Statistical Yearbook 2020 concise version, 4 December 2020, page 1

10     In the late 1960s the UK was the fifth largest producer of steel in the world. By the 1980s the UK was around the tenth largest producer and by 2015 it was the eighteenth. See: House of Commons Library, UK Steel: Decades of decline, 18 December 2017ONS, Updated: The British steel industry since the 1970s, Steel production in Great Britain, 1900 to 2015, 18 January 2016

11     World Steel Association, World Crude Steel Production, 27 January 2020

12     Financial Times, UK steel hit by perfect storm of falling prices and high costs, 29 September 2015

13     BBC, Tata Steel announces 720 job cuts, 16 July 2015

mothballing their plant in Redcar on Teesside[14] and the company went into liquidation in October 2015.[15] The same month, Caparo Industries[16] went into administration[17] and Tata Steel announced it would be cutting its workforce at Scunthorpe, Clydebridge and Dalzell.[18] Following further announcements of job cuts and reports that the site at Port Talbot was losing £1 million a day,[19] Tata Steel ultimately sold its long products division for a nominal £1 to Greybull Capital[20] and its Speciality Steels business based in South Yorkshire to Liberty House for £100 million.[21]

5.    Recent developments at Liberty Steel have re-focused attention on the industry's long-term prospects in the UK. The sector faces an uncertain future and is grappling with rising gas prices and questions about its financial sustainability. It must now also grapple with the specific challenges it faces in order to meet the Government's target to reach net zero emissions by 2050[22] and a 78% reduction in emissions by 2035.[23]

## Our inquiry

6.    On 27 April 2021, we launched an inquiry into Liberty Steel and the future of the UK steel industry. While the immediate 'crisis' prompted by the collapse of Greensill Capital raised serious questions about the financing of the steel industry, it also exposed the longer-term and strategic challenges faced by the sector in the UK and raised questions about the Government's approach to and support for the steel industry.

7.    Our inquiry therefore focused on two key themes. First, on the specific and immediate issues directly related to the collapse of Greensill Capital and the relationship between Greensill Capital, GFG Alliance and Liberty Steel. We also considered the extent of financial support offered by the UK Government to companies linked with GFG Alliance as part of the Government's Coronavirus Business Interruption Loan Scheme (CBILS) and Coronavirus Large Business Interruption Loans Scheme (CLBILS).

8.    The high-profile collapse of Greensill Capital and its implications have been the subject of detailed analysis and scrutiny by several Select Committees.[24] We explore the financial details only in so far as they raise broader questions around financing and support for the UK steel industry and securing its future prospects, which was the central focus of this inquiry.

---

14    Financial Times, SSI mothballs Redcar steel plant with loss of 1,700 jobs, 28 September 2015

15    BBC, Redcar steelworks: Owners SSI go into liquidation, 2 October 2015

16    Much of which was later purchased by Liberty House. See: Liberty Steel Group, Sanjeev Gupta's Liberty House secures another UK steel plant; protecting jobs and pensions, 3 July 2017

17    Financial Times, Caparo Industries becomes latest victim of steel crisis, 19 October 2015

18    BBC, Tata Steel 'set to cut 1,200 jobs', 16 October 2015

19    BBC, Tata Steel confirms 1,050 job cuts, 18 January 2016

20    Guardian, Tata Steel deal saves 4,400 jobs in UK, 11 April 2016

21    Financial Times, Tata sells speciality steel to Liberty House for £100m, 9 February 2017

22    Department for Business, Energy and Industrial Strategy, UK becomes first major economy to pass net zero emissions law, 27 June 2019

23    Department for Business, Energy and Industrial Strategy, UK enshrines new target in law to slash emissions by 78% by 2035, 20 April 2021. The Government's Industrial Decarbonisation Strategy, published on 17 March 2021, explicitly acknowledges the specific pressures faced by iron and steel in this regard due to its highly specialised processes. See: HM Government, Industrial Decarbonisation Strategy, 17 March 2021, page 141

24    See: Treasury Committee, Lessons from Greensill Capital, Sixth Report of Session 2021–22, 20 July 2021; Public Accounts Committee, Lessons from Greensill Capital; and Public Administration and Constitutional Affairs Committee, Propriety of governance in light of Greensill

9.   The second part of this inquiry takes a broader view of the steel industry in the UK and the long-term and strategic challenges it faces. Drawing on our recent major report on industrial policy[25] we considered how Government should best support this major foundational industry as it navigates a series of complex challenges, including the significant changes required to meet the Government's net zero ambitions.

10.   Shortly after we announced our inquiry, on 4 May 2021, the Serious Fraud Office (SFO) announced its investigation into suspected fraud, fraudulent trading and money laundering in relation to the financing and conduct of GFG Alliance businesses, including its financing arrangements with Greensill Capital. This investigation is ongoing.[26] On the same day, the Financial Conduct Authority (FCA) also confirmed that it was formally investigating matters relating to Greensill Capital in the UK, stating that several allegations had been made in the press regarding the circumstances of Greensill Capital's failure, some of which are potentially criminal in nature. This investigation remains ongoing.[27]

11.   We invited both Lex Greensill, Founder and CEO of Greensill Capital, and Sanjeev Gupta to give oral evidence to our inquiry. Mindful of the SFO and FCA investigations, we sought to question Mr Greensill on some of the broader issues and their application to the steel industry, including the use of publicly funded loans, audit, corporate governance and supply chain finance.[28] Mr Greensill declined our invitation on the basis that he would not be able to comment directly on GFG Alliance or Liberty Steel, along with concerns around prejudicing an ongoing SFO investigation into GFG Alliance.[29] While Mr Greensill gave evidence to the Treasury Select Committee in May earlier this year[30] it is unfortunate that Mr Greensill did not take the opportunity to address serious questions around how the steel industry is financed or Greensill Capital's role in events at Liberty Steel. Although Mr Greensill responded to our request in writing, he did not otherwise engage with our inquiry.

12.   Despite previous commitments to attend, Mr Gupta also notified us that he would be declining our invitation a few days before he was due to give evidence.[31] We wrote to Mr Gupta with a series of detailed questions around corporate governance, lending practices and the use of taxpayer-backed funding within GFG Alliance,[32] and received his response in early August.[33]

13.   In July we visited Tata Steel Port Talbot and Liberty Steel Newport to observe the steelmaking process, meet with steelworkers and hold discussions on the current state of the industry. We are grateful to both companies for facilitating these visits and all those who provided oral and written evidence to our inquiry.

25    Business, Energy and Industrial Strategy Committee, Post-pandemic economic growth: Industrial policy in the UK, First Report of Session 2021–22, 28 June 2021; and Business, Energy and Industrial Strategy Committee, Post-pandemic economic growth: Industrial policy in the UK: Government Response to the Committee's First Report of Session 2021–22, Sixth Special Report of Session 2021–22, 23 September 2021

26    Serious Fraud Office, SFO confirms investigation into Gupta Family Group Alliance, 14 May 2021

27    Treasury Committee, FCA Response regarding Greensill Capital, 4 May 2021

28    Correspondence from the Business, Energy and Industrial Strategy Committee, 16 June 2021

29    Correspondence to the Business, Energy and Industrial Strategy Committee, 30 June 2021

30    Treasury Committee, Oral evidence: Lessons from Greensill Capital, 11 May 2021

31    Correspondence to the Business, Energy and Industrial Strategy Committee, 1 July 2021

32    Correspondence from the Business, Energy and Industrial Strategy Committee, 13 July 2021

33    Correspondence to the Business, Energy and Industrial Strategy Committee, 3 August 2021

# 2   Liberty Steel UK and GFG Alliance

14.   Liberty Steel UK is one of six major steel companies in the UK, alongside British Steel, Celsa, Forgemasters, Outokumpu, and Tata Steel.[34] As at 2018, Liberty Steel UK had the fifth largest output, producing 212,000 tonnes per year.[35] In terms of employment, of the 33,400[36] steel workers in the UK, 2,100 are employed by Liberty Steel UK.[37] Liberty Steel UK operates 11 sites across England, Scotland and Wales.[38] These UK sites are collectively known as the Liberty Steel UK business, a list of which is attached in Annex B.[39] Liberty Steel UK specialises in high-end alloys, stainless and carbon steels and its products are primarily used in the aerospace, oil and gas, industrial engineering and automotive industries.[40] It also specialises in what it calls GREENSTEEL - low carbon steel produced by recycling and upcycling scrap steel with locally sourced materials and resources using electric arc furnaces powered by renewable energy.[41]

Gupta Family Group Alliance (GFG Alliance) is a group of global steel and mining businesses which operates over 200 manufacturing locations in twelve countries. GFG Alliance consists of many companies owned by the Gupta family, including entities described as Liberty Steel Group and Liberty Steel UK. It was established in 1955 by Parduman K Gupta, Sanjeev Gupta's father, in Ludhiana, India. GFG Alliance holds investments in financial services, property and other specialist businesses. GFG Alliance states that it employs 35,000 people across 30 countries and has revenues of USD $20bn.[42] Through a central treasury function, GFG Alliance provides necessary funding, cash flow and investment for the continued operations of Liberty Steel UK.[43]

## Collapse of Greensill Capital

15.   Greensill Capital was the primary funder of Liberty Steel UK which is controlled by a group of companies collectively known as GFG Alliance.[44] On 8 March 2021, Greensill Capital, a financial firm that specialised in providing supply chain finance to companies globally, with a specific focus on SMEs, collapsed.[45] In March 2021 Greensill Capital filed for insolvency and went into administration.[46] Lex Greensill explained that the failure

---

34   As of 2018, the largest steelworks in the UK in terms of output were British Steel and Tata Steel, both producing around three million tonnes per year. British Steel and Tata are followed by Celsa and Outokumpu, which produced 1.1 and 0.35 million tonnes per year (respectively).UK Steel, UK Steel Sites & Statistics, 2nd Edition, 2018

35   UK Steel, UK Steel Sites & Statistics, 2nd Edition, 2018

36   House of Commons, UK Steel Industry: Statistics and policy, 18 June 2021, CBP 7317

37   Employment within the major six steel companies in the UK as of 2018 ranged from 8,500 employed by Tata Steel, 3990 employed by British Steel, 2,100 employed by Liberty Steel, 2,000 employed by Celsa, 640 employed by Forgemasters, and 570 employed by Outokumpu UK Steel, UK Steel Sites & Statistics, 2nd Edition, 2018

38   Liberty Steel Group, Our Locations

39   Liberty Steel Group, LIBERTY Steel UK

40   MakeUK, UK Steel Sites and Statistics 2nd Edition, May 2018, p 3

41   Liberty Steel Group, GREENSTEEL

42   GFG Alliance, About Us

43   Q171–172

44   Business, Energy and Industrial Strategy Committee, Written evidence submitted by GFG Alliance (LS0008), Published 6 July 2021, p 14, para 56

45   Greensill Capital was founded in 2011 by Alexander "Lex" Greensill. Mr Greensill stated that since its inception it had funded over 8 million suppliers in 175 countries. Bank of England, Communications between David Cameron and senior Bank Officials about Greensill Capital and the Covid Corporate Financing Facility (CCFF), 22 April 2021, p 12

46   Companies House, Statement of Administrator's Proposal, 6 May 2021

of Greensill Capital was caused by the fact that Tokio Marine, the company's principal insurance provider, had not renewed Greensill Capital's insurance and, therefore, Credit Suisse would no longer fund Greensill Capital.[47]

16.   As a supply chain finance company, Greensill Capital provided large amounts of working capital to GFG Alliance. By the time of its collapse, Greensill Capital was GFG Alliance's "most significant financial backer".[48] Whilst not a company in its own right, GFG Alliance, an informal alliance of many companies owned by the Gupta Family Group, provided working capital to Liberty Steel UK using supply chain finance derived funds received from Greensill Capital, through what was described as a 'central treasury function' managed directly by Sanjeev Gupta. The financial viability of Liberty Steel UK was therefore reliant on the financial viability of Greensill Capital. Greensill Capital's collapse therefore, "created a very significant challenge for the business [GFG Alliance] as its main source of working capital finance was cut off."[49]

### Liberty Steel business model

17.   Liberty Steel UK's business model was premised on purchasing steel businesses that were "in distressed, mothballed and loss-making states".[50] Liberty Steel undertook a series of large acquisitions in quick succession, and at a time when the industry was dealing with a "lack of long-term vision and strategy, capital, and investment in capacity and capability".[51]

18.   Between 2015 and 2017 Liberty House Group, (now known as Liberty Steel Group), made acquisitions and reopened a number of steel assets in the UK, including: the reopening of the Newport Liberty Steel plant in October 2015 after Liberty House purchased the site in July 2013;[52] purchase of the Tredegar site in November 2016;[53] purchase of the Clydebridge and Dalzell steel plants in March 2016;[54] and the 2017 acquisition of Tata Steel's Speciality Steels business in a £100 million deal, including an electric arc steelworks and bar mill at Rotherham; a steel purifying facility in Stocksbridge; a mill in Brinsworth; as well as service centres in Bolton and Wednesbury.[55]

### Financial viability

19.   The financial position of Liberty Steel UK businesses has varied since 2015. Sites such as the Dalzell plate mill in Motherwell, acquired in 2016, showed consistent growth from being a loss-making business to establishing a "key position" as a supplier to UK

---

47    Treasury Committee, Oral evidence: Lessons from Greensill Capital, 11 May 2021, HC (2021–22) 151, Q92 and Q275

48    Business, Energy and Industrial Strategy Committee, Written evidence submitted by GFG Alliance (LS0008), Published 6 July 2021, p 14, para 56

49    Business, Energy and Industrial Strategy Committee, Written evidence submitted by GFG Alliance (LS0008), Published 6 July 2021, p 14, para 58

50    Business, Energy and Industrial Strategy Committee, Written evidence submitted by GFG Alliance (LS0008), Published 6 July 2021, p 4, para 5

51    Business, Energy and Industrial Strategy Committee, Written evidence submitted by GFG Alliance (LS0008), Published 6 July 2021, p 4, para 5

52    BBC News, Liberty steelworks in Newport reopens after two years, 16 October 2015

53    WalesOnline, Steelworks which closed last year will re-open and create 70 new jobs, 10 November 2016

54    BBC News, Deal done to sell two Tata Steel mills in Scotland, 24 March 2016

55    WalesOnline, Liberty House acquires Tata Steel UK's Speciality Steels business in a £100m deal, 9 February 2017

infrastructure, such as onshore windfarms.[56] However, even before the collapse of Greensill Capital and Liberty Steel UK's subsequent loss of its main financial backing, Liberty Steel UK faced a number of financial difficulties. GFG Alliance told us that the significant reduction in the aerospace sector due to COVID-19 resulted in a decrease in demand of up to 60% for some products, particularly for speciality steels at the Liberty Steel Stocksbridge site and associated downstream units.

20.   Some sites had a "pre-existing need for additional financial support", which resulted in "severe stress on what was already an ambitious plan to make these assets sustainable and economically viable".[57] GFG Alliance asserted that this reduction in production volume and sales caused a "negative impact on [the] growth trajectory and profitability and the ability to invest in assets to expand capacity or capability" of Liberty Steel UK sites.[58]

21.   Anton Krull, Chief Financial Officer at Liberty Steel UK, highlighted the impact of the COVID-19 pandemic on some of the Liberty Steel UK sites and noted that the "rising steel price" had "put pressure on working capital", making things "somewhat difficult for those businesses".[59] Mr Krull summarised the position in that "the larger businesses are challenged [… but] some of the smaller businesses are operating reasonably profitably".[60]

## Corporate Governance

### GFG Alliance

22.   GFG Alliance, and its subsidiary companies, are a collection of businesses and investments that do not operate as a consolidated group but as an alliance of businesses.[61] GFG Alliance told us that "GFG's structure and organisation is not unusual for family-owned groups, particularly those that are fast growing and have a variety of assets […]".[62] Professor Siddiqui, Professor of Accounting at the University of Manchester, disagreed and described it as "highly unusual".[63] He told us that "this entity is massive now, so I would not say this is quite normal if you consider the scale".[64]

### GFG Advisory Board

23.   Witnesses to our inquiry identified questionable corporate governance arrangements within GFG Alliance and Liberty Steel UK, due to decision-making structures being centralised around Sanjeev Gupta, with only very minimal input or knowledge of decision making from other executives.

---

56   Business, Energy and Industrial Strategy Committee, Written evidence submitted by GFG Alliance (LS0008), Published 6 July 2021, p 4, para 5
57   Business, Energy and Industrial Strategy Committee, Written evidence submitted by GFG Alliance (LS0008), Published 6 July 2021, p 5, para 14–16
58   Business, Energy and Industrial Strategy Committee, Written evidence submitted by GFG Alliance (LS0008), Published 6 July 2021, p 5, para 14–16
59   Q116
60   Q117
61   Business, Energy and Industrial Strategy Committee, Written evidence submitted by GFG Alliance (LS0008), Published 6 July 2021, p 12, para 45
62   Business, Energy and Industrial Strategy Committee, Written evidence submitted by GFG Alliance (LS0008), Published 6 July 2021, p 12, para 47
63   Q509
64   Q509

24.  GFG Alliance told us that it had taken measures to improve corporate governance structures within the group, specifically by creating the GFG Advisory Board (GAB) in October 2020. The Board includes "senior, independent experts from industry, politics, economics and law, who could provide advice and guidance to support the GFG's environmental, social and governance commitments […]".[65] Jon Bolton, former Chief Executive Officer at Liberty Steel Group UK stated that as GFG Alliance grew as a business, "the big strategic decisions", were made by "the central group", which included executives within Liberty Steel.[66] However, he explained that this central group consisted of "predominantly, Sanjeev Gupta. He was the prime mover for the strategy of the group. A group of us would advise that but, essentially, decisions were made centrally by Sanjeev".[67] He described group meetings as being "short […] half-hour meetings just to hear a statement from Sanjeev to update the advisory board on what is happening in the company".[68]

25.  Professor Siddiqui explained that the Advisory Board was not "a formal committee at all. I do not think it has any formal remit in terms of that. It may just be an informal committee of friends".[69] He questioned the legitimacy and advisory role of the GAB and described it as a "ritualistic approach" to corporate governance.[70] The GAB was suspended on 7 April 2021 following the Greensill Capital collapse "to allow the GFG management team [to] focus on immediate business priorities related to refinancing and restructuring".[71]

### GFG Alliance financial arrangements

26.  As well as over-centralised decision making, with the lack of adequate accountability structures, witnesses to our inquiry also identified that GFG Alliance has unusually centralised financial arrangements. These aspects of centralised decision authority and financial control are in contrast to what has historically been a loose collection of business entities in a "family office" style organisation, inevitably raising questions of transparency, independence and reliability of any one corporate entity. Anton Krull, Chief Financial Officer at Liberty Steel UK, explained that financial decisions for Liberty Steel UK were made centrally by GFG Alliance, with Mr Krull having little involvement in financial activities within the businesses such as funding procedures. Mr Krull explained that his remit was "really around the businesses and the operations, and their future in that respect,"[72] and "in terms of the capital structure [of Liberty Steel] and the funding, that has always been dealt with centrally through a [GFG] treasury function. Mr Krull acknowledged that he wasn't aware of the bigger financial picture within Liberty Steel UK, but added that he did not believe this centralised treasury structure to be unusual.[73]

27.  Professor Siddiqui noted that such a centralised structure was indeed unusual, and that normally, you would expect the CFO to be an important part of the management,

---

65  Business, Energy and Industrial Strategy Committee, Written evidence submitted by GFG Alliance (LS0008), Published 6 July 2021, p 13, para 53
66  Q99
67  Q100
68  Q139
69  Q507
70  Q507
71  Business, Energy and Industrial Strategy Committee, Written evidence submitted by GFG Alliance (LS0008), Published 6 July 2021, p 13, para 53
72  Q171
73  Q145 and Q172

"but here we are failing to see the management". He added that it appeared to be "down to one person here to make all the decisions" and described the CFO as more akin to the "role of an operating officer" rather than the typical role of a CFO.[74] Professor Yang, Associate Professor of Management Science and Operations at the London Business School, agreed and stated that he did not know of any companies where a "supply chain finance programme goes through without the CFO".[75]

28.   **The corporate structure and governance of GFG Alliance companies resulted in no formal oversight or accountability of the decisions taken by Sanjeev Gupta. Mr Gupta put members of his staff in an unacceptable position by employing them with job titles associated with traditional executive functions in well run companies, without giving them the required access to information or decision-making powers necessary for them to perform their duties. It is unclear why Mr Gupta opted to structure his companies in this unusual and, given the scale of his operations, unacceptable way.**

29.   *We recommend that Ministers reflect on the systemic risks to UK industry posed by such unusual corporate structures and, if deemed necessary, bring forward amendments to the Companies Act.*

## Audit

### GFG Alliance and Liberty Steel UK audit

30.   Several GFG Alliance and Liberty Steel UK companies were audited by King & King, a chartered accountants, registered auditors and chartered tax advisors.[76] Milan Patel, Partner at King & King, confirmed to us that the firm began auditing companies in which Sanjeev Gupta was the beneficial owner, or director of, in 2015,[77] and was appointed to Liberty Steel companies towards the end of 2018.[78]

### Liberty Steel UK audit: revenue and capacity

31.   Reporting surrounding the audit of GFG Alliance and Liberty Steel UK companies has largely focused on the revenue and capacity of King & King,[79] a relatively small audit firm, given the number, size and complexity of the accounts it audited.[80] King & King is an audit firm with six partners, two chartered accountants, four chartered certified accountants, and a total of 40 staff.[81] Several witnesses to our inquiry identified a number of risks posed by a relatively small audit firm auditing large companies, including a potential lack of capacity to complete audits effectively and efficiently, and information asymmetry which could compromise the independence of the auditors.

---

74    Q507

75    Q508

76    King & King, Home

77    Q332

78    Q331

79    Financial Times, The tiny audit firm that signs off Sanjeev Gupta's empire, 28 April 2021; The Telegraph, Spotlight falls on two-partner firm that audited Gupta's empire, 18 April 2021; The Sunday Times, Sanjeev Gupta: Anatomy of a scandal, 20 March 2021

80    Financial Times, The tiny audit firm that signs off Sanjeev Gupta's empire, 28 April 2021

81    Q306

### King & King

32.   Professor Siddiqui disputed the likeliness of King & King's ability to audit a large amount of GFG Alliance companies with large turnovers. Professor Siddiqui gave context about the size of the firm stating that "the big four would have an average partner size of 750 and employee size of nearly 275,000 in the UK", compared to the 40 staff employed by King & King.[82] Professor Siddiqui confirmed that King & King "is a very small firm, but the revenue of GFG Alliance that they have audited in total is more than £2.5 billion, which then puts it into the category of a top-50 FTSE company in terms of revenues".[83]

33.   Mr Patel said that his organisation was capable of auditing an organisation with £2.5 billion of revenue and added that King & King has "many clients who have hundreds of millions of pounds of turnover. It is not unusual for a firm of our size to have clients that have hundreds of millions in turnover."[84]

34.   Professor Siddiqui also told us that King & King raised "red flags" in relation to its expertise and capacity. He suggested that if King & King were industry specialists and had experience of auditing steel industry businesses, they may be able to audit GFG Alliance and Liberty Steel companies with the staff capacity and resources currently available. However, King & King only became auditors to Liberty Steel companies in 2018, and was therefore still relatively new to the audit of these companies. Professor Siddiqui added that GFG Alliance and Liberty Steel have "a very complicated governance structure. You have, as I said, a number of companies. Taken together, they do not produce consolidated financial statements", which would also make King & King's audit of GFG Alliance and Liberty Steel companies very difficult.[85] Professor Siddiqui therefore made the assessment that King & King "would be severely stretched".[86]

35.   When asked whether King & King may not have the capacity to audit GFG Alliance and Liberty Steel UK companies, Anton Krull, Chief Financial Officer at Liberty Steel UK, stated that "it did occur to me. It is certainly one of the areas going forward in terms of both the consolidation of the Liberty Steel UK group and having a clear understanding of the auditors, the transparency and all that goes around that".[87]

36.   The Financial Reporting Council's (FRC) 2019 Ethical Standards states that auditors must not receive over 15% of its annual fee income from a single client.[88] The Times reported that King & King received £1.1 million for auditing up to £2.5 billion of revenue generated by GFG Alliance companies.[89] Milan Patel, Partner at King & King, told us that "we have been through our standards and ethical standards, and we believe that we do not exceed the thresholds".[90] The percentage of revenue that King & King received from the audit of GFG Alliance companies has not been disclosed.

---

82   Q470
83   Q470
84   Q294
85   Q470
86   Q470
87   Q203
88   Financial Reporting Council, Revised Ethical Standard 2019, December 2019
89   The Telegraph, Spotlight falls on two-partner firm that audited Gupta's empire, 18 April 2021; Financial Times, The tiny audit firm that signs off Sanjeev Gupta's empire, 28 April 2021
90   Q321

37.   Adam Leaver, Professor in Accounting and Society at Sheffield University, identified the risk of an "information asymmetry" between the company and its auditor when using a small audit firm being paid large amounts of money to audit companies with large revenues. He argued that this risked a loss of independence of the auditor.[91]

38.   Professor Siddiqui acknowledged that it was "possible" that King & King were selected by Sanjeev Gupta as auditors of GFG Alliance companies as they were willing to do what Mr Gupta wanted them to do.[92] He added that "is a commonly exercised thing in many private companies that you pick auditors that you could possibly dominate, but we do not have any evidence of that at the moment."[93]

### Auditor resignations and consolidated accounts

39.   In May 2019, MHA McIntyre Hudson, the auditors prior to King & King, resigned as auditors of Liberty Precision Tubes Ltd due to discrepancies between it and GFG Alliance's valuations of GFG Alliance assets for the year ending March 2018.[94] Professor Siddiqui noted that auditor resignations should raise a red flag for the next auditor, as this was not "usual practice".[95] As such, the new auditor would need to explore why the previous auditor resigned.[96] Professor Siddiqui concluded that auditor resignation reflects "on GFG's poor corporate governance mechanisms", as GFG Alliance's structure is "very complex".[97]

40.   In 2019, in a bid to "silence criticism of his bookkeeping" Sanjeev Gupta announced that Liberty Steel Group companies would publish a set of consolidated accounts.[98] A spokesperson for GFG said:

> We are working towards further enhanced transparency and governance, and intend to publish consolidated accounts for Liberty Steel Group in 2020 … However, as a private, family-owned company, we do not intend to provide granular details of our finances in response to every rumour, half-truth or piece of speculation."[99]

41.   In written evidence, GFG Alliance stated that there were difficulties with producing consolidated accounts due to the COVID-19 pandemic, however, accounts for Liberty Steel would still be published for the year ending March 2021.[100] To date, accounts for some Liberty Steel UK companies are listed as overdue on Companies House and no consolidated accounts have been published.[101]

---

91   Financial Times, The tiny audit firm that signs off Sanjeev Gupta's empire, 28 April 2021
92   Q475
93   Q475
94   Reuters, Auditor to company owned by metals tycoon Gupta quit over asset value, 9 July 2019; Companies House, Auditor's resignation, dated 30 May 2019
95   Q476
96   Q476
97   Q476
98   The Telegraph, Steel billionaire Sanjeev Gupta hits back at 'ridiculous' critics as he unveils radical shake-up, 29 October, 2019
99   Financial Times, The workings of Sanjeev Gupta's empire, 26 February 2020
100   Business, Energy and Industrial Strategy Committee, Written evidence submitted by GFG Alliance (LS0008), Published 6 July 2021, p 13, para 51
101   Some Liberty Steel UK companies are listed as having overdue accounts on Companies House. For example: LIBERTY STEEL TREDEGAR LTD, LIBERTY STEEL NEWPORT LIMITED, and LIBERTY STEEL DALZELL LTD

42.   Jon Bolton, former Chief Executive Officer at Liberty Steel Group UK, told us in evidence that the publishing of consolidated accounts had been discussed by the GFG Advisory Board. Mr Bolton told us that "[…] those consolidated accounts, clearly, for the various market circumstances and suchlike have not yet been published. It was something that the advisory board was keen to see and, clearly, Liberty and GFG were keen to produce".[102]

43.   Professor Siddiqui outlined the difficulty for auditors and transparency when a group of companies are not a consolidated entity. He told us that if King & King audits 60 companies and other auditors are involved with the audit of other GFG Alliance and Liberty Steel companies then "as an auditor, you are never going to get a complete picture of how this group is performing or how this alliance is performing".[103]

44.   **We were not reassured by the evidence presented by King & King and note the legal restrictions placed upon Mr Patel, and other auditors who had previously audited GFG Alliance companies, by Sanjeev Gupta.**[104]

45.   **Despite public statements over a number of years to the contrary, we see, as yet, no tangible evidence that Sanjeev Gupta and GFG Alliance companies are making improvements to corporate governance or improving transparency through the publication of consolidated accounts.**

### *Accounting Deadlines*

46.   Witnesses also expressed concern at the frequent changing of accounting deadlines for companies, within GFG Alliance, including some Liberty Steel UK businesses, which are audited by King & King. Since 2019, 24 GFG Alliance companies have changed their accounting period on at least two occasions. While legal, this is an "unusual" accounting practice, and is one of the "risky" financial practices used by GFG Alliance. When questioned as to why this occurred, Mr Patel, the auditor, told us he had "no knowledge of that" and that the reason was for "Liberty to know".[105]

47.   When asked about his experience of the process of companies changing their accounting deadlines Mr Patel described that "you would have the conversation with the auditors, but they do not have to give you a reason why they are changing it. It is just to inform the auditors so that the timing of the audit process would change".[106] Mr Patel denied that changing accounting periods twice since 2019 was unusually frequent. He explained "they were trying to look at a new date to bring all the group companies within a particular date. That was all there was to that".[107] Cynthia O' Murchu, Investigative Reporter at the *Financial Times*, disagreed with Milan Patel. She described this "clear pattern of companies changing their accounting dates multiple times" as a "huge red flag".[108]

---

102    Q209
103    Q470
104    Q 279, Q 301–302, Q 327–328, Q 382–383; Milan Patel told the Committee that he had been instructed by GFG Alliance lawyers not to discuss information relating to Liberty Steel Group during the evidence session which he attended.
105    Q347
106    Q348
107    Q349
108    Q480

48.   Professor Siddiqui explained that companies delaying their accounting periods is "unusual but it is allowed".[109] UK companies are able to extend their accounting period to 18 months once in every five years unless otherwise stated by Companies House. Professor Siddiqui asserted that the delay of accounting of 17 of the 24 companies within the alliance that had changed their accounting deadlines twice or more since 2019 "should be investigated".[110] Cynthia O'Murchu described it as an "[…] an obfuscation". She said that ultimately, it will be down, to the investigatory bodies "to really dig into this and hear all the evidence as to why this was done and whether there are legitimate reasons to do so".[111]

49.   **We found it utterly unconvincing, and do not believe that King & King had the capacity, expertise, or resources to audit the accounts of multiple large GFG Alliance and Liberty Steel UK companies representing over £2.5 billion of revenue.**

50.   **The reputation of Liberty Steel UK has been threatened by the poor audit and accounting practices of GFG Alliance, including the changing of accounting deadlines and its inability to produce consolidated accounts. As these accounts are yet to be published it is difficult to see the true financial picture of Liberty Steel UK. Unless remedied, these deficiencies severely limit the potential of that firm to be viewed as a reliable partner in any long-term strategy for the UK steel industry.**

51.   ***We recommend that the Financial Reporting Council, as the competent authority for audit in the UK, refer this case to the relevant Recognised Supervisory Body, the Institute of Chartered Accountants for England and Wales, to investigate King & King under the Audit Enforcement Procedure as a matter of urgent public interest.***

## Government rejection of funding for Liberty Steel UK

52.   In a letter to the BEIS Department following the collapse of Greensill Capital in March 2021, GFG Alliance requested £170 million in financial support from the Government.[112] The Secretary of State, Rt Hon Kwasi Kwarteng MP, ultimately rejected the £170 million grant request on the basis that, "we cannot simply give taxpayers' money to companies that are very opaque, with assets all over the world and liabilities that nobody seems to have got to the bottom of. That would be very irresponsible".[113]

53.   The Secretary of State later explained in more detail his decision not to extend £170 million to Sanjeev Gupta noting that it was the "opacity about their corporate governance and this difficulty to understand the full nature of their businesses that prevented me and my officials from giving them taxpayers' money. We were, dare I say it, vindicated in our approach".[114] He added that this rejection of funding was not because of Liberty Steel UK's assets or operations, stating that "[…] the assets are fundamentally good ones",[115] however, the issues with Liberty Steel UK financial viability were created by "financial engineering".[116]

---

109   Q479
110   Q479
111   Q481
112   Q517
113   Q134
114   Q2
115   Q515
116   Q515

54.   We raised a number of questions about corporate governance structures and audit with the Secretary of State. This included questions about the need for a formalised fit and proper person test for directors of private companies in order for companies to receive Government subsidies in relation to the £170 million grant requested by GFG Alliance, particularly for sectors such as the steel industry that are considered strategic. The Secretary of State described that "the approach we take always looks at a whole range of issues", when making decisions on providing financial support to companies.[117] He added that "as long as Government have provided limited support in special instances to businesses, it is always the case that there is a process. It has never been the case that people would simply get the money by asking for it".[118]

55.   When questioned further about the need for formalised tests within other industries as is the approach in healthcare and the charity sector, as opposed to considering financial support on a case-by-case basis, the Secretary of State responded stating that "we do not want to put the walls so high on investors that we deter them, but we do have informal tests. That is one of the reasons why I rejected the £170 million".[119]

56.   **We commend the Government's decision to reject GFG Alliance's request for £170 million of financial support in March 2021. The Secretary of State was correct to be cautious about providing a large grant to a group of companies with a centralised, complex and opaque governance structure.**

57.   *In light of the Greensill Capital collapse and subsequent financial hardship of GFG Alliance and Liberty Steel UK, we urge the Government to give consideration to formalising a fit and proper person test for private company directors within any future steel sector deal.*

### Liberty Steel UK refinancing

58.   On 10 October 2021, GFG Alliance announced that it would inject £50 million of new funding into Liberty Steek UK through a new separate corporate entity Liberty Capital.[120] This funding is expected to allow the restart of production at the Rotherham site which contains Liberty Steel UK's electric arc furnace that produces GREENSTEEL. GFG announced that it will also enable Liberty Steel UK's speciality steel division; Stocksbridge, Narrow Strip, and Performance Steel, to run focussed production campaigns.[121]

59.   Liberty Steel UK is expected to run as normal with funding for growth in working capital now being approved through Liberty Capital. GFG announced that this funding will allow sites to prove that operations can run efficiently which will enable the group to finalise longer term debt restructuring and refinance Liberty Steel UK operations in full.[122]

60.   **We note the recent developments within GFG Alliance and Liberty Steel UK and welcome the injection of capital at Liberty Steel's Rotherham plant. However, we note**

---

117   Q544
118   Q530
119   Q544–454
120   GFG Alliance, GFG Alliance issues update on restructuring and refinancing progress, 10 October 2021
121   GFG Alliance, GFG Alliance issues update on restructuring and refinancing progress, 10 October 2021
122   GFG Alliance, GFG Alliance issues update on restructuring and refinancing progress, 10 October 2021

that once again Sanjeev Gupta has decided to set up an additional corporate entity to provide financial support to Liberty Steel UK companies without clear reporting and decision making on the source and terms of use of that funding.

61.  **We would welcome the Insolvency Service considering whether, on the basis of the evidence we have received, Sanjeev Gupta may have acted in breach of his fiduciary duties as a company director in the United Kingdom.**

62.  **More broadly, we believe that until Mr Gupta restructures his GFG Alliance companies into a more acceptable corporate structure and publishes consolidated accounts that are adequately audited, that he fails to fulfil the criteria that we believe should be applied to define a fit and proper person for the purposes of receiving any form of Government support.**

# 3   Supply Chain Finance

## Supply chain finance

63.   Greensill Capital provided funding to customers such as GFG Alliance through supply chain finance (SCF). This SCF funding from Greensill Capital was used by GFG Alliance to fund Liberty Steel UK entities. Lex Greensill described supply chain finance as "Greensill's flagship product" and claimed to be the market-leading provider of working capital finance for companies globally, with a specific focus on SMEs."[123]

64.   SCF has been described by Andrew Bailey, Governor of the Bank of England as:

> […] a form of short-term business finance where the future payment obligations of a buyer (typically a large corporate) are transferred to a finance provider in return for that finance provider paying the supplier up front (typically less a haircut). The finance provider receives the payment from the buyer at a future date. The finance provider is therefore taking a primary credit exposure to the buyer, which frequently is investment grade. SCF is one of a range of financing options that SMEs can use to meet their short-term liquidity needs, with the majority of the funding coming from banks.[124]

65.   SCF is used most frequently by large companies such as Vodafone and Tesco, with data suggesting that around 7% of businesses use supply chain finance programmes.[125] Supply chain finance is not frequently used by private companies such as Greensill Capital. Sir Jon Cunliffe, Deputy Governor for Financial Stability at the Bank of England, explained that "[…] the majority of this sort of finance is still done by banks, not players that securitise the assets in the market."[126]

## Accounting procedures

66.   The way in which Greensill Capital used supply chain finance has been viewed as controversial due to its accounting treatment which can allow customers of supply chain finance, such as GFG Alliance, to hide the true extent of their debt.[127]

67.   Professor Siddiqui described how funds from supply chain finance do not need to be classified as debt on a company's balance sheet. A company can classify funds from supply chain finance as a trade payable or as a loan. If a company classifies these funds as a trade payable, these funds would sit within the working capital of a company and not as debt, however, if these funds are shown as a loan, they would be a liability.[128] Cynthia O'Murchu explained that this could present a stronger financial position than may be the case in reality, for example, as had been the case with NMC Health which went into administration in April 2020 with large amounts of debt that was not declared.[129]

---

123   Bank of England, Communications between David Cameron and senior Bank Officials about Greensill Capital and the Covid Corporate Financing Facility (CCFF), 22 April 2021, p 12
124   Bank of England, Bank of England Response regarding Greensill Capital, Dated 6 May 2021
125   Q440
126   Treasury Committee, Oral evidence: Bank of England Monetary Policy Reports, HC 142, 24 May 2021, Q131
127   Financial Times, Greensill case shows risks of supply chain finance, 4 March 2021
128   Q483
129   Q482

68. The *Financial Times* reported in March 2021 that by the time of its collapse, Greensill Capital was exposed to around $5 billion of GFG Alliance debt.[130] This news report stated that according to Greensill Capital lawyers, GFG Alliance companies were "experiencing financial difficulties" and had "started to default" on its financial obligations to Greensill Capital.[131] The subsequent collapse of Greensill Capital and large amounts of debt significantly impacted Liberty Steel UK, as Greensill Capital could no longer provide the supply chain finance funds to GFG Alliance which would then be used to finance Liberty Steel UK sites.

69. It is unclear how much debt GFG Alliance holds and whether GFG Alliance classified its supply chain finance cashflow as trade payable, however, the large amount of debt and the symbiotic relationship between GFG Alliance and Greensill Capital have both played a significant role in the financial difficulties of Liberty Steel UK. Sanjeev Gupta told the BBC Radio 4 Today programme that "given the legal disputes we have with them [Greensill Capital] I can't talk specifics", but added the amount owed by GFG Alliance to Greensill Capital "is in many billions".[132]

### Concentration risk to GFG Alliance

70. Both Lex Greensill and GFG Alliance have described a concentration risk - a high percentage of lending to one customer - in relation to their respective companies which could have played a role in the collapse of Greensill Capital and the subsequent financial difficulties within GFG Alliance and Liberty Steel UK. Lex Greensill told the Treasury Committee that a concentration risk became apparent to Greensill Capital's German regulator BaFin (Greensill Capital also operated in Germany) in mid-2020 as a reduction plan - a plan to reduce concentration risk for companies - was proposed to Greensill Capital "with respect to the amount of exposure that we held for one of our customers".[133] However, Mr Greensill told the Treasury Committee that the initial reduction plan "was going to be impossible for us to comply with", so in January 2021 "BaFin agreed to a plan that we [Greensill Capital] proposed, which dealt with that immediate issue. The next event was the failure of our insurer to renew, which was in March".[134]

71. Although Lex Greensill described a concentration risk to large customers, he denied that Greensill Capital's largest customer was GFG Alliance, stating that "I am not allowed to say, but the British company that you keep talking about was not our largest customer in terms of the assets that we funded".[135] However, GFG Alliance outlined to us the group's high level of dependence on working capital from Greensill Capital, stating that "by 2020 GFG had recognised the need to further diversify its lender base to reduce its reliance on Greensill Capital".[136] GFG Alliance described that the process of diversification was underway but became difficult as a result of the COVID-19 pandemic and ultimately, "no material refinancing of GFG's debt to Greensill took place before Greensill Capital

---

130   The Telegraph, Thousands of steel jobs in jeopardy as Greensill Capital collapses, 8 March 2021

131   The Telegraph, Thousands of steel jobs in jeopardy as Greensill Capital collapses, 8 March 2021

132   The National, Liberty Steel owes 'many billions' to failed finance firm Greensill Capital, 2 April 2021

133   Treasury Committee, Oral evidence: Lessons from Greensill Capital, HC 151, 11 May 2021, Q97

134   Treasury Committee, Oral evidence: Lessons from Greensill Capital, HC 151, 11 May 2021, Q97; More information can be found in the Treasury Committee Report: Lessons from Greensill Capital

135   Treasury Committee, Oral evidence: Lessons from Greensill Capital, HC 151, 11 May 2021, Q172

136   Business, Energy and Industrial Strategy Committee, Written evidence submitted by GFG Alliance (LS0008), Published 6 July 2021, p 14, para 58

collapsed in early March 2021".[137] GFG Alliance also stated that it had an "over reliance on Greensill as GFG's core financier" which created "a very significant challenge for the business as its main source of working capital finance was cut off".[138] As a result of this over reliance, GFG Alliance had to make "difficult decisions to divest or otherwise liquidate assets".[139]

72.   The consequences of the high concentration risk between GFG Alliance and Greensill Capital had a significant effect on Liberty Steel UK, whose operations in the UK were more severely impacted by Greensill Capital's collapse than its operations in some other countries.[140]

### Future receivables or "prospective receivables"

73.   Another facility reportedly offered by Greensill Capital was future receivables, also sometimes referred to as "prospective receivables". Future receivables are a form of financing where funds are extended, but instead of being based on an invoice for a specific purchase, they are based on an expectation that some future invoice could potentially be issued.[141] Prospective receivables are deemed to be a high-risk facility due to the fact that this facility could allow customers to raise large amounts of capital from unverified or ultimately fictional transactions.

74.   GFG Alliance used Greensill Capital's prospective receivables programme. However, GFG Alliance and Greensill Capital have disputed how this arrangement worked. In written evidence to us, GFG Alliance said that:

> As part of Prospective Receivables programmes, Greensill employees identified companies with whom its counterparties could potentially do business in the future. Greensill then determined, at its discretion and based on insurance capacity it had, the amount of each Prospective Receivables purchase and its maturity.[142]

75.   Lex Greensill disputed this and denied that Greensill Capital operated a "prospective receivable" product for any client in the manner described by GFG in their evidence.[143] Mr Greensill further stated that "the term "prospective receivable" was never used by Greensill Capital to describe any of its products", and that "It is entirely incorrect that "Greensill Capital employees identified companies with whom our clients could potentially do business in the future", as was stated by GFG Alliance.[144]

76.   Mr Greensill also stated that all future receivables were "based on details of existing trading partners provided to Greensill by our clients", and "entered into on the expectation

---

137   Business, Energy and Industrial Strategy Committee, Written evidence submitted by GFG Alliance (LS0008), Published 6 July 2021, p 14, para 58

138   Business, Energy and Industrial Strategy Committee, Written evidence submitted by GFG Alliance (LS0008), Published 6 July 2021, p 14, para 58

139   Business, Energy and Industrial Strategy Committee, Written evidence submitted by GFG Alliance (LS0008), Published 6 July 2021, p 14, para 58

140   Business, Energy and Industrial Strategy Committee, Written evidence submitted by GFG Alliance (LS0008), Published 6 July 2021, p 5, para 17

141   Treasury Committee, Lessons from Greensill Capital Report, Published 20 July 2021, p 16

142   Business, Energy and Industrial Strategy Committee, Written evidence submitted by GFG Alliance (LS0008), Published 6 July 2021, p 14, para 57

143   Business, Energy and Industrial Strategy Committee, Correspondence from Lex Greensill, Dated 21 July 2021

144   Business, Energy and Industrial Strategy Committee, Correspondence from Lex Greensill, Dated 21 July 2021

that the future receivables would convert into account receivables within a specified period.[145] This was reinforced by a warranty from the client that the receivables will arise pursuant to sales contracts with the relevant trading partners".[146]

77. Professor Siddiqui described the risks of future receivables as "very high". Cynthia O'Murchu agreed they are "extremely risky".[147] She explained that the *Financial Times* had investigated invoices raised by GFG Alliance using the future receivables facility that could not be verified by the Greensill Capital administrators Grant Thornton after Greensill Capital went into administration.[148] Although GFG Alliance had stated to the *Financial Times* that these invoices were part of the future, or prospective, receivables programme, a number of companies "emphatically" denied doing business with GFG Alliance.[149] This use of "suspect invoices" added an additional level of risk to GFG Alliance's use of future receivables.

78. **The way in which future, or prospective, receivables operated between GFG Alliance and Greensill Capital is disputed by both parties. We note that several claims have been made about the use of future receivables and their relation to "suspect invoices" and welcome the Serious Fraud Office's investigation into this matter.**

79. **Steel is a foundational industry in the UK and in need of significant structural reform. The use of high-risk financial funding practices, such as future receivables lending, that Greensill Capital and GFG Alliance engaged in are barriers to such reforms. By his use of such practices Mr Gupta, the so-called "saviour of steel" is creating uncertainties that further undermine the long term viability of the steel industry in the UK.**

80. *We recommend that the Financial Conduct Authority and HM Treasury investigate the use of, and accounting rules for, future or prospective receivables.*

### Circular trading

81. The term circular financing, or circular trading as it is sometimes referred to, has been used in relation to Liberty Steel UK. It has been used to describe the process in which a company sells a product to a related company. The product may then be sold multiple times to different related companies. The product is then sold back to the original company and is finally sold to an unrelated party. The company that originally sold the product is able to raise multiple invoices to its supply chain finance lender for the same product and is therefore able to gain access to more working capital to be paid back at a later date.[150]

82. The *Sunday Times* reported that a number of GFG Alliance and Sanjeev Gupta-linked companies have been linked to circular financing. This includes the circular financing of steel through the Liberty Steel Newport site.[151] On 17 April 2021 *The Sunday Times* reported that Liberty Steel Newport was used in a circular trading scheme. It was reported

145   Business, Energy and Industrial Strategy Committee, Correspondence from Lex Greensill, Dated 21 July 2021
146   Business, Energy and Industrial Strategy Committee, Correspondence from Lex Greensill, Dated 21 July 2021
147   Q443
148   Q443
149   Q461
150   The Sunday Times, Revealed: Sanjeev Gupta's circular money trail, 17 April 2021
151   The Sunday Times, Revealed: Sanjeev Gupta's circular money trail, 17 April 2021

that Liberty Steel Newport sold £2.5 million of coils and tubes to VS International (VSI).[152] Liberty Steel Newport was then able to raise funds from Greensill Capital to provide finance against the VSI invoice, also known as a receivable. VSI then sold the same steel to Sanjeev Gupta's CS Management Services before selling the steel back to Liberty Steel Newport.[153] Finally, the same steel was reportedly then to be sold to a third party with Liberty Steel Newport raising money from Greensill Capital against an invoice for a second time against the same steel.[154]

83.   GFG Alliance told us that media reports of circular trading were "misleading".[155] GFG Alliance described the arrangements that led to circular trading media reports about Liberty Steel Newport stating that "raising finance through a temporary sale of inventory not needed immediately, with an agreement to buy it back later when needed, using a bilateral or tripartite Repurchase agreement (REPO) structure is common not only in commodities but even more so in financial markets".[156] GFG Alliance set out that "once repurchased the inventory will eventually be sold on to a final consumer and again raising finance against that sale would be normal".[157] GFG Alliance asserted that Liberty Steel Newport "abided by all the normal rules that apply to such inventory-based financing and did so in full knowledge of all parties involved", and that all funding was repaid in full as well as financial gains for investors.[158]

84.   Although a company selling products and repurchasing them at a later date is legal, when asked whether the REPO structure described by GFG Alliance is a legitimate business operation for a steel business, Professor Siddiqui told us that, "you are selling the same product in a sense. You have the same product being sold out to a company and then you are purchasing it back. It does not look like a regular practice to me".[159] Professor Yang agreed stating that "this is quite unusual", as it would be "quite easy to get inventory-based financing" on Liberty Steel products as opposed to finding sellers, signing repurchasing agreements and borrowing against accounts receivable.[160]

85.   Lex Greensill said that "to the best of my knowledge, Greensill Capital did not engage in circular financing".[161] He denied that Greensill Capital was at any point party to bilateral or tripartite repurchase agreements outlined in GFG Alliance's written evidence.[162]

86.   **GFG Alliance's reported engagement in circular trading, or REPO structures, exacerbated a concentration risk to Greensill Capital by raising large amounts of working capital against invoices created to raise finance instead of selling steel to genuine customers.**

152   The Sunday Times, Revealed: Sanjeev Gupta's circular money trail, 17 April 2021
153   The Sunday Times, Revealed: Sanjeev Gupta's circular money trail, 17 April 2021
154   The Sunday Times, Revealed: Sanjeev Gupta's circular money trail, 17 April 2021
155   Business, Energy and Industrial Strategy Committee, Written evidence submitted by GFG Alliance (LS0008), Published 6 July 2021, p 15, para 60
156   Business, Energy and Industrial Strategy Committee, Written evidence submitted by GFG Alliance (LS0008), Published 6 July 2021, p 15, para 60
157   Business, Energy and Industrial Strategy Committee, Written evidence submitted by GFG Alliance (LS0008), Published 6 July 2021, p 15, para 60
158   Business, Energy and Industrial Strategy Committee, Written evidence submitted by GFG Alliance (LS0008), Published 6 July 2021, p 15, para 60
159   Q 466
160   Q467
161   Business, Energy and Industrial Strategy Committee, Correspondence from Lex Greensill, Dated 21 July 2021
162   Business, Energy and Industrial Strategy Committee, Correspondence from Lex Greensill, Dated 21 July 2021

87.   **We did not receive evidence that the use of circular trading between companies is a systemic issue, but note the potential criminal liability associated with the worst examples of financial engineering between businesses. Despite repeated reassurances from GFG Alliance, we remain unconvinced by Sanjeev Gupta's attempts to re-structure and re-finance his businesses. We are not satisfied that Sanjeev Gupta is adequately addressing the many fundamental issues and concerns associated with the corporate governance, leadership, transparency, funding and operations of his businesses and remained concerned that this poses a threat to the long-term prospects of Liberty Steel UK.**

# 4   Coronavirus Large Business Interruption Loans Scheme

88.  In March 2020, the Chancellor of the Exchequer, Rishi Sunak MP, announced the Coronavirus Business Interruption Loan Scheme (CBILS), as a means of financial support for businesses in response to the economic challenges faced due to the COVID-19 pandemic. This scheme offered financial support to small and medium-sized businesses (SMEs) across the UK with a turnover of up to £45 million that were experiencing a loss in revenue and a disruption to cash flow. On 3 April, this scheme was extended, and the Coronavirus Large Business Interruption Loans Scheme (CLBILS) was announced. These schemes supported businesses with a turnover of more than £45 million to access loans, overdrafts, and other types of finance.[163]

89.  The scheme was delivered through commercial lenders such as accredited banks, providing up to £200 million in the form of facilities such as term loans, overdrafts, invoice finance or asset finance directly to businesses.[164] The loans were backed by a Government guarantee, that in the event of the borrower failing to repay the loan, the Government would repay the lender 80% of the loan's value. Lenders had to comply with the scheme rules in order to benefit from the guarantee.[165] The loan schemes were developed jointly by the BEIS Department, HM Treasury and the British Business Bank,[166] and administered by the British Business Bank.[167]

90.  Through the CLBIL scheme Greensill Capital was able to lend £350 million to Liberty Steel UK companies. An investigation by the British Business Bank is currently underway into the misuse of these loans by Greensill Capital and the guarantees have been suspended.[168]

91.  The Treasury Committee[169] and Public Accounts Committee's[170] respective *Lessons from Greensill Capital* inquiries as well as the National Audit Office's Investigation into the British Business Bank's accreditation of Greensill Capital,[171] have assessed in detail, aspects of Greensill Capital's financial conduct and relationship with the UK Government. Our interest is in understanding the financial risk to the taxpayer through the direct funding of a major foundational industry, via the complex and precarious means used by Greensill Capital and GFG Alliance.

---

163   National Audit Office, Investigation into the British Business Bank's accreditation of Greensill Capital, 7 July 2021, p 4, para 2

164   British Business Bank, Coronavirus Large Business Interruption Loan Scheme (CLBILS)

165   National Audit Office, Investigation into the British Business Bank's accreditation of Greensill Capital, 7 July 2021, p 4, para 2

166   National Audit Office, Investigation into the British Business Bank's accreditation of Greensill Capital, 7 July 2021, p 4, para 3

167   National Audit Office, British Business Bank Report, 10 January 2020, p 5, para 3; The Bank is owned by the Government, and the BEIS Department is the sole shareholder which has wider policy responsibility for business and enterprise.

168   National Audit Office, Investigation into the British Business Bank's accreditation of Greensill Capital, 7 July 2021, p 10, para 14–15

169   Treasury Committee, Lessons from Greensill Capital

170   Public Accounts Committee, Lessons from Greensill Capital

171   National Audit Office, Investigation into the British Business Bank's accreditation of Greensill Capital

### Greensill Capital's Coronavirus Corporate Finance Facility (CCFF) and CLBILS applications and lending

92.   Between March and June 2020, Greensill Capital applied to be part of the Coronavirus Corporate Finance Facility (CCFF) scheme.[172] The scheme was announced on 17 March 2020 as a joint HM Treasury and Bank of England lending facility, designed to support larger firms by helping them to bridge disruption to their cash flows as a result of COVID-19 through the purchase of short-term debt in the form of commercial paper (CP).[173] On 26 June 2020, HM Treasury informed Greensill Capital they did not meet the eligibility criteria for the CCFF.[174]

93.   During the same time period, Greensill Capital made two separate applications to be accredited for CLBILS. The first application was submitted on 19 April 2020 to offer the invoice finance variant.[175] Another separate application was submitted on 12 June 2020 for accreditation under the term loan and revolving credit facility variants. This second application also requested approval to participate in the Larger Scheme Facility, to allow it to make loans of more than £50 million.[176]

94.   Greensill Capital was authorised by the British Business Bank to lend a maximum of £400 million CLBILS. This £400 million was comprised of eight loans of £50 million each.[177] Although the CLBILS rules specified that loans to the same borrower or to any member of the borrower's group could not exceed £50 million, (with the exception that Larger Scheme Facility accredited lenders could provide loans of up to £200 million per group), Greensill Capital provided six CLBILS loans, totalling £300 million, to six companies that appeared to be associated with GFG Alliance. It appeared that one further loan had been given to SIMEC International (UK) Limited in July, also a GFG Alliance company. All seven loans were of £50 million each.[178]

95.   As Greensill Capital was not accredited to the Larger Scheme Facility, the NAO reported that the British Business Bank was "concerned that Greensill's activity may have contravened the scheme rules on lending to groups", as lending over £50 million to

172   Treasury Committee, HM Treasury Correspondence to Treasury Committee, 7 May 2021

173   Bank of England, Covid Corporate Financing Facility (CCFF)

174   Treasury Committee, HM Treasury Correspondence to Treasury Committee, 7 May 2021, p 6; At a summary level, to be eligible for the CCFF scheme, applicants needed to: Make a material UK contribution, Be investment grade rated (or equivalent) as at 1 March 2020 (as supplemented by the ongoing credit quality review described below), Not be PRA- or FCA-regulated and, Not be a public undertaking, Not be a leveraged investment vehicle

175   Invoice finance is a form of lending used to support cash flow and release funding for investment by raising funds against unpaid invoices. It is often used by businesses that sell products or services on credit to other businesses.

176   National Audit Office, Investigation into the British Business Bank's accreditation of Greensill Capital, 7 July 2021, p. 26, para 2.11

177   National Audit Office, Investigation into the British Business Bank's accreditation of Greensill Capital, 7 July 2021, p. 33, para 3.2 and 3.3

178   The seven GFG Alliance companies that received CLBILS loans were: SIMEC International (UK) Limited, Speciality Steel UK Limited, Liberty Commodities Limited, Liberty Industries UK Limited, Liberty Steel Newport Limited, Liberty Pipes (Hartlepool) Limited, Liberty Merchant Bar Plc; National Audit Office, Investigation into the British Business Bank's accreditation of Greensill Capital, 7 July 2021, p. 36, para 3.5 and 3.6

one group would require the British Business Bank to be notified and approve the loans beforehand.[179] In this instance GFG Alliance had been treated as a single group, therefore, Greensill Capital's lending was £300 million above the lending limits applicable to it.[180]

96.   Given the subsequent collapse of Greensill Capital, and the suspension of the Government's £350 million loan guarantee[181] witnesses raised the question about the adequacy of information sharing between HM Treasury, BEIS and the British Business Bank, in the context of the accreditation of Greensill Capital to CLBILS being a potential risk due to its relationship with GFG Alliance and Wyelands Bank (also owned by Sanjeev Gupta). Both the Treasury Select Committee and the Public Accounts Committee explored this issue in detail and confirmed that appropriate information had been shared.[182] The Secretary of State for BEIS confirmed to us that the Bank of England did not raise any issues about Greensill Capital in correspondence as "there did not appear to be any reason to disclose such sensitive information to any further parties, including the BBB".[183]

### Interest in Greensill Capital's CLBILS accreditation by BEIS

97.   The British Business Bank noted that BEIS officials had a high level of interest in Greensill Capital's accreditation as a CLBILS lender between April and September 2020.[184] The National Audit Office (NAO) noted that the British Business Bank typically makes accreditation decisions independently, except for the Larger Scheme Facility, and keeps both HM Treasury and the BEIS Department informed. BEIS took an interest in Greensill Capital's accreditation given its status as a financier to Liberty Steel UK.[185] GFG Alliance had previously requested a £170 million grant on behalf of Liberty Steel UK in March 2020.[186]

98.   The BEIS Department viewed direct support to Liberty Steel "as a last resort, requiring a strong strategic case". BEIS did not consider a bespoke guarantee to be necessary as they were developing business support schemes that might offer Government guarantees to Greensill Capital. The Department, therefore, suggested to Liberty Steel UK that Greensill Capital could apply for those schemes. Greensill Capital subsequently applied to the British Business Bank for accreditation.[187]

---

179   National Audit Office, Investigation into the British Business Bank's accreditation of Greensill Capital, 7 July 2021, p. 36, para 3.5 and 3.6

180   National Audit Office, Investigation into the British Business Bank's accreditation of Greensill Capital, 7 July 2021, p. 36, para 3.7

181   The total amount of Government guarantees suspended was £400 million. This includes the suspension of the eighth £50 million Government backed loan guarantee. The recipient of this loan is named as Aar Tee Commodities (UK), a metals trading company owned by Sanjeev Gupta's associate Ravi Trehan. It is reported that Mr Trehan formerly owned a minority stake in Liberty Commodities and was previously a board member of GFG Alliance's charitable foundation.

182   Discussion about information sharing between HM Treasury, the BEIS Department and the British Business Bank about GFG Alliance, Wyelands Bank and Greensill Capital can be found in the following evidence sessions: Treasury Committee, Oral evidence: Lessons from Greensill Capital, HC 151, 27 May 2021, Q 438, Q439; Public Accounts Committee, Oral evidence: Lessons from Greensill Capital, HC 169, 22 July 2021, Q 2

183   Business, Energy and Industrial Strategy Committee, Correspondence from Rt Hon Kwasi Kwarteng MP Secretary of State Department for Business, Energy & Industrial Strategy, Dated 4 August 2021

184   National Audit Office, Investigation into the British Business Bank's accreditation of Greensill Capital, 7 July 2021, p. 31

185   National Audit Office, Investigation into the British Business Bank's accreditation of Greensill Capital, 7 July 2021, p. 30, para 2.22

186   Q 517

187   National Audit Office, Investigation into the British Business Bank's accreditation of Greensill Capital, 7 July 2021, p. 30

99.   We have been given sight of the eight email exchanges between BEIS and the British Business Bank between April and September 2020 requesting updates on Greensill Capital's accreditation to CLBILS and the Larger Scheme Facility.[188] A number of these emails confirmed that Liberty Steel was lobbying the BEIS Department for financial support for Greensill Capital, as one of its clients. The Department were keen to know the outcome and wanted the decision to be prioritised, so that, if necessary, alternative support options could be considered for Liberty Steel UK. The NAO concluded that the British Business Bank did not prioritise Greensill Capital's application as it could delay the accreditation of other lenders.[189]

100.  While the BBB noted that the BEIS Department level of interest in Greensill Capital's accreditation was "unusual",[190] the Department explained that its "level of interest was not specifically about Greensill but rather its connection to the steel industry, as the Department considers disruptions in this sector can have disproportionate impacts across a range of industries".[191]

101.  The BEIS Secretary of State told us that "we were in very unusual times".[192] He drew our attention to the NAO's report, *Investigation into the British Business Bank's accreditation of Greensill Capital*, which "made clear that it is not uncommon for BEIS to request updates on the accreditation of lenders". The Secretary of State added that the Department needed to stay up to date on the progress of applications as these were "unprecedented and challenging times, and it was important that, as a Department, we were preparing for all potential outcomes".[193]

102. **We note that concerns were raised by HM Treasury and shared with BEIS about GFG Alliance and Wyelands Bank during the accreditation process of Greensill Capital to the CLBIL scheme.**

103. **We recognise that the subsequent level of interest from the BEIS Department about the accreditation of Greensill Capital was "unusual" but we are confident that this did not impact the approval process and the British Business Bank's decision remained independent. Given the potential impact of the financial position of Greensill Capital on Liberty Steel's UK operations, we acknowledge the due diligence of both the Secretary of State and his officials in monitoring the accreditation process closely was entirely proper.**

104. **However, the collapse of Greensill Capital and its impact on Liberty Steel UK highlights the fragility of the sector in the UK more generally and raises far reaching and fundamental questions for the Government to consider in terms of how it should work with the industry to secure a sustainable, long-term future.**

---

188   Business, Energy and Industrial Strategy Committee, Letter from the British Business Bank on Greensill Capital's application for accreditation under the Coronavirus Large Business Interruption Scheme (CLBILS), dated 19 July 2021

189   National Audit Office, Investigation into the British Business Bank's accreditation of Greensill Capital, 7 July 2021, p. 31

190   National Audit Office, Investigation into the British Business Bank's accreditation of Greensill Capital, 7 July 2021, p. 31

191   National Audit Office, Investigation into the British Business Bank's accreditation of Greensill Capital, 7 July 2021, p. 31

192   Q 575

193   Business, Energy and Industrial Strategy Committee, Correspondence to the Business, Energy and Industrial Strategy Committee, 10 August 2021

# 5   Challenges and opportunities facing the UK steel industry

105. The risk to Liberty Steel UK following the collapse of Greensill Capital has exposed the vulnerability of an industry described by the Government as a "national strategic asset" which will "play a critical role in providing the materials necessary to drive the UK's green industrial revolution."[194] As a "foundation industry"[195] steel is vital for the UK's manufacturing and construction sectors and sits at the base of a number of industrial sectors including automotive, construction, energy, aerospace, yellow goods and others.[196]

106. The UK steel industry employs a total of 33,700 people with a further 42,000 jobs supported in the supply chain.[197] However, these jobs are spread unevenly across the UK, being heavily concentrated in Wales (28%) and Yorkshire and Humberside (28%), followed by the north of England (15.5%) and the West Midlands (12.5%) with only a small minority located in the south (8%).[198] Jobs in the steel industry are also relatively well-paid with average salaries 33% higher than the national average and 45% higher than the average in Wales and Yorkshire and Humberside.[199] As such, not only does steel underpin a range of domestic supply chains, it forms the core of local communities, many of which are located in areas of relative deprivation.[200] As one of the largest employers in the local area, the potential closure of Liberty Steel's sites at Rotherham and Stocksbridge alone would, according to recent comments made by steelworkers employed at the sites, "decimate" both areas and leave parts of the defence sector dependent on global markets.[201] If the Government is serious about its "levelling up" agenda,[202] it therefore cannot afford to oversee the continued decline of the UK steel industry.

107. The second part of our report will therefore examine some of the broader issues facing the UK steel industry and how it can secure a more sustainable future. The Government has claimed that it is committed to "doing everything it can to help the UK steel industry secure a long-term viable future."[203] However, evidence submitted to our inquiry identified a number of challenges which continue to threaten the industry's viability, with three key issues in particular highlighted by the witnesses we heard from. First, high electricity prices continue to be a significant financial burden for UK steel producers and are having a pernicious effect on inward investment, with the situation potentially made worse by Ofgem's upcoming Targeted Charging Review;[204] second, UK steel producers continue to encounter challenges in competing for and securing public contracts; and third, the UK steel sector is uniquely vulnerable to global trade pressures as a result of protections in place in both the EU and the US.

---

194   Department for Business, Energy and Industrial Strategy, Business Secretary co-chairs third UK Steel Council meeting of 2021, 21 July 2021

195   UK Government, Transforming foundation industries, 30 October 2019

196   UK Steel, UK Steel Sites & Statistics (2nd edition), May 2018

197   UK Steel, Key Statistics Guide April 2021, page 3

198   House of Commons Library, Briefing Paper 07317: UK steel industry: statistics and policy, 2 January 2018, page 6

199   UK Steel, Key Statistics Guide April 2021, page 3

200   House of Commons Library, Constituency data: Indices of deprivation, 21 September 2020

201   The Guardian, 'If it shuts it will be a disaster': Rotherham fears for its steel industry, 15 March 2021

202   For our report on the Government's levelling up agenda see: Business, Energy and Industrial Strategy Committee, Post-pandemic economic growth: Levelling up, Third Report of Session 2021–22, 22 July 2021

203   Department for Business, Energy and Industrial Strategy, UK steel industry, 8 June 2016

204   Ofgem, Targeted Charging Review: Decision and Impact Assessment, 18 December 2019

108. In addition to these challenges, the Government has committed to reaching net zero emissions by 2050[205] and a 78% reduction in emissions by 2035.[206] These ambitions were set out in the Government's Industrial Decarbonisation Strategy published in March this year[207] and the Business Secretary has stated his expectation that any future support for the industry must be "allied with a commitment on the part of the industry towards decarbonisation and producing clean steel."[208] To support the industry's transition to net zero the Government has announced an Industrial Energy Transformation Fund to support the development and deployment of low carbon technologies;[209] a Clean Steel Fund to support the UK steel sector to transition to lower carbon iron and steel production;[210] along with a Hydrogen Strategy which sets out how the Government will support the production and use of low carbon hydrogen[211] and a Net Zero Hydrogen Fund to support new hydrogen production projects.[212] However, it remains an open question which technology or mix of technologies will be favoured for the transition to net zero and while we heard that decarbonisation will bring with it opportunities for the sector, we also heard that more support and direction are needed if the industry is to meet the Government's targets.

109. This chapter will examine these issues and some of the solutions proposed to deal with them while the following chapter will look at how these might be pulled together into a broader strategy to set the industry on the path to a more viable and sustainable future.

## Energy prices

110. While improvements in energy efficiency have led to a reduction in the energy demands of steelmaking over time,[213] steel production and processing remain highly energy intensive. According to the World Steel Association, energy costs represent anywhere between 20% and 40% of the total cost of steel production.[214] Both of the principal methods of steel production are energy intensive, though energy inputs differ depending on the method of production. In the case of blast furnaces,[215] approximately 89% comes from coal, 7% from electricity, 3% from natural gas and 1% from other sources. In the case of electric arc furnaces, 50% comes from electricity, 38% from natural gas, 11% from coal and 1% from other sources.[216]

111. UK steel producers are currently facing some of the highest electricity prices in Europe. According to the Government's most recent survey of international industrial energy prices, the UK's industrial electricity prices including taxation were the third highest in the International Energy Association (IEA), the third highest in the G7 and 49% above the IEA median. Excluding taxes, UK prices were the third highest in the IEA,

205   Department for Business, Energy and Industrial Strategy, UK becomes first major economy to pass net zero emissions law, 27 June 2019

206   Department for Business, Energy and Industrial Strategy, UK enshrines new target in law to slash emissions by 78% by 2035, 20 April 2021

207   HM Government, Industrial Decarbonisation Strategy, 17 March 2021

208   Q19

209   World Steel Association, Energy use in the steel industry, April 2021, page 1

210   World Steel Association, Energy use in the steel industry, April 2021, page 1

211   World Steel Association, Energy use in the steel industry, April 2021, page 1

212   World Steel Association, Energy use in the steel industry, April 2021, page 1

213   World Steel Association, Energy use in the steel industry, April 2021, page 1

214   World Steel Association, Energy use in the steel industry, April 2021, page 1

215   Further detail on blast furnaces and other technical terms can be found in Annex A of this report.

216   World Steel Association, Energy use in the steel industry, April 2021, page 1

the second highest in the G7 and 58% above the IEA median.[217] Analysis by UK Steel earlier this year found that the average electricity price disparity between the UK and Germany stood at £22/MWh and at £18/MWh between the UK and France, meaning that UK steel producers were paying 86% and 62% more, respectively, than their German and French competitors. This price disparity represents a total additional cost to UK steel producers of £54 million per year compared to those in Germany, the equivalent of 25% of annual capital investment across the sector.[218]

112. Steel companies repeatedly told us that energy prices are one of the biggest challenges facing the industry. Dr Henrik Adam, Chief Executive Officer of Tata Steel in Europe, said that, with respect to electricity prices, UK steel producers were not competing on a "level playing field" with producers in Europe.[219] He claimed that, even after compensation from the UK Government, Tata Steel was paying "almost double" the price for energy compared with competitors in Germany and "significantly higher" than competitors in France.[220] Liberty Steel UK told us that, as an electric arc furnace operator with a number of downstream operations, a significant proportion of fixed costs associated with their GREENSTEEL production and products were attributable to electricity costs.[221] Jon Bolton, former Chief Executive Officer of Liberty Steel UK and a member of the GFG Advisory Board, cited "significant" electricity costs as a challenge for Liberty Steel UK and other steel businesses[222] and claimed that competitive energy costs would help support investment in the sector.[223]

113. As steel producers operate in a highly competitive international market they are unable to pass the cost of high electricity prices on to consumers, reducing profit margins and the availability of internal capital available for investment.[224] Furthermore, as the sector is dominated by large multinational organisations with multiple plants in different countries, the persistent high cost of electricity in the UK has acted as a long-term deterrent to inward investment and this "chronic cycle of low margins and barriers to sufficient investment" has placed the UK steel sector's long-term sustainability at risk.[225]

114. The problem of high electricity prices has gained even greater significance in the context of ambitions to decarbonise the industry. UK Steel told us that internationally competitive electricity prices were "perhaps the key determinant in the viability of low-carbon steel production" as every pathway available to achieve decarbonisation requires significant increases in electricity consumption.[226] According to their estimates, the conversion of blast furnaces to electric arc furnaces would require between two to three times more electricity and hydrogen-based steel production would require between six to seven times more electricity, while carbon capture and storage would "increase energy requirements significantly."[227] UK Steel noted that, if clean steel production is

217    UK Government, International industrial energy prices, Industrial electricity prices in the IEA (QEP 5.3.1), 22
        December 2020
218    UK Steel (LS0006)
219    Q89
220    Q89
221    GFG Alliance (LS0008)
222    Q119
223    Q121
224    UK Steel (LS0006)
225    UK Steel (LS0006)
226    UK Steel (LS0006)
227    UK Steel (LS0006)

highly electricity-intensive, steel companies will choose to invest in those countries where electricity prices are internationally competitive and "at present this is clearly not the UK."[228]

115. **High electricity prices are hindering the ability of UK steel producers to compete on the international market and are a deterrent to inward investment. If the Government is serious about decarbonising the steel industry, it must first recognise the severity of the challenge energy prices pose to steel companies in achieving the transition to net zero and take action to reduce these costs.**

116. The increase in wholesale gas prices over the past year[229] has recently transformed what was a long-standing problem into an immediate crisis. In September this year, British Steel were warning of a fifty-fold increase in quoted rates and a maximum price at peak times of up to £2,500/MWh compared with an average rate of £50/MWh in April, making it impossible to produce profitably at certain times of the day.[230] The chief executive of Celsa Steel UK claimed that surges in electricity prices were "at risk of forcing good businesses to stop production or face financial ruin by continuing to operate."[231] Sudden shutdowns could also lead to damaged equipment, poorer environmental performance and disruption to downstream supply chains.[232]

117. While wholesale gas prices have increased by 400% across Europe this year, the increase has been sharper in the UK than in many other parts of the continent.[233] UK Steel has estimated that, in the last eight months alone, the disparity in electricity prices faced by UK and German steel companies has doubled, with UK producers facing prices over £35/MWh more than those faced by their German counterparts.[234] During the extreme spikes in prices seen in September, UK Steel has estimated that producers were facing prices as high as £109/MWh more.[235]

118. In response to the crisis, the Business Secretary submitted a formal request to the Treasury for increased financial support for manufactures struggling with high energy costs.[236] Options under consideration are reported to include providing short-term loans or guarantees while gas prices remain high or rewriting the compensation scheme for energy-intensive industries.[237] However, UK Steel has responded to these proposals by arguing that any proposal to lend money to steel businesses to help with soaring gas prices would be little more than a "sticking plaster" and that solutions will be needed for "what is a significant long-term problem."[238]

119. **UK steel producers were already facing some of the highest electricity prices in Europe prior to recent rises in the wholesale price of gas. Soaring gas prices have since transformed what was a long-standing problem into an immediate crisis. We urge the**

228   UK Steel (LS0006)
229   BBC, Why are gas prices so high and what is happening to fuel bills?, 12 October 2021
230   Financial Times, British Steel warns of 50-fold increase in power prices, 21 September 2021
231   Financial Times, British Steel warns of 50-fold increase in power prices, 21 September 2021
232   Reuters, Crisis looms in Britain, steel makers warn, 11 October 2021
233   Reuters, Crisis looms in Britain, steel makers warn, 11 October 2021
234   Financial Times, British Steel warns of 50-fold increase in power prices, 21 September 2021
235   Reuters, UK Steel says government needs to help steelmakers after energy price spike, 12 October 2021
236   The Guardian, No 10 backs Kwasi Kwarteng as split with Treasury emerges in energy row, 11 October 2021
237   The Guardian, No 10 backs Kwasi Kwarteng as split with Treasury emerges in energy row, 11 October 2021
238   The Guardian, UK steel industry says energy loan plan is just a 'sticking plaster', 12 October 2021

**Government to support UK steel producers but note that short-term bailouts must not be at the expense of a longer-term strategy to secure a level playing field for UK steel producers with their European counterparts.**

### Action on electricity prices

120. As with many of the challenges facing the UK steel industry today, high electricity prices have been a long-standing problem. Our predecessor Committee's report published in response to the 2015–16 steel crisis noted that, at the time, the UK's industrial electricity prices were the highest in the EU[239] and that these costs made up a "significant proportion" of costs for UK steel producers.[240] In May this year, the Secretary of State conceded that it was "common knowledge" that steel companies in France and Germany faced lower electricity prices than UK companies and that "this has been a problem that has been highlighted for some years, and we are trying to find solutions to it."[241]

121. The Government noted in their written submission to our inquiry that £500 million in relief for electricity costs (now over £600 million)[242] has been provided to the steel sector since 2013.[243] This includes reductions in the indirect costs due to the Contracts for Difference, Renewables Obligation and Small-Scale Feed-In Tariff and compensation for the indirect emission cost due to the UK Emission Trading System and Carbon Price Support mechanism.[244] However, this does not appear to have translated into a meaningful reduction in the price disparity faced by UK steel producers as reported by the steel companies we heard from.[245] It has been estimated that taken together these exemptions and compensation packages have reduced policy costs for UK steel producers from a gross value of £71/MWh to a net £19/MWh but this remains significantly higher (around double) than the net £10/MWh paid by steel companies in Germany and the £8/MWh paid in France.[246]

122. Furthermore, UK steel producers pay significantly higher network costs. While total network costs are similar across the UK, France and Germany at around €33–36/MWh, industrial consumers in the UK pay a much higher proportion of these costs, as the French and German governments have chosen to reduce these costs for industry and allocate them elsewhere.[247] As a result, UK steel producers pay between eight and ten times more in network charges than their direct competitors.[248]

123. We heard the Government's action on electricity prices to date described by Gareth Stace of UK Steel, the trade association for the UK steel industry, as follows:

> The Government have always said, "yes, we've dealt with energy prices," but they have not. We as UK Steel, for the last five years, annually produce

---

239   Business, Innovation and Skills Committee, The UK steel industry: Government response to the crisis, First Report of Session 2015–16, 21 December 2015, page 12

240   Business, Innovation and Skills Committee, The UK steel industry: Government response to the crisis, First Report of Session 2015–16, 21 December 2015, page 13

241   Q18

242   Correspondence to the Business, Energy and Industrial Strategy Committee, 10 August 2021

243   Department for Business, Energy and Industrial Strategy (LS0004)

244   Minister of State (Business, Energy and Industrial Strategy), Answer to written question UIN 170785, 17 March 2021

245   Q89, Q119

246   UK Steel, Closing the Gap, 4 February 2021, page 12

247   UK Steel, Closing the Gap, 4 February 2021, page 10

248   UK Steel, Closing the Gap, 4 February 2021, page 10

> an electricity price disparity report. Every year it produces that France and Germany pay 80% less or we pay 80% more for electricity than they do. It has stayed the same. Government say, "yes, we must do something about this" […]. However, we have not ever seen where the Government have said, "we are going to do it," and we do it.[249]

124. UK Steel submitted a number of detailed proposals on how the price disparity faced by UK steel producers might be reduced. These included compensating or exempting UK steel producers from the Carbon Price Support and/or Capacity Market costs; increasing the level of renewable levy exemptions; and implementing network cost reductions similar to those in France and Germany.[250] UK Steel estimated that a reduction in network costs alone, similar to what is available to German industry (where a reduction of up to 90% is available to eligible companies), would reduce costs for UK steel producers by £25 million per year.[251] These reductions would inevitably mean allocating costs elsewhere, as happens in France and Germany, but to date the Government appears hesitant to reallocate costs to other network users and no action has been taken beyond the compensation offered in relation to policy costs. Dr Henrik Adam, Chief Executive Officer of Tata Steel in Europe, told us that other European countries "clearly favour and support industry and manufacturers that have a high demand on energy much more than we do in the UK today"[252] and confirmed that this would mean reducing the cost for industry but potentially pushing the cost on to consumers.[253] When asked about action on high electricity prices in July, the Government stated that:

> UK steel producers are paying more than their European competitors for electricity and this is a key area where we need to consider options. When doing so, we also need to be conscious about how fundamental power is to every business and every household and to human life. Decisions on the price of electricity will need to be carefully considered to ensure that it is fair for all network users.[254]

125. **We recognise that decisions on how and whether to compensate industry for the costs of electricity will, by necessity, have implications for consumers and other network users. However, it is clear that current electricity costs for UK steel producers are unsustainable. Compensation provided by the Government to the UK steel industry to date has fallen far short of the support offered to their competitors and has not translated into a meaningful reduction in the price disparity. Energy policy costs have been brought down but remain twice as high as those in France and Germany while network costs are almost ten times as high. Further support from the UK Government will be needed if the UK steel industry is to compete on a level playing field and attract investment. This issue will only become more urgent as the industry moves to decarbonise and the sector's demand for electricity rises accordingly.**

---

249   Q43
250   The Carbon Price Support is the UK's tax on carbon emissions while the Capacity Market operates as a charge based on a supplier's net share of demand during periods of high demand on the network. Further detail on these costs can be found in Annex A of this report.
251   UK Steel (LS0006)
252   Q90
253   Q91
254   Correspondence to the Business, Energy and Industrial Strategy Committee, 10 August 2021

126. *If additional support is not forthcoming, high electricity prices will continue to have a pernicious effect on the UK steel industry, resulting in long-term decline and future crises. The Government should set out, following a consultation with industry, what support it will offer beyond the current compensation scheme to reduce the cost of electricity for UK steel producers and bring them in line with those of their competitors. At a minimum, the price disparity should be brought down to within £1/MWh of the total cost faced by key competitors in France and Germany and the Government should track any disparity going forward to ensure it does not widen again.*

### Targeted Charging Review

127. In August 2017, Ofgem announced the launch of its 'Targeted Charging Review' which aimed to address concern that the current framework for residual charging could result in inefficient use of electricity networks. In particular, Ofgem sought to tackle the issue of certain network users adjusting the timing and volume of their production or consumption of electricity to reduce their exposure to charges, therefore pushing charges onto network users who are not able to do this (mainly residential and small business consumers).[255]

128. Subject to Ofgem consultation, changes to Distribution Use of System charges are set to come into force in April 2022 and Transmission Network Use of System charges in April 2023.[256] Among other changes, from this date charges for non-domestic consumers will be based on a series of fixed charging bands rather than being determined through Triads (the three highest winter peak periods).[257] Currently, certain businesses (including steel producers) can save money on electricity bills by reducing their consumption or switching to onsite generation during forecast Triad periods but once these changes are implemented they will no longer be able to do so.[258]

129. We heard concern that, when implemented, the Targeted Charging Review will more than double network charges and could almost triple charges for UK steel producers, resulting in a situation in which UK steel producers face network charges that are 24–60 times higher than their competitors in Germany and France, respectively. Were this to happen, network charges would be the single largest electricity price element and "cancel out much of the positive impact of the Government's Energy Intensive Industries package."[259] This is the means by which certain electricity-intensive businesses, such as steel producers, are exempted from the indirect costs of the Contracts for Difference and Renewables Obligation schemes and the Small-Scale Feed-In-Tariff.[260] According to analysis by UK Steel, these exemptions and compensation have reduced policy prices from a gross value of £71/MWh to a net £19/MWh,[261] a reduction of £52/MWh. However, without mitigating action, the Targeted Charging Review is set to increase the price disparity by £17/MWh[262] and make network costs the single largest electricity price element in the UK.[263]

255   Ofgem, Targeted Charging Review - Significant Code Review launch statement, 4 August 2017
256   Energy Intelligence Centre, Targeted Charging Review (TCR) Guide, 28 September 2021
257   Energy Intelligence Centre, Targeted Charging Review (TCR) Guide, 28 September 2021
258   Energy Intelligence Centre, Targeted Charging Review (TCR) Guide, 28 September 2021
259   Q91
260   Department for Business, Energy and Industrial Strategy, Energy Intensive Industries (EIIS), 1 December 2020
261   UK Steel, Closing the Gap, 4 February 2021, page 12
262   UK Steel, Closing the Gap, 4 February 2021, page 11
263   UK Steel, Closing the Gap, 4 February 2021, page 10

130. When asked what assessment had been made of the potential effect of the Targeted Charging Review proposals on the UK steel sector earlier this year, the Government answered that "network charging is a matter for Ofgem, as the independent regulator, and decisions on its Targeted Charging Review are for it to make."[264]

131. **When implemented, the Targeted Charging Review has the potential to burden UK steel producers with costs exceeding relief provided to the sector as an energy intensive industry. We note that despite this decision having a potentially significant impact on UK steel producers it has been left entirely to Ofgem without the opportunity for the Government to intervene.**

132. *Given that UK steel producers are already facing some of the highest electricity prices in Europe and that demand for electricity will only increase as the sector decarbonises, the Government should exempt the steel sector from increased costs arising from Targeted Charging Review reforms.*

## Public procurement

### Government policy on public procurement

133. The Government is a major buyer of steel with an estimated steel requirement of 7.6 million tonnes over the next decade.[265] By comparison, in 2019 (prior to the COVID-19 pandemic) the UK produced 7.2 million tonnes of crude steel[266] which would make public steel requirements equivalent to approximately 10% of domestic steel production. This significant purchasing power could be harnessed to support the UK steel sector and deliver wider benefits. UK Steel lists some of the benefits of using procurement policy to support UK steel producers as being:[267]

- Increasing the economic value a project delivers to the UK

- Increasing the ability and potential of each project to spread its economic benefits across the UK

- Increasing the interest in the competitive process and therefore helping to deliver best value for money

- Delivering against a wider range of outcomes beyond just upfront cost, such as the social and environmental benefits that can flow from procurement decisions

- Providing a strong pipeline of projects in the UK that helps anchor manufacturing and accompanying innovation here in the UK

---

264   Minister of State (Business, Energy and Industrial Strategy) (Energy and Clean Growth), Answer to written question UIN 149257, 4 February 2021

265   Department for Business, Energy and Industrial Strategy, Steel public procurement 2021, 19 May 2021

266   World Steel, 2021 World Steel in Figures, 3 June 2021, page 9

267   UK Steel, Maximising Value: Positive Procurement of Steel, 2021, page 2

134. Guidance on the public procurement of steel was first published in October 2015 in the form of the Procurement Policy Note (PPN) on procuring steel in major projects.[268] This was subsequently revised in December 2016 to make it more suited to wider public sector use.[269] The measures contained in the PPN sought to:

> Ensure that Government applies a more strategic and transparent approach to the sourcing of steel in major projects [which] should stimulate greater competition and lead to better value for money, while helping to address the barriers that prevent UK suppliers from competing effectively.[270]

The PPN sets out a number of considerations to inform contracting authorities' procurement strategies, taking into account social issues and broader Government-wide and Departmental objectives such as economic growth and the encouragement of a more diverse supplier base. Some of these considerations include:[271]

- Contractors' capability in relation to supply chain management

- Sustainable sourcing and production

- Skills and training of the workforce engaged on the contract

- Targeting new employment opportunities at the long-term unemployed

- Benefits to the local community affected or engaged with the project

135. The revised PPN published in December 2016 was accompanied by the first 'Steel Pipeline,'[272] an indicative list bringing together all planned and ongoing infrastructure projects requiring steel with the aim of enabling UK steel producers to plan and bid for Government contracts more easily. This was followed up by an updated pipeline in December 2017 which showed how the Government was planning to use 3 million tonnes of steel over the next five years on infrastructure projects including High Speed 2 (HS2), the construction of Hinkley Point and the maintenance and upgrading of the UK's motorway network.[273] A further update was published in October 2020 outlining steel requirements up to 2030 along with a review of how Government Departments had applied the steel procurement guidance contained in the PPN.[274] These documents showed that the reported proportion of steel procured within the UK for public projects for the financial year 2018–19 was 77%, an increase of 40% from the previous year. The value of contracts placed with UK suppliers also increased by 20% from £67 million to £81 million.[275] The most recent steel pipeline was published in May 2021, together with an updated review of how Government Departments had applied the steel procurement guidance.[276]

---

268   Crown Commercial Service, Procurement Policy Note—Procuring steel in major projects, 30 October 2015

269   Crown Commercial Service, Procurement Policy Note: Procuring Steel in Major Projects—Revised Guidance, 13 December 2016, page 1

270   Crown Commercial Service, Procurement Policy Note: Procuring Steel in Major Projects—Revised Guidance, 13 December 2016, page 2

271   Crown Commercial Service, Steel Procurement in Major Projects, 12 December 2016, pp. 11–14

272   Crown Commercial Service, UK Government Steel Pipeline, 12 December 2016

273   Department for Business, Energy and Industrial Strategy, Steel public procurement pipeline 2017, 15 December 2017

274   Department for Business, Energy and Industrial Strategy, Steel public procurement 2020, 9 October 2020

275   Department for Business, Energy and Industrial Strategy, New data shows proportion of steel procured within UK has doubled since last year, 9 October 2020

276   Department for Business, Energy and Industrial Strategy, Steel public procurement 2021, 19 May 2021

### Impact of public procurement policy

136. We heard that, despite advances made since the publication of the PPN in 2015 and the steel pipeline, efforts to drive up the public procurement of steel had "failed to have the impact hoped for."[277] Dr Henrik Adam, Chief Executive Officer of Tata Steel in Europe, commented that while the range of Government support on procurement offered to date was helpful, they were "not really game changers,"[278] while UK Steel told us they had "not truly yet addressed the barriers experienced by UK steel companies in attempting to supply into public projects."[279] UK Steel noted the disparity between the 160,000 tonnes of steel sourced from UK steel producers as documented in the Government's compliance with the steel procurement guidance (PPN 11/16)[280] and the 800,000 to 900,000 tonnes of steel the 2020 steel pipeline[281] indicated is used by the Government each year,[282] leaving around 700,000 tonnes of publicly procured steel either unaccounted for or sourced from outside the UK.

137. Witnesses identified a number of barriers that continue to be experienced by UK steel producers when supplying into public projects in what UK Steel described as a "business as usual approach."[283] The complexity of steel supply chains has meant that an open tender process is rarely used and this lack of transparency often prevents steel companies from having visibility of supply opportunities and public project owners from knowing where their steel is supplied from.[284] Furthermore, the "informal" approach to steel procurement has meant that established supply chains are often favoured by contractors, further reducing opportunities for UK steel producers. We were told that steel companies are "often unaware of what their products are ultimately used for"[285] and that:

> The preference for contracting authorities and tier ones to not directly purchase steel acts as a barrier to transparency and opportunities for wider social value objectives to be achieved are missed, along with opportunities to innovate and reduce costs both at the CAPEX and OPEX stage of a project.[286]

138. This lack of transparency has implications for the application of social and environmental objectives and we heard broad agreement that these considerations ought to be taken into account. The Green Alliance told us that a requirement for clean steel in large infrastructure projects could serve as part of a drive to promote markets for clean steel and a supportive policy environment for achieving net zero.[287] Roy Rickhuss CBE, General Secretary of Community Union, told us that "contracting authorities should give proper weighting to social and environmental clauses in the tendering process to support domestic jobs and industry, just like they do in France and Germany."[288] Gareth Stace of

---

277   UK Steel (LS0006)
278   Q89
279   UK Steel (LS0006)
280   Department for Business, Energy and Industrial Strategy, Compliance with the steel procurement guidance (PPN 11/16), 9 October 2020
281   Department for Business, Energy and Industrial Strategy, Steel procurement pipeline 2020, 9 October 2020
282   UK Steel (LS0006)
283   UK Steel (LS0006)
284   UK Steel (LS0006)
285   UK Steel (LS0006)
286   UK Steel (LS0006)
287   Green Alliance, Hanbury Strategy, European Climate Foundation (LS0003)
288   Green Alliance, Hanbury Strategy, European Climate Foundation (LS0003)

UK Steel emphasised that for taxpayer-funded projects, public bodies should look beyond the cost of steel to "the value of the whole purchase, where that steel is coming from, those transport emissions, and even human rights in the country you are buying it from."[289]

139. However, while the current steel procurement guidance does contain a list of broader social criteria to be applied at "key stages of the procurement life-cycle,"[290] the fact that an open tender process is rarely used for the supply of steel into public projects means that, in the absence of more explicit direction on social and environmental value objectives from above, sub-contractors are not taking them into account.[291] All this would suggest that much of the guidance contained in the PPN is not being applied by public bodies sufficiently rigorously and we heard that a "cultural shift"[292] on this issue was now needed, with one witness telling us "we really, really need to see some action now. We cannot have the warm words that we have had in the past."[293]

140. We wrote to the Secretary of State in July asking what action was being taken by his Department to address the barriers faced by UK steel producers in attempting to supply into public projects. He pointed to the work of the Steel Procurement Taskforce in attempting to "promote the unique selling points of UK steel and explore how best to support and position the industry for success in forthcoming major public contracts."[294] The Secretary of State also noted that:

> It is important that suppliers continue to be treated equally and fairly through open competition. Keeping our procurement market open to international competition ensures better value for money for the taxpayer and facilitates UK suppliers being offered reciprocal rights to participate in procurements abroad.[295]

However, it is clear from much of the evidence we received that a significant part of the problem lies with how the current guidance is being applied as the result of what is often an opaque and informal approach to procurement, aside from insufficient aid or support from the UK Government in promoting UK industry.

141. **Despite advances made since the publication of the Procurement Policy Note in 2015, UK steel producers are still encountering challenges when competing for and securing public contracts. Much of this is due to an opaque and informal approach taken to steel procurement by contracting authorities and action is needed from the Government to make this process more transparent. Furthermore, a lack of transparency in steel supply chains together with an absence of explicit guidance on how social and environmental considerations should be applied has meant that broader objectives are being missed. Public procurement of steel has the potential to deliver wider benefits and further action is needed to ensure that the full value offered by UK steel producers is taken into account when supplying steel into public projects.**

142. ***To ensure full transparency, the Procurement Policy Note (PPN) on steel procurement in major projects should be updated to include a requirement for contracting authorities***

289  Q54
290  Crown Commercial Service, Steel Procurement in Major Projects, 12 December 2016, pp. 1, 11–14
291  UK Steel (LS0006)
292  Q54
293  Q55
294  Correspondence to the Business, Energy and Industrial Strategy Committee, 10 August 2021
295  Correspondence to the Business, Energy and Industrial Strategy Committee, 10 August 2021

*to provide supply chain plans and publicise supply opportunities for UK steel producers. The Government should also publish updated guidance on how social and environmental considerations should be made in relation to steel purchases to ensure these are taken into account by contracting authorities.*

### Data on public steel requirements

143. Part of the challenge with transparency in steel supply chains stems from incomplete data collected by public bodies. Gareth Stace of UK Steel told us that "there is still lots of steel where Government Departments cannot tell you where that steel came from," expressing concern that "surely Government Departments should know what they are spending their money on?"[296] The most recent publication of compliance with the steel procurement guidance noted that "returns [on steel procured for major infrastructure projects] are self-declared and BEIS is reliant on Government Departments and their Arm's Length Bodies and contractors for the quality and completeness of the data provided."[297] It goes on to comment that "there are challenges in collecting this data" and cites gaps in the data provided by Government Departments—of the 91 projects which reported, 90 detailed tonnage requirements, 87 specified the value of their steel requirements and only 69 specified both contract value and origin details.[298]

144. There is also an absence of data relating to steel contracts awarded by the Contracts for Difference scheme or Highways England.[299] As a result, insights are "based on the limited set of returns provided by Government Departments rather than all Government projects."[300] Contracts for Difference is the Government's main mechanism for supporting low-carbon electricity generation by awarding developers of low-carbon electricity-generating projects the difference between the strike price and the reference price for electricity produced over the course of the contract.[301] The scheme has allocated funding to major steel-using projects, including offshore windfarms and energy plants[302] and yet these do not currently fall within the scope of the Procurement Policy Note. We heard concern that projects funded by the Contracts for Difference scheme did not fall within the scope of the PPN and that data on the value and origin of steel requirements for these projects had not been reported, with Gareth Stace pointing out that the scheme involved public money.[303] The same applies with respect to data collected on steel contracts awarded by Highways England. This is particularly concerning given that Highways England is a major purchaser of steel, with at least 30,000 tonnes of steel required over the next ten years according to the Government's steel pipeline.[304]

145. In March this year, alongside the re-established UK Steel Council, the Government established the Steel Procurement Taskforce, co-chaired by Lord Grimstone and Gareth Stace of UK Steel, to explore what Government and industry can do to address challenges

296   Q54
297   Department for Business, Energy and Industrial Strategy, Steel public procurement 2021, 19 May 2021, page 4
298   Department for Business, Energy and Industrial Strategy, Steel public procurement 2021, 19 May 2021, page 4
299   Department for Business, Energy and Industrial Strategy, Steel public procurement 2021, 19 May 2021, page 4
300   Department for Business, Energy and Industrial Strategy, Steel public procurement 2021, 19 May 2021, page 4
301   Contracts for Difference Allocation Round 4 (CfD AR4) portal, Frequently Asked Questions [Accessed 9 September 2021]
302   Department for Business, Energy and Industrial Strategy, Contracts for Difference Second Allocation Round Results, 11 September 2017
303   Q54
304   Department for Business, Energy and Industrial Strategy, Steel procurement pipeline 2021, 19 May 2021

the sector faces in competing for and securing public contracts.[305] Its aims include "improving data reporting […] with the aim to deliver more robust data in the coming years."[306] When asked about the issue of incomplete data on steel procured for public projects, the Secretary of State told us that "we have to measure and know how much [steel is procured] and where it is coming from" and that the Government had "set up a taskforce whose job it is to look at these questions, which […] will report in a few months, certainly by the end of the year."[307]

146. **High-quality data will be essential for monitoring and improving compliance with steel procurement policy. However, this data is currently incomplete with only partial data being reported by Government Departments and Arm's Length Bodies. We welcome the work of the Steel Procurement Taskforce in working to improve the quality of this data. However, at the very least, all Government projects should be fully reporting on the value and origin of their steel requirements.**

147. *A requirement should be set for all Government projects, including steel contracts awarded by the Contracts for Difference scheme and Highways England, to fully report on the value and origin of their steel requirements.*

### Minimum steel content targets

148. In our first session with the Secretary of State, we were told that "there is clearly a role for the UK Government as procurers of steel to help the industry"[308] and that a departure from EU rules on public procurement was viewed as an opportunity to support the sector.[309] Gareth Stace of UK Steel described the public procurement of UK-made steel as a "win-win" for the Government, asking "why would you spend taxpayers' money on steel that you purchase from abroad when you could purchase it in the UK and keep that pound of taxpayers' money in the UK?"[310]

149. In April last year a contract for 9,000 tonnes of steel bridgeworks for High Speed 2 was awarded to French supplier Eiffage-Kier-Ferrovial-Bam.[311] Both British Steel and Liberty Steel UK have since contested claims that the weathering steel plate required could not be procured domestically to the required size.[312] We were told that UK steel producers "do not even get a look in" as contractors often favour established suppliers[313] and that this was sometimes due to an assumption that UK suppliers would not have the capability to meet contractors' requirements:

> We have also had lots of examples of where [contractors] say, "we did not purchase it from the UK because the UK does not have that capability," and either we do or we could have had that capability and capacity to produce

305   Department for Business, Energy and Industrial Strategy, Lord Grimstone co-chairs inaugural Steel Procurement Taskforce meeting, 12 March 2021

306   Department for Business, Energy and Industrial Strategy, Steel public procurement 2021, 19 May 2021, page 4

307   Q536

308   Q14

309   Q19

310   Q53

311   Eiffage, Eiffage and Kier receive Notice to Proceed for HS2, 15 April 2020

312   Financial Times, UK steel companies fear missing out on HS2 contracts, 1 October 2020

313   Q54

that particular type of steel, if only we had known about it, because it would be many years both in terms of the investment and being able to supply that product to the market.[314]

150. UK Steel suggested that setting minimum UK steel content targets for major public projects could serve as an effective measure to improve opportunities for UK steel producers.[315] This would not necessarily be a legally binding target but rather a statement of intent with which to drive improvements in public procurement.[316] The establishment of the Steel Procurement Taskforce signals both a recognition that more work needs to be done in this area and the benefits of doing so. It will be for the Taskforce to provide detailed recommendations on how the procurement of UK-made steel should be improved. However, the Taskforce is not due to report until later in the year[317] and measures could be taken now to support the steel sector. A sense of urgency was conveyed to us by Roy Rickhuss CBE, who referenced the Government's £600 billion infrastructure programme[318] and the need for "decisive, game-changing interventions in this area if [the steel sector] are not going to miss out."[319]

151. **Decisive action should be taken to ensure that UK steel producers do not miss out on the Government's ambitious infrastructure programme. Setting minimum UK steel content targets for major public projects would serve as an important first step to improving opportunities for UK steel producers. *The Government should introduce minimum UK steel content targets for major public projects, starting with High Speed 2.***

## Trade

152. Steel is an intensively traded product. Prior to the COVID-19 pandemic, an estimated 25–30% of steel products produced globally each year travelled across national borders.[320] However, it is widely recognised that global steel markets are distorted by state interventions—steel industries are often heavily subsidised by national governments resulting in production levels far exceeding what the market would otherwise dictate.[321] Subsidies can include:[322]

- Cash grants, awards and cost refunds

- Preferential loans, debt instruments placement, equity infusions and conversions

- Guarantees and other transfers of liabilities

- Debt forgiveness or restructuring

- Tax benefits

314    Q54
315    UK Steel (LS0006)
316    UK Steel, COVID-19—restart and recovery, 14 May 2020, page 11
317    Correspondence to the Business, Energy and Industrial Strategy Committee, 10 August 2021
318    Infrastructure and Projects Authority and HM Treasury, National Infrastructure and Construction Pipeline 2018, 26 November 2018
319    Q55
320    World Steel Association, 2021 World Steel in Figures, 3 June 2021, page 24
321    House of Commons Library, UK Steel Industry: Statistics and policy, 18 June 2021, page 27
322    OECD, Government support to the steel sector: instruments, information sources, and existing guidelines, September 2017, pp. 6–7

- Government approach to mergers and acquisitions

153. Governments participating in the OECD Steel Committee "consider excess capacity as being one of the main challenges facing the global steel sector today"[323] and according to the Global Forum on Steel Excess Capacity:

> Excess steelmaking capacity creates significant difficulties for steel producers in advanced, emerging and developing economies alike. It depresses prices, undermines profitability, generates damaging trade distortions, jeopardizes the very existence of companies and branches across the world, creates regional imbalances, undermines the fight against environmental challenges and dangerously destabilizes world trading relations.[324]

154. The problem has the potential to be further exacerbated by restrictions imposed in response to the COVID-19 pandemic with concerns around possible stockpiling of steel, particularly by China, and the potential for markets to be flooded with low or below-cost products once restrictions are eased. The pandemic has led to a worldwide reduction in steel production but there have been significant differences between regions. While the EU saw a 17.9% fall in production in the first half of 2020 (compared with the first half of 2019) and North America a 17.6% fall, Asia saw a much smaller fall of 2.3%.[325] Production in China actually increased by 2.2% with most steel-using sectors returning to pre-COVID-19 production levels by the end of April 2020.[326]

### Trade remedies

155. Countries are able to use trade remedies to protect their domestic industries from a flood of global oversupply. In March 2018, the US imposed a 25% tariff on steel imports to protect against "unfair trade."[327] The EU reacted with a tariff on products bound for the EU in late June 2018 and a provisional EU safeguard on steel imports followed in July 2018.[328] In February 2019, the EU implemented a final safeguard measure operating as a Tariff Rate Quota (TRQ) of 100% based on import levels in 2015–2017 with a dissuasive 25% tariff above that. Further rules regarding quarterly quotas for certain products and countries were included and these are amended periodically as the safeguard is reviewed.[329] Nineteen product categories covered by the EU steel safeguard measure were identified by the Secretary of State for International Trade where UK production exists, all of which were transitioned in order to provide continuity to UK producers.[330] The Trade Remedies Investigations Directorate (TRID) (the predecessor to the Trade Remedies Authority) subsequently conducted a transition review of safeguard measures across the nineteen steel product categories to ensure these measures fully reflected the UK market situation.[331]

156. We heard that these safeguard measures continue to be necessary due to the vulnerable position of the UK market. The EU recently announced that it would extend its own steel

323   OECD, Steelmaking capacity, June 2020
324   Global Forum on Steel Excess Capacity [Accessed 8 August 2021]
325   OECD, Steel Market Developments, Q4 2020, September 2020, page 22
326   OECD, Steel Market Developments, Q4 2020, September 2020, page 23
327   BBC News, Trump tariffs: US President imposes levy on steel and aluminium, 8 March 2018
328   Eurofer, EU steel safeguard
329   Eurofer, EU steel safeguard
330   UK Government, Trade remedies transition policy, 16 December 2020
331   UK Government, Trade remedies transition policy, 16 December 2020

safeguards for at least another three years[332] and we heard that, if the EU continues to apply their own safeguards, irrespective of whether they are justified, the UK will need to have a similar policy otherwise exporters to the EU will divert their products to the UK market.[333] UK Steel claimed that "the EU and US are almost certain to continue to place controls on UK steel exports for the foreseeable future" and that if the UK were to drop its own safeguards then, as one of very few exposed markets in the world, the likelihood of trade divergence towards the UK market would be "extremely high" and "huge levels of injury [to the UK steel sector] would be caused."[334]

157.  UK Steel highlighted the particular vulnerability of the UK market to the problem of global overcapacity, as just 2% of excess production would be enough to meet the entirety of UK demand.[335] They noted that current safeguards "provide for a careful balance of interests between steel producers and consumers" as they are designed only to restrict supply when imports surge above levels that would be damaging to the UK sector.[336] UK Steel further noted that Tariff Rate Quotas currently allow for 111% of historical volumes of steel to enter the UK tariff-free at a time when overall demand, as a result of measures imposed in response to COVID-19, is expected to be at 10% below historical levels. Consequently, there is sufficient additional capacity within the UK steel sector to meet demand.[337]

158. **Given that global steel markets continue to be heavily distorted by state subsidisation and that the EU and the US continue to apply tariffs on imported steel, the UK requires a response from Government regarding potential trade divergence towards UK markets and significant injury to UK steel producers.**

## Recommendation of the Trade Remedies Authority

159. The Trade Remedies Investigations Directorate (the predecessor to the Trade Remedies Authority) announced its Statement of Intended Preliminary Decision on 19 May. It recommended the revocation of measures on nine categories of steel imports on the basis that, in six of the nine revoked categories, there was no increase in imports to the UK between 2013–2017 (meaning the measures could not be extended) and, for the other three revoked categories, that the import increase was not significant enough, was not likely to cause injury, or that extending the measure did not meet the Economic Interest Test.[338] For the ten product categories in which TRID recommended that measures be extended, TRID determined that Tariff Rate Quotas would remain the most appropriate form of measure to be applied, with imports outside the quotas facing a tariff of 25%.[339]

160. The preliminary recommendation was met with concern by industry voices. British Steel remarked that, if accepted, the recommendation would be a "major setback for UK manufacturers" while UK Steel claimed that "the UK will become a magnet for huge volumes of steel imports" and that "it is beyond worrying to consider the damage this

---

332    European Commission, EU prolongs steel safeguard for three years, 25 June 2021
333    Metals Consulting International Limited (LS0002)
334    UK Steel (LS0006)
335    UK Steel (LS0006)
336    UK Steel (LS0006)
337    UK Steel (LS0006)
338    Trade Remedies Investigations Directorate, Steel safeguard measures review – draft recommendation published, 19 May 2021
339    Trade Remedies Investigations Directorate, Steel safeguard measures review – draft recommendation published, 19 May 2021

could do to the UK steel sector and its long-term viability," adding that the removal of protections would have an adverse impact on the manufacture of steel sections at Teesside, tubes in Hartlepool and wire-rod made in Cardiff, Scunthorpe and Rotherham.[340] The Department for International Trade responded to these concerns by reiterating that the Government "supports free trade for British steel manufacturers" and that "the Secretary of State has limited powers in relation to the TRA, and only has the choice under law to accept the TRA's recommendation, or see safeguard measures expire at their end date."[341]

161. We wrote to the Secretaries of State for Business, Energy and Industrial Strategy and International Trade on 25 May seeking clarification on whether recommendations from TRA were binding on the Government or whether Ministers would intervene in cases that are not in the United Kingdom's interest.[342] The Secretary of State for International Trade responded:

> My powers, as established in 2018 under the Taxation (Cross-border Trade) Act, are limited. As the Trade Secretary, I can only accept or reject the TRA recommendation as a whole, but I cannot modify or partially accept it. I cannot extend this or any measure if the TRA does not recommend it. This is currently a matter for the TRA. However, the world has changed since 2018 when these powers were put in place. We will not hesitate to defend UK industry from unfair trading practices. As previously stated, we are exploring what else we might need in our toolkit to defend British industry from unfair trading practices, dumping, subsidies and unforeseen surges in imports as well as market distortions while continuing to champion free and fair trade in line with our international obligations.[343]

162. In June, the Secretaries of State for Business, Energy and Industrial Strategy and International Trade held a meeting with UK steel producers in which the industry argued that the TRA's recommendations were flawed, based on partial data and showed a "complete disregard for the practical considerations" of the sector.[344] They added that the TRA did not take into account that the EU and the US were keeping in place their own trade protections, leaving Britain exposed to steel imports. Gareth Stace of UK Steel told us that the Trade Remedies Authority had made its decision "behind closed doors" without a two-way dialogue with industry.[345] As a consequence, it had "fundamentally" misunderstood that sites produce a number of products and that these "all hang on each other," meaning that dropping safeguards on some products would affect those products for which the safeguards had been retained.[346]

163. The industry suggested tweaks to legislation which could be made quickly, allowing six of the nine safeguards to be kept while remaining compliant with World Trade Organisation rules. However, the Department for International Trade expressed concerns over whether this would be compliant with the UK's international obligations:

---

340  Financial Times, Steel industry hits out at UK plans to remove tariff protections, 20 May 2021
341  Financial Times, Steel industry hits out at UK plans to remove tariff protections, 20 May 2021
342  Correspondence from the Business, Energy and Industrial Strategy Committee, 25 May 2021
343  Correspondence from the Secretary of State for Business, Energy and Industrial Strategy and the Secretary of State for International Trade and President of the Board of Trade, 11 June 2021
344  The Telegraph, Cabinet split over bid to protect British steel makers from imports, 27 June 2021
345  Q46
346  Q46

> Any forcing through of legislation in order to disregard the TRA recommendation, which is based on evidence provided by interested parties including importers, domestic producers and overseas exporters, would breach WTO rules, leaving us open to challenge and retaliation.[347]

164. Despite these concerns, on 30 June it was announced that the Government would introduce a public notice to launch a temporary extension on five of the nineteen steel products for one year, with imports outside the quotas facing a tariff of 25%.[348] This extension would aim to give industry more time to appeal the TRA decision and include an assessment of "the risk of injury arising from the EU safeguard which was published after the TRA made their decision."[349] Furthermore, the UK Government would review the Trade Remedies framework "as an urgent priority […] to ensure it is up-to-date, champions WTO rules and is fit for purpose in the post-COVID world."[350]

165. **We share the concerns expressed to us that the Trade Remedies Authority's recommendation to revoke safeguards on nine categories of steel imports was not based on an open dialogue with industry and had therefore missed the wider impact its decision would have had on UK steel producers. These concerns also appear to be shared by the UK Government as demonstrated by its decision to overrule the Trade Remedies Authority's recommendation and grant industry more time to appeal its decision. A two-way dialogue with industry must inform future recommendations by the Trade Remedies Authority and we welcome the opportunity given to both parties to do so.**

## Decarbonisation

166. The UK Government has committed to bringing all greenhouse gas emissions to net zero by 2050[351] and to cut emissions by 78% by 2035.[352] Decarbonising the steel industry will be an important part of meeting these targets as the sector is a significant contributor of greenhouse gas emissions, responsible for 13.9% of greenhouse gas emissions from manufacturing and 2.3% of the total greenhouse gas emissions from all industry.[353] In addition to the Government's overarching net zero target the Climate Change Committee has recommended that ore-based steelmaking ('primary' steelmaking using blast furnaces) reach near-zero emissions by 2035[354] and the Government is currently considering the implications of this recommendation in collaboration with the UK Steel Council.[355]

167. In March this year, the Government published its Industrial Decarbonisation Strategy which aimed to "show how the UK can have a thriving industrial sector aligned with the net zero target, without pushing emissions and business abroad."[356] The strategy

---

347   The Telegraph, Cabinet split over bid to protect British steel makers from imports, 27 June 2021

348   Reuters, UK to extend quotas and tariffs on most steel imports, 27 June 2021

349   Secretary of State for International Trade, Written statement UIN HCWS136, 30 June 2021

350   Secretary of State for International Trade, Written statement UIN HCWS136, 30 June 2021

351   Department for Business, Energy and Industrial Strategy, UK becomes first major economy to pass net zero emissions law, 27 June 2019

352   Department for Business, Energy and Industrial Strategy, UK enshrines new target in law to slash emissions by 78% by 2035, 20 April 2021

353   ONS, Atmospheric emissions: greenhouse gases by industry and gas, 3 December 2020 (10,412.6 thousand tonnes carbon dioxide equivalent out of 75,129.8 [manufacturing total] and 451,464.2 [all industry total])

354   Climate Change Committee, Policies for the Sixth Carbon Budget and Net Zero, 9 December 2020, page 111

355   HM Government, Industrial Decarbonisation Strategy, 17 March 2021, page 19

356   HM Government, Industrial Decarbonisation Strategy, 17 March 2021, page 8

notes that there are limited windows of opportunity for equipment to be replaced with low carbon alternatives between now and 2050 and that shutting down a plant to replace or retrofit equipment is expensive and disruptive, with equipment typically only replaced or upgraded at the end of its lifetime.[357] The Government has committed to engage with industry to understand the feasibility of ensuring that replacement equipment is able to be easily retrofitted with carbon capture and storage or hydrogen, and the Industrial Energy Transformation Fund will support this transition through the provision of grant funding towards the commercial demonstration of fuel switching technologies.[358] The Government is also considering the option of making it a mandatory requirement for upgraded equipment to be low-carbon ready later in the 2020s, as recommended by the Climate Change Committee.[359]

168. Though both of the principal methods for producing steel require large amounts of energy, the blast furnace route produces considerably more carbon emissions due to the use of coking coal as a reducing agent to extract iron from iron oxide ores.[360] The Government estimates that the primary steelmaking sites at Port Talbot and Scunthorpe are responsible for 95% of all iron and steel industry emissions and consequently that "decarbonising these two blast furnace sites and the wider steel sector will be essential to the decarbonisation story of UK industry."[361] When giving evidence in May 2021, in reference to the Climate Change Committee's recommendation of cutting emissions by 78% by 2035, the Secretary of State made the statement that:

> 2035 is in 14 years' time and so, over those 14 years, I would expect the basic oxygen, blast furnace process to be phased out, but that is not something that is going to happen next week or next month. […] That is why I resuscitated the Steel Council, why we have discussions and are producing papers, and why we have the Industrial Decarbonisation Strategy. We are very clear about the long-term goal, and that is something that is going to happen over time.[362]

When pressed on whether the long-term goal really was to phase out basic oxygen steelmaking in this country, the Secretary of State remarked "it will be phased out to the point that we will have an 80% reduction" and that basic oxygen steelmaking "is a carbon-emitting one, so the logic of decarbonisation is that we are going to try to come up with steel production that is less carbon-emitting."[363] He went on to clarify that 'net zero' does not mean the same as 'absolute zero' and that "we are not […] going to slam the door shut on [basic oxygen] manufacture of steel. We are saying that we want to move towards a cleaner and less-carbon-emitting process."[364]

169. We heard that while decarbonising the nation's blast furnaces will be challenging, the UK ought to retain its primary steelmaking capability rather than move over exclusively to electric arc furnaces. Edwin Basson, Director General of the World Steel Association, noted that decarbonisation does "not per se mean going to electric arc furnaces. It also

357   HM Government, Industrial Decarbonisation Strategy, 17 March 2021, page 55
358   HM Government, Industrial Decarbonisation Strategy, 17 March 2021, page 55
359   HM Government, Industrial Decarbonisation Strategy, 17 March 2021, page 55
360   House of Commons Library, UK Steel Industry: Statistics and policy, 18 June 2021, page 32
361   HM Government, Industrial Decarbonisation Strategy, 17 March 2021, page 53
362   Q25
363   Q26
364   Q27

means what you do with your blast furnaces and making those efficient."[365] Roy Rickhuss CBE, General Secretary of Community Union, stated that he did "not believe personally that a transition to totally electric arc furnaces is the right answer" given that they cannot produce the qualities and grades of steel that blast furnaces are capable of producing.[366]

170. Roz Bulleid, Head of Policy, the Green Alliance, said that "there is an argument for the UK continuing to produce primary steel and doing it in a clean way, rather than just exporting that and […] potentially do it in a higher-carbon way."[367] This point was also made to us by UK Steel, who told us that "the UK must aim to tackle not just emissions produced within our own borders but those produced elsewhere and imported."[368] To do otherwise "would run the risk of decarbonising through deindustrialisation instead of through investment and innovation" and "would mean a reduction in industrial capability, jobs, and economic activity instead of the creation of a new green industry and the myriad of benefits that would flow from that."[369]

171. However, while we identified broad agreement that the UK's primary steelmaking capability should be retained, the question of which technology to use to reach the 2035 target was still "very much an unknown."[370] Gareth Stace of UK Steel commented that while some of the blast furnace capacity could be moved to electric arc furnaces—a technology which has the benefit of being "tried and tested" and "probably cheaper than other technologies"—he was doubtful that on their own they would be sufficient to achieve the net zero target and that "there would be a need for carbon capture and storage and hydrogen."[371] However, these technologies remain largely untested at scale in the steel industry and "zero-carbon hydrogen is a long way off."[372] Roz Bulleid, told us that "it is a little unclear which [technology] is going to be the best route" and that "there is a real urgency now that we examine in detail the cases for all of these technologies to make sure that we have a good suite of options available."[373] Of all the options, she described hydrogen as "quite promising" and was keen to see it trialled but called for innovation and research funding to be made available for other routes too.[374]

172. Each plant presents unique challenges and solutions will need to be tailored to the specific circumstances of individual sites—while the Scunthorpe site has the potential to utilise carbon capture and storage (CCS) due to its proximity to the Endurance aquifer,[375] a possibility raised by the Secretary of State at our first evidence session,[376] CCS at the Port Talbot site presents a more difficult challenge. In their written submission, IPPR North, a think tank for the North of England noted that the absence of suitable sites to store captured carbon near South Wales will likely mean transporting captured carbon to storage hubs in the North West of England, assuming CCS is the preferred solution

365   Q45
366   Q44
367   Q47
368   UK Steel (LS0006)
369   UK Steel (LS0006)
370   Q36
371   Q36
372   Q36
373   Q47
374   Q47
375   Equinor, New partnership to develop offshore CO2 transport and storage in the UK North Sea, 26 October 2020
376   Q28

for the site. The site is also likely to be further from a hydrogen network. Given this, while decarbonising the steelworks at Port Talbot is possible, we were told "it comes with additional challenges."[377]

173. Regardless of the route chosen, many witnesses identified a real urgency for decisions to be made now. Chris McDonald, Chief Executive of the Materials Processing Institute, told us that these decisions will need to be taken imminently as all of the blast furnaces in the UK will soon need to be replaced (one of the two furnaces at Port Talbot will need to be replaced by the end of the 2020s and the other by the end of the 2030s).[378] As a blast furnace investment is "typically a 20–25-year investment" and are both carbon emitting and low productivity he asked "why would anyone invest in that technology again?"[379] In their written evidence, the Materials Processing Institute pointed to the need for decisions on infrastructure and wider system changes to be made in order to enable the industry to transition:

> Routes to decarbonisation involve significant capital expenditure and technology choices […]. Given the right policy framework, the industry itself can be relied upon to make the necessary steel investment, but these sit in a wider industrial context. For instance, moving from coking coal to hydrogen will require national investment in the generation, transportation and storage of green hydrogen. Likewise a steel producer can make their facility ready for carbon capture and storage, but cannot create the whole CCS network.[380]

174. Despite the need for decisions on infrastructure and wider system changes it is notable that the Industrial Decarbonisation Strategy does not back any particular route with an admission that both low carbon hydrogen and Carbon Capture, Utilisation and Storage (CCUS) are "at early stages of development."[381] The Government's Net Zero Strategy published in October this year similarly notes that hydrogen-based steelmaking, CCUS and electrification are all being considered as potential routes to decarbonisation without committing to any particular route.[382] We were cautioned on what the Materials Processing Institute referred to as the "moral hazard" of funnelling industry towards a particular route that later proves to be suboptimal, ossifying steel producers around "older, less productive and inefficient technology where steel producers would have less incentive to invest in modern technologies which could be both more green, more productive and more internationally competitive."[383] However, it is clear from the evidence we received that industry requires certainty from Government on infrastructure and wider system changes before it is able to invest and commit to any particular technological pathway.

175. **There is a clear lack of direction with respect to the future of the nation's blast furnaces both within the Government and in industry. A range of options exist for the decarbonisation of primary steelmaking, including carbon capture and storage (CCS), hydrogen, or a mixture of technologies running in parallel. It will ultimately be for the**

377  IPPR North (LS0005)
378  Q50
379  Q50
380  Materials Processing Institute (LS0009)
381  HM Government, Industrial Decarbonisation Strategy, 17 March 2021, page 29
382  Department for Business, Energy and Industrial Strategy, Net Zero Strategy: Build Back Greener, 19 October 2021, page 129
383  HM Government, Industrial Decarbonisation Strategy, 17 March 2021, page 29

sector and each individual business, with its own unique sites and products, to work out which technology is optimal for them. However, to enable these decisions industry requires certainty from Government on infrastructure and wider system changes.

176. **We found broad agreement that the UK should retain a primary steelmaking capacity rather than push its emissions and business abroad, a point recognised in the Government's own Industrial Decarbonisation Strategy. However, if the Government is serious about its emissions targets and given that the nation's blast furnaces will soon need to be replaced, if the UK is to retain its primary steelmaking capacity then key decisions and certainty are needed imminently. The Government's Industrial Decarbonisation strategy has so far failed to provide this certainty and the Government must step up its efforts to provide industry with direction and a supportive policy environment to enable it to transition to a low carbon future.**

### Potential of hydrogen direct reduced iron

177. Despite a lack of overarching direction around technological pathways we heard that, of the two primary pathways identified in the Industrial Decarbonisation Strategy—one based on the rollout of CCS infrastructure and one based on the use of hydrogen direct reduced iron (DRI)—the second held significant promise as a potential solution for the UK steel industry.

178. Blast furnaces produce substantial amounts of carbon dioxide due to the reduction of solid iron ore into liquid pig iron using carbon (in the form of coke).[384] However, hydrogen can be used in place of carbon in this process to 'directly reduce' the iron, resulting in a solid iron product (sometimes referred to as 'sponge iron') which can then be melted in an electric arc furnace (EAF) to produce steel. By substituting the carbon in this process, the hydrogen direct reduced iron pathway can lower carbon dioxide emissions by as much as 89–99%.[385]

179. The Materials Processing Institute were particularly enthusiastic about this route, commenting that:

> Delivery of a DRI-hydrogen/EAF-based solution for steel decarbonisation in Britain would take a decade and meet all milestones of the Paris climate change agreement whilst allowing a smooth and just transition for the workforce.[386]

We were told by the Materials Processing Institute that "hydrogen DRI technology seems the most adapted solution for the UK industry" as it is "a proven methodology with a very limited technological risk" which will have "an immediate impact on CO2 emissions."[387] Furthermore, the technology would preserve the full range of steel produced; compensate for the decrease in productivity of the coke ovens at Port Talbot and Scunthorpe (by adding DRI to the blast furnaces); and enable a switch to hydrogen when the technology is proven.[388]

---

384   Encyclopedia Britannica, Blast furnace [Accessed 14 September 2021]
385   Fabrice Patisson and Olivier Mirgaux, Hydrogen Ironmaking: How It Works, 9 July 2020
386   Materials Processing Institute (LS0009)
387   Materials Processing Institute, Decarbonisation of the Steel Industry in the UK, 18 March 2021, page 10
388   Materials Processing Institute, Decarbonisation of the Steel Industry in the UK, 18 March 2021, page 10

180. In the context of current uncertainties around technological pathways, the DRI-hydrogen route has the added benefit of not requiring an immediate or irreversible decision with respect to the blast furnaces as it could be developed in tranches in parallel with existing, proven technologies.[389] IPPR North suggested that additional electric arc furnace capacity could be added to the Scunthorpe site this decade while it experiments with the use of hydrogen inputted into its blast furnace. By the early-2030s it could increasingly use hydrogen direct reduced iron in combination with electric arc furnaces and by the mid-2030s, blast furnace production could largely be replaced by the hydrogen-electric arc furnace method.[390]

181. Roz Bulleid of the Green Alliance raised the prospect of a "hybrid transition" in which two technologies could be run alongside each other for a time rather than a one-off switch in technology, including a combination of hydrogen and carbon capture[391] and that "there is a huge amount of compatibility between the electric arc furnace recycling route and hydrogen production of steel. The hydrogen could be used to increase the range of products that recycling enables us to make."[392] We were told that the development of this process would permit existing blast furnace operations to continue with reduced emissions and that the capital expenditure, disruption to operations and loss of employment would be lower than that of a complete switch to electric steelmaking.[393]

182. While the implications for the energy system would need to be considered, pursuing this route would create more jobs in the production and supply of hydrogen fuels[394] and would be well-suited to a fair and just transition for steel employees and communities, as the transition could be gradual, spanning between now and 2035 (when the technology could be available) or later depending on the lifespan of the blast furnaces.[395] The Materials Processing Institute highlighted the importance of this aspect, commenting that "the absence of redundancies during the transition is a condition of the support by the stakeholders without which the changes would have a high probability to fail."[396]

183. As with other routes however, hydrogen-based steel production remains untested at scale in this country, despite already being underway in Germany and Sweden with upcoming projects planned for Austria, France and Italy.[397] The Green Alliance told us that "without action, the UK will not be able to make an informed decision on the best route to steel decarbonisation and risks being left behind".[398] A trial of this technology could deliver a range of benefits to the UK, including testing production; creating initial capability; developing world-leading expertise; and generating a market for an emerging low-carbon hydrogen supply.[399] Metals Consulting International argued that the steel industry could be used as a test for the real-world application of large-scale hydrogen production using renewable energy.[400] A pilot located in a strategically important location in the UK could then be ramped up, with the trial delivered either through a competitive

389   Materials Processing Institute (LS0009)
390   IPPR North (LS0005)
391   Q48
392   Q44
393   Metals Consulting International Limited UK (LS0002)
394   IPPR North (LS0005)
395   Materials Processing Institute (LS0009)
396   Materials Processing Institute (LS0009)
397   Bellona, Hydrogen in steel production: what is happening in Europe, 26 May 2021
398   Green Alliance, Hanbury Strategy, European Climate Foundation (LS0003)
399   Green Alliance, Hanbury Strategy, European Climate Foundation (LS0003)
400   Metals Consulting International Limited UK (LS0002)

tender with private funding backed by initial funds from the Government or backed entirely by the Government.[401] The Green Alliance have estimated that a new at-scale DRI plant could cost around £500 million but an initial, small-scale, proof-of-concept pilot would cost much less than this.[402] The Materials Processing Institute noted that this technology "could be of interest for the whole of the industry including the current EAF based producers" but that most of these producers are too small not only to cover the CAPEX requirement but also to justify investment in a large facility, noting that the hydrogen-based HBI steel plant opened by Voestalpine in Texas had a total cost of $1.1 billion.[403]

184. The Government's Hydrogen Strategy, published on 17 August this year, notes that electric arc furnaces coupled with hydrogen direct reduced iron is being considered as one of the main options for decarbonising steel[404] but otherwise makes brief mention of steel and no concrete action is specified for driving this development. The "key actions" outlined in the strategy's 2020s roadmap does not list any action specifically relating to steel prior to the mid-2030s, when the steel industry is mentioned as a potential end-user.[405] When asked whether the Government would consider a trial of hydrogen-based steel production in this country, the Secretary of State claimed that the Government remained "absolutely open to investing in hydrogen, or seeing hydrogen invested in […] particularly in the steel industry" but did not speak specifically on any plans for a trial.[406]

185. **We identified enthusiasm from many witnesses for the use of hydrogen direct reduced iron as a technology well-suited to decarbonising the UK steel industry. However, as with other potential solutions, it is a technology that remains untested at scale. A pilot of hydrogen-based steel production in the UK would help to inform future decisions on decarbonisation; create initial capability; develop UK-based expertise; and facilitate a switch to hydrogen once the technology is proven.**

186. *The Government should commit to a pilot of hydrogen-based steel production in the UK as part of its industrial decarbonisation strategy. Funding for the project should be sought in partnership with interested steel businesses or backed in part by the Clean Steel Fund. The Government should further consult on the most appropriate location for the pilot which would deliver the widest benefit for industry as a whole.*

### Retention and recycling of scrap steel

187. As an infinitely recyclable material and the most recycled material in the world, steel has been called "the most sustainable material of the 21st century."[407] While a basic oxygen furnace can be charged with as much as 30% scrap steel, an electric furnace can be charged with 100% scrap and the World Steel Association have estimated that recycling just one tonne of scrap saves approximately 1.5 tonnes of carbon dioxide, 1.4 tonnes of iron ore,

---

401   Green Alliance, Hanbury Strategy, European Climate Foundation (LS0003)
402   Green Alliance, Hanbury Strategy, European Climate Foundation (LS0003)
403   Materials Processing Institute, Decarbonisation of the Steel Industry in the UK, 18 March 2021, page 10
404   Department for Business, Energy and Industrial Strategy, UK Hydrogen Strategy, 17 August 2021, page 54
405   Department for Business, Energy and Industrial Strategy, UK Hydrogen Strategy, 17 August 2021, page 24
406   Q570
407   World Steel Association, Steel recycling [Accessed 8 August 2021]

740 kg of coal and 120 kg of limestone.[408] These energy and raw materials savings mean that the recycling of scrap can play an important role in decarbonisation and broader environmental efforts.

188. Regardless of the route the UK steel industry takes to decarbonise we heard that the sector is not currently making the most of the high availability of scrap in the UK. The Secretary of State remarked that "we are exporting a whole lot of scrap to Turkey and then reimporting it, essentially, as steel. That does not make sense to me and we have to look at ways in which we can retain and recycle more of the steel scrappage that we produce."[409] Roz Bulleid of the Green Alliance told us that "it makes a huge amount of sense to maximise our recycling of steel in the UK rather than […] to export scrap steel as much as we actually produce and then re-import high quality finished products ourselves"[410] and the Green Alliance called for "ways to use less steel, promote reuse in sectors such as construction and ensure high quality collection and recycling of scrap metal."[411]

189. Edwin Basson, Director General of the World Steel Association, noted that a smaller steel-using economy like the UK had the opportunity to become self-contained in the sense of generating and recycling its own scrap but that the quality of that scrap would determine the range of products the UK could produce.[412] To achieve this model, electric arc furnace capacity would need to be expanded in the UK along with stricter guidelines around the recycling of scrap and further measures to ensure that scrap was not exported out of the country.[413] Although there is a high availability of scrap in the UK, only a low percentage of it (approximately 1 million tonnes) is high quality scrap[414] and the Government will need to create a "supportive environment" to enable the market to produce a higher percentage of high quality scrap.[415] Gareth Stace of UK Steel said that an understanding should be developed of how the market, Government policy, and scrap collectors and processors' practices can be changed in order to provide better quality scrap at the right price.[416]

190. When asked what was being done to incentivise the retention and utilisation of scrap steel in the UK the Secretary of State told us that this was an issue currently being considered by the UK Steel Council.[417] The Secretary of State indicated that the Government favoured incentives over punitive measures such as export tariffs,[418] with the potential of procurement policy being used to drive demand for clean steel (and therefore the retention and utilisation of scrap) raised as one of the means being considered to ensure that scrap is recycled here in the UK.[419]

191. **Previously used steel, also known as scrap, will play a central role in efforts to decarbonise the UK steel industry. The high availability of scrap in the UK represents**

408    World Steel Association, Steel facts, 2018, page 41
409    Q29
410    Q44
411    Green Alliance, Hanbury Strategy, European Climate Foundation (LS0003)
412    Q56
413    Q56
414    Q50
415    Q52
416    Q57
417    Q560
418    Q561
419    Q562

a valuable resource which is under-utilised, and a range of measures will be needed to ensure that the recycling of scrap is a more attractive option for UK steel producers than exporting it abroad for others to recycle. We welcome the work of the UK Steel Council in attempting to find solutions to this issue and call on Ministers from both the Department for Business, Energy and Industrial Strategy and the Department for Environment, Food and Rural Affairs (with respect to waste policy) to work with the Council to optimise steel recycling in the UK.

# 6   The future of the UK steel industry

192. Throughout our inquiry we heard a clear message that the Government needs to go further in providing support and certainty if it is to avoid future crises and there was a clear sense of frustration that many long-running challenges had not been resolved. These challenges were described as "well-rehearsed"[420] by Jon Bolton, former CEO of Liberty Steel while Gareth Stace of UK Steel told us he felt "like a broken record" in having to raise the same issues repeatedly over a number of years.[421] Recent action taken by the Government to address these issues were variously described as "not really game changers,"[422] "retroactive,"[423] and the Government's position towards the UK steel industry summarised as "historically unsupportive."[424]

193. It is notable that many of these challenges were raised throughout the 2015–16 steel crisis as endangering the industry and yet remain unresolved today. This period saw a series of plant closures, company mergers and staff lay-offs and it is estimated that between September 2015 and March 2016, 7,000 jobs in the steel industry were lost.[425] Our predecessor Committee published a report on the crisis in December 2015 and while it noted that the sector's difficulties were mainly caused by low prices due to an over-abundance of steel on the international market[426] and a strengthening pound,[427] it also highlighted many of the issues identified in this report, including high electricity prices;[428] ineffectual action on unfair trade practices;[429] and difficulties encountered by UK steel producers in competing for public contracts.[430] A report by the All Party Parliamentary Group on Steel and Metal Related Industries published in January 2017 further highlighted these issues as contributing to what it described as an "existential crisis" and a path of "accelerating decline that may well lead to the end of the steel industry in this country."[431] The report singled out "the pernicious impact of uncompetitive energy prices;"[432] the need for the Government to commit to a positive public procurement policy;[433] and inadequate defences to protect against unfair and illegal trade,[434] all of which were highlighted in the evidence we received.

---

420   Q119
421   Q43
422   Q86
423   Q89
424   Q52
425   BBC, Britain's steel industry: What's going wrong?, 30 March 2016
426   Business, Innovation and Skills Committee, The UK steel industry: Government response to the crisis First Report of Session 2015–16, 21 December 2015, page 6
427   Business, Innovation and Skills Committee, The UK steel industry: Government response to the crisis First Report of Session 2015–16, 21 December 2015, page 7
428   Business, Innovation and Skills Committee, The UK steel industry: Government response to the crisis First Report of Session 2015–16, 21 December 2015, page 12
429   Business, Innovation and Skills Committee, The UK steel industry: Government response to the crisis First Report of Session 2015–16, 21 December 2015, page 19
430   Business, Innovation and Skills Committee, The UK steel industry: Government response to the crisis First Report of Session 2015–16, 21 December 2015, page 16
431   The All Party Parliamentary Group on Steel and Metal Related Industries, Steel 2020: Forging a Future for the British Steel Industry, January 2017, page 6
432   The All Party Parliamentary Group on Steel and Metal Related Industries, Steel 2020: Forging a Future for the British Steel Industry, January 2017, page 15
433   The All Party Parliamentary Group on Steel and Metal Related Industries, Steel 2020: Forging a Future for the British Steel Industry, January 2017, page 28
434   The All Party Parliamentary Group on Steel and Metal Related Industries, Steel 2020: Forging a Future for the British Steel Industry, January 2017, pp. 25–27

194. It is important to note that the support demanded by the industry is not being sought to gain any particular market advantage but rather to level the playing field with competitors and enable a transition to net zero, which cannot currently be undertaken on a purely commercial basis.[435] We heard that, even in G7 economies, notable interventions are made to support the steel industry in areas such as energy costs, decarbonisation and public procurement and this country will require similar interventions if the UK is to maintain a strong and sustainable steel sector.[436] The consequences of not doing so will only lead to further decline as the future development of the UK steel industry depends on investment by private companies whose motivation to invest will rest on an expectation of profitable operations in the UK relative to the alternatives available.[437]

195. When questioned on the importance of the sector and the need for further support the Secretary of State acknowledged that "there is a strategic case for UK-produced steel"[438] and cited the industry's importance to national security along with its role as a foundational sector which provides highly paid jobs in areas of relative deprivation as reasons to back the industry.[439] The Secretary of State went on to say that "no country in the world produces steel on the basis of laissez-faire and the free market"[440] and that:

> Once you are strategically committed to the industry, you have to provide some measure of support. It does not make sense to say that we are strategically committed to this industry and then not support it when the market turns against it.[441]

196. **Many of the challenges facing the UK steel industry today are long-running and have led to crises in the past. Without fundamental reform of energy pricing and a clear decarbonisation strategy, the sector will fail to attract much needed investment and continue on a path of accelerating decline. The Government's rhetoric on the strategic importance of the sector must be matched by supportive policy.**

197. One of the most significant developments since the steel crisis in 2015–16 is the Government's ambitious target to reach net zero emissions by 2050[442] and to cut emissions by 78% by 2035,[443] both as a challenge and an opportunity for the UK steel industry to position itself as a leading manufacturer of clean steel. Many of the challenges facing the industry have gained even greater urgency in the context of these targets, either as an obstacle or as a means for reaching and achieving them. For example, we heard how competitive electricity prices were "perhaps the key determinant in the viability of low-

---

435    Q52
436    IPPR North (LS0005); UK Steel (LS0006)
437    Metals Consulting International Limited (LS0002)
438    Q11
439    Q19
440    Q24
441    Q21
442    Department for Business, Energy and Industrial Strategy, UK becomes first major economy to pass net zero emissions law, 27 June 2019
443    Department for Business, Energy and Industrial Strategy, UK enshrines new target in law to slash emissions by 78% by 2035, 20 April 2021

carbon steel production;"[444] that public procurement policy could be used to promote markets for clean steel;[445] and that trade policy could be used to level the playing field between imported, polluting steel and cleaner, domestically produced products.[446]

198. Many of these issues were highlighted in the consultation for the Clean Steel Fund, which identified the poor health of the UK steel sector and the consequent lack of available capital for anything beyond essential repairs or maintenance as the single most important barrier to investment in decarbonisation.[447] Given that decarbonisation projects carry significantly more risk than business-as-usual projects, there is a tendency for the former to achieve a low rank in companies' project pipelines.[448] Improving the overall health of the UK steel sector will therefore be a necessary condition of decarbonisation and solutions to the long-term challenges outlined in the previous chapter will be critical if the sector is to successfully transition to net zero.

199. **A successful transition to net zero will be dependent on addressing the wider challenges and opportunities facing the UK steel industry. These issues will need to be tackled as part of a broader, strategic approach to decarbonisation.**

200. An absence of policy frameworks was identified in responses to the Clean Steel Fund call for evidence as a key barrier to decarbonisation, in particular a lack of clarity around technological pathways and certainty around project economics.[449] According to these responses, in certain areas the steel industry is trapped in a 'chicken and egg' scenario in which the risks of committing to a particular technological pathway in isolation without the necessary infrastructure in place are too great,[450] along with the risk of 'locking in' a particular technology that later proves to be suboptimal.[451] Both of these points were raised as concerns during our visit to Tata Steel Port Talbot and earlier this year the outgoing boss at British Steel reported that £1.2 billion of investment promised by Jingye to upgrade facilities at Scunthorpe and Teeside[452] would be put on hold in the absence of clear direction from Government.[453] We were told that decisions are not being made, with the situation summarised by Roy Rickhuss CBE, General Secretary of Community Union, as "a lot of uncertainty and concern, and a lot of worried steelworkers […] because nobody seems to be doing anything."[454]

201. The Energy and Climate Intelligence Unit (ECIU), a non-profit organisation that supports debate on energy and climate change issues in the UK, has claimed that a state of mutual hesitancy from both Government and industry has resulted in a deficit of plans

444   Department for Business, Energy and Industrial Strategy, UK enshrines new target in law to slash emissions by 78% by 2035, 20 April 2021

445   Green Alliance, Hanbury Strategy, European Climate Foundation (LS0003)

446   Green Alliance, Hanbury Strategy, European Climate Foundation (LS0003)

447   Department for Business, Energy and Industrial Strategy, Summary of Responses to the Clean Steel Fund Call for Evidence, 14 December 2020, page 17

448   Department for Business, Energy and Industrial Strategy, Summary of Responses to the Clean Steel Fund Call for Evidence, 14 December 2020, page 17

449   Department for Business, Energy and Industrial Strategy, Summary of Responses to the Clean Steel Fund Call for Evidence, 14 December 2020, page 17

450   Department for Business, Energy and Industrial Strategy, Summary of Responses to the Clean Steel Fund Call for Evidence, 14 December 2020, page 18

451   Department for Business, Energy and Industrial Strategy, Summary of Responses to the Clean Steel Fund Call for Evidence, 14 December 2020, page 19

452   Financial Times, British Steel boss Ron Deelen to resign at end of March, 16 March 2021

453   The Telegraph, British Steel's Ron Deelen: 'We would like to start spending big money', 15 February 2021

454   Q39

to commence clean steel production.[455] The UK is now in danger of falling behind its competitors in this regard—the ECIU's report highlighted twenty trial, pilot and full-scale projects in Europe already underway that use hydrogen to produce primary steel and a further fourteen European DRI projects, taking the number of hydrogen steel projects across the continent to twenty-three.[456] According to the ECIU, comparatively slow progress in the UK will be taken into account by multinational companies that will tend to direct investment towards plants in Germany, France and further afield instead of upgrading UK steel mills.[457] The report also criticised the Clean Steel Fund which "as it stands, is not driving progress in steel sector decarbonisation" and the Industrial Decarbonisation Strategy, due to its lack of actionable policies and pledges.[458]

202. The Department acknowledged that "the costs and risks associated with […] decarbonisation technologies, such as carbon capture and storage and hydrogen, mean that companies are finding it challenging to invest on a purely commercial basis."[459] The Department cited the £1 billion of investment up to 2025 it has offered to facilitate the deployment of carbon capture and storage in two industrial clusters by the mid-2020s and four clusters by 2030. It also cited the Government's Hydrogen Strategy and consultation package which sets out support for the production and use of low carbon hydrogen across the wider economy.[460]

203. However, aside from the Industrial Decarbonisation Strategy, which does not contain a set of actionable policies, the Government lacks a clear roadmap or overarching strategy for decarbonising steel. The Industrial Decarbonisation Strategy itself explicitly states that it is "technology neutral"[461] and that "in the long run [the UK Government] believe that markets will be best placed to determine the most cost-effective pathways to decarbonisation."[462] As such, it fails to address the lack of clarity around technological pathways that was raised as a concern in responses to the Clean Steel Fund.

204. Furthermore, following the shelving of the original Industrial Strategy[463] the Government lacks a broader strategy for the steel sector as a whole. The Government's original Industrial Strategy made brief mention of steel, promising to "identify opportunities for steel markets and build on these innovation assets across the UK" with an ambition to "engage with industry, as well as with the unions, the devolved administrations and other partners to develop a commercially sustainable proposition in a competitive global market."[464] The Government has since transitioned its Industrial

455   Energy and Climate Intelligence Unit, Stuck on the starting line: How the UK is falling behind Europe in the race to clean steel, May 2021, page 8

456   Energy and Climate Intelligence Unit, Stuck on the starting line: How the UK is falling behind Europe in the race to clean steel, May 2021, pp. 8–9

457   Energy and Climate Intelligence Unit, Stuck on the starting line: How the UK is falling behind Europe in the race to clean steel, May 2021, page 11

458   Energy and Climate Intelligence Unit, Stuck on the starting line: How the UK is falling behind Europe in the race to clean steel, May 2021, page 6

459   Correspondence to the Business, Energy and Industrial Strategy Committee, 10 August 2021

460   Correspondence to the Business, Energy and Industrial Strategy Committee, 10 August 2021

461   Department for Business, Energy and Industrial Strategy, Industrial Decarbonisation Strategy, 17 March 2021, page 53

462   Department for Business, Energy and Industrial Strategy, Industrial Strategy: Building a Britain fit for the future, November 2017, page 9

463   For our report on the Government's Industrial Strategy see: Business, Energy and Industrial Strategy Committee, Post-pandemic economic growth: Industrial policy in the UK First Report of Session 2021–22, 28 June 2021

464   Department for Business, Energy and Industrial Strategy, Industrial Strategy: Building a Britain fit for the future, November 2017, page 239

Strategy into the Plan for Growth[465] which, while mentioning issues tangentially related to the sector, such as the Government's ambitions to transition to net zero, investing in infrastructure and levelling up, does not mention the steel industry once.

205. The Financial Times reported that the shelving of the Industrial Strategy was part of a move by the Government to a more ad hoc approach to economic support.[466] However, we heard that a longer-term, comprehensive policy framework was needed to "help move the industry past short-term bailouts,"[467] "ensure it realigns to meet climate targets"[468] and enable it to "adapt and survive."[469] According to reports in the Financial Times, industry executives have stressed that investment decisions will only be made on the basis of a clear strategy from the Government and clarity on the direction of travel was needed if the UK was to be at the "vanguard of decarbonisation."[470] However, according to Gareth Stace of UK Steel, none of the initiatives announced by the Government so far "add up to a comprehensive strategy."[471] In evidence submitted by GFG Alliance, we heard that the "distressed, mothballed and loss-making states" of the businesses it purchased were due in part to "the lack of a long-term, realisable, strategic vision for the industry in the UK"[472] and Roy Rickhuss CBE noted that a coordinated approach would help to ensure that decisions in the future are taken in line with the best interests of the industry as a whole rather than the interests of single entities.[473]

206. The steel sector has been actively seeking support and certainty from the Government since the publication of the original Industrial Strategy in 2017, one of the key components of which were 'sector deals.' These were defined as "partnerships between the Government and industry on sector specific issues" which could "create significant opportunities to boost productivity, employment, innovation and skills."[474] In September 2017, UK Steel published a set of proposals that would form the basis of a potential sector deal. It included a number of commitments from the UK steel sector including increasing annual investment from £200 million to £300 million; increasing employment from 2,300 to 33,700; and providing £30 million per year of matched R&D funding via a new 'Future Steel Challenge Fund.'[475] In return it sought commitments from the Government on electricity costs, public procurement and business rates.[476] However, to date a sector deal has not been agreed. Our predecessor Committee's report *Industrial Strategy: Sector Deals* published in March 2019 noted that despite multiple meetings between the sector and the Government on a deal the Government appeared "unwilling to meet the requests of the sector."[477] UK Steel responded to the report by reiterating the industry's need for a level playing field with competitors:

465  HM Treasury, Build Back Better: our plan for growth, 3 March 2021
466  Financial Times, Business dismay at decision to drop plan for UK industrial strategy, 8 March 2021
467  Green Alliance, Hanbury Strategy, European Climate Foundation (LS0003)
468  Green Alliance, Hanbury Strategy, European Climate Foundation (LS0003)
469  Green Alliance, Hanbury Strategy, European Climate Foundation (LS0003)
470  Financial Times, Britain's steel industry faces up to the climate challenge, 7 June 2021
471  Financial Times, Britain's steel industry faces up to the climate challenge, 7 June 2021
472  GFG Alliance (LS0008)
473  Q35
474  Department for Business, Energy and Industrial Strategy, Industrial Strategy: Building a Britain fit for the future, November 2017, page 192
475  UK Steel, A Steel Sector Deal: Executive Summary, September 2017, page 1
476  UK Steel, A Steel Sector Deal: Executive Summary, September 2017, page 1
477  Business, Energy and Industrial Strategy Committee, Industrial Strategy: Sector Deals, Seventeenth Report of Session 2017–19, 19 March 2019, page 22

> The steel sector has put forward a comprehensive sector deal proposal committing to increases in jobs, capital investment and production capacity. To unlock this, and place the sector on a sustainable footing, the sector simply requires a level playing field with our EU counterparts on electricity prices and business rates.[478]

It further urged the Government to "fully recognise the importance of foundation sectors, highly innovative in their right, not only to the success of other manufacturing sectors, but to UK construction, infrastructure and the wider economy."[479] The Government responded to the report by stating that it remained "open to discussing a sector deal with the steel industry and have been meeting with companies in the sector regularly to discuss this."[480] However, the Government claimed that while the sector had made significant demands on energy prices and business rates it had put forward only limited commitments on future UK investment, portraying the sector's position as an "ask," not a "deal."[481]

207. When asked whether the Government was considering a strategy for steel in light of its refusal to approve a sector deal and the shelving of its Industrial Strategy, the Secretary of State pointed to the Government's review of public procurement rules but did not speak more broadly on plans for an overarching strategy for the sector.[482] However, this position appears to have developed in the intervening months. When asked again in July whether the Government was considering a strategy for steel, the Secretary of State responded:

> In the next few months, we should have more clarity as to what we will be coming out with, but I definitely hear the argument that we have to think of steel on a longer-term basis. I, and a number of my predecessors, have dealt with steel crises over the last five or six years now on an ad hoc basis. We had the Tata Steel crisis, if I can put it that way, in 2016. We have had an ongoing issue with British Steel and Greybull, and then selling it on to Jingye, after a period when it was being looked after by the official receiver. We have issues now. I want to have a much more sustainable, long-term approach to the sector. It is time now to think about how we can do that. I have said that the principle behind any kind of long-term future for the industry, which I passionately believe in, will be some deal around Government support for the industry and a commitment to decarbonisation.[483]

We wrote to the Secretary of State following the session seeking clarification on when a strategy was expected and were told that this was being looked at "as a potential option" but that a commitment could not be given without pre-empting the work of the Steel Council or of collective Government decision-making.[484]

208. **The steel industry has faced a number of crises in recent years but action to support the sector has been taken on a mostly ad hoc, reactive basis. The sector cannot continue to lurch from crisis to crisis and action is needed now if the UK is to retain a resilient**

478    UK Steel, Press Release: BEIS Select Committee Sector Deal Report, 19 March 2019
479    UK Steel, Press Release: BEIS Select Committee Sector Deal Report, 19 March 2019
480    Business, Energy and Industrial Strategy Committee, Industrial Strategy: Sector Deals: Government Response to the Committee's Seventeenth Report, Nineteenth Special Report of Session 2017–19, 7 June 2019, page 4
481    Business, Energy and Industrial Strategy Committee, Industrial Strategy: Sector Deals: Government Response to the Committee's Seventeenth Report, Nineteenth Special Report of Session 2017–19, 7 June 2019, page 5
482    Q14
483    Q523
484    Correspondence to the Business, Energy and Industrial Strategy Committee, 10 August 2021

and competitive domestic industry. Decarbonisation presents a unique opportunity to realign the sector but this will require a comprehensive, joined-up policy framework to remove barriers to transformation and enable critical investment decisions.

209. *We call on Ministers to establish a new Sector Deal for the steel industry. The Sector Deal should address long-running challenges to the sector's competitiveness as part of a cohesive plan for decarbonising the industry. It should set out a range of supportive policies to assist this transition and a clear roadmap for how the industry will decarbonise in line with the Government's target to cut emissions by 78% by 2035 and reach net zero by 2050. This Sector Deal should be developed in response to the Steel Council's report later this year and announced no later than Summer 2022.*

# Conclusions and recommendations

## Liberty Steel UK and the GFG Alliance

### Corporate Governance

1.  The corporate structure and governance of GFG Alliance companies resulted in no formal oversight or accountability of the decisions taken by Sanjeev Gupta. Mr Gupta put members of his staff in an unacceptable position by employing them with job titles associated with traditional executive functions in well run companies, without giving them the required access to information or decision-making powers necessary for them to perform their duties. It is unclear why Mr Gupta opted to structure his companies in this unusual and, given the scale of his operations, unacceptable way. (Paragraph 28)

2.  *We recommend that Ministers reflect on the systemic risks to UK industry posed by such unusual corporate structures and, if deemed necessary, bring forward amendments to the Companies Act.* (Paragraph 29)

### Audit

3.  We were not reassured by the evidence presented by King & King and note the legal restrictions placed upon Mr Patel, and other auditors who had previously audited GFG Alliance companies, by Sanjeev Gupta. (Paragraph 44)

4.  Despite public statements over a number of years to the contrary, we see, as yet, no tangible evidence that Sanjeev Gupta and GFG Alliance companies are making improvements to corporate governance or improving transparency through the publication of consolidated accounts. (Paragraph 45)

5.  We found it utterly unconvincing, and do not believe that King & King had the capacity, expertise, or resources to audit the accounts of multiple large GFG Alliance and Liberty Steel UK companies representing over £2.5 billion of revenue. (Paragraph 49)

6.  The reputation of Liberty Steel UK has been threatened by the poor audit and accounting practices of GFG Alliance, including the changing of accounting deadlines and its inability to produce consolidated accounts. As these accounts are yet to be published it is difficult to see the true financial picture of Liberty Steel UK. Unless remedied, these deficiencies severely limit the potential of that firm to be viewed as a reliable partner in any long-term strategy for the UK steel industry. (Paragraph 50)

7.  *We recommend that the Financial Reporting Council, as the competent authority for audit in the UK, refer this case to the relevant Recognised Supervisory Body, the Institute of Chartered Accountants for England and Wales, to investigate King & King under the Audit Enforcement Procedure as a matter of urgent public interest.* (Paragraph 51)

### Government rejection of funding for Liberty Steel UK

8.  We commend the Government's decision to reject GFG Alliance's request for £170 million of financial support in March 2021. The Secretary of State was correct to be cautious about providing a large grant to a group of companies with a centralised, complex and opaque governance structure. (Paragraph 56)

9.  *In light of the Greensill Capital collapse and subsequent financial hardship of GFG Alliance and Liberty Steel UK, we urge the Government to give consideration to formalising the fit and proper person test for private company directors within any future steel sector deal.* (Paragraph 57)

10. We note the recent developments within GFG Alliance and Liberty Steel UK and welcome the injection of capital at Liberty Steel's Rotherham plant. However, we note that once again Sanjeev Gupta has decided to set up an additional corporate entity to provide financial support to Liberty Steel UK companies without clear reporting and decision making on the source and terms of use of that funding. (Paragraph 60)

11. We would welcome the Insolvency Service considering whether, on the basis of the evidence we have received, Sanjeev Gupta may have acted in breach of his fiduciary duties as a company director in the United Kingdom. (Paragraph 61)

12. More broadly, we believe that until Mr Gupta restructures his GFG Alliance companies into a more acceptable corporate structure and publishes consolidated accounts that are adequately audited, that he fails to fulfil the criteria that we believe should be applied to define a fit and proper person for the purposes of receiving any form of Government support. (Paragraph 62)

### Supply Chain Finance

13. The way in which future, or prospective, receivables operated between GFG Alliance and Greensill Capital is disputed by both parties. We note that several claims have been made about the use of future receivables and their relation to "suspect invoices" and welcome the Serious Fraud Office's investigation into this matter. (Paragraph 78)

14. Steel is a foundational industry in the UK and in need of significant structural reform. The use of high-risk financial funding practices, such as future receivables lending, that Greensill Capital and GFG Alliance engaged in are barriers to such reforms. By his use of such practices Mr Gupta, the so-called "saviour of steel" is creating uncertainties that further undermine the long term viability of the steel industry in the UK. (Paragraph 79)

15. *We recommend that the Financial Conduct Authority and HM Treasury investigate the use of, and accounting rules for, future or prospective receivables.* (Paragraph 80)

16. GFG Alliance's reported engagement in circular trading, or REPO structures, exacerbated a concentration risk to Greensill Capital by raising large amounts of working capital against invoices created to raise finance instead of selling steel to genuine customers. (Paragraph 86)

17.  We did not receive evidence that the use of circular trading between companies is a systemic issue, but note the potential criminal liability associated with the worst examples of financial engineering between businesses. Despite repeated reassurances from GFG Alliance, we remain unconvinced by Sanjeev Gupta's attempts to re-structure and re-finance his businesses. We are not satisfied that Sanjeev Gupta is adequately addressing the many fundamental issues and concerns associated with the corporate governance, leadership, transparency, funding and operations of his businesses and remained concerned that this poses a threat to the long-term prospects of Liberty Steel UK. (Paragraph 87)

### Coronavirus Large Business Interruption Loans Scheme

18.  We note that concerns were raised by HM Treasury and shared with BEIS about GFG Alliance and Wyelands Bank during the accreditation process of Greensill Capital to the CLBIL scheme. (Paragraph 102)

19.  We recognise that the subsequent level of interest from the BEIS Department about the accreditation of Greensill Capital was "unusual" but we are confident that this did not impact the approval process and the British Business Bank's decision remained independent. Given the potential impact of the financial position of Greensill Capital on Liberty Steel's UK operations, we acknowledge the due diligence of both the Secretary of State and his officials in monitoring the accreditation process closely was entirely proper. (Paragraph 103)

20.  However, the collapse of Greensill Capital and its impact on Liberty Steel UK highlights the fragility of the sector in the UK more generally and raises far reaching and fundamental questions for the Government to consider in terms of how it should work with the industry to secure a sustainable, long-term future. (Paragraph 104)

### Challenges and opportunities facing the UK steel industry

### Electricity prices

21.  High electricity prices are hindering the ability of UK steel producers to compete on the international market and are a deterrent to inward investment. If the Government is serious about decarbonising the steel industry, it must first recognise the severity of the challenge energy prices pose to steel companies in achieving the transition to net zero and take action to reduce these costs. (Paragraph 115)

22.  UK steel producers were already facing some of the highest electricity prices in Europe prior to recent rises in the wholesale price of gas. Soaring gas prices have since transformed what was a long-standing problem into an immediate crisis. We urge the Government to support UK steel producers but note that short-term bailouts must not be at the expense of a longer-term strategy to secure a level playing field for UK steel producers with their European counterparts. (Paragraph 119)

23.  We recognise that decisions on how and whether to compensate industry for the costs of electricity will, by necessity, have implications for consumers and other network users. However, it is clear that current electricity costs for UK steel

producers are unsustainable. Compensation provided by the Government to the UK steel industry to date has fallen far short of the support offered to their competitors and has not translated into a meaningful reduction in the price disparity. Energy policy costs have been brought down but remain twice as high as those in France and Germany while network costs are almost ten times as high. Further support from the UK Government will be needed if the UK steel industry is to compete on a level playing field and attract investment. This issue will only become more urgent as the industry moves to decarbonise and the sector's demand for electricity rises accordingly. (Paragraph 125)

24. *If additional support is not forthcoming, high electricity prices will continue to have a pernicious effect on the UK steel industry, resulting in long-term decline and future crises. The Government should set out, following a consultation with industry, what support it will offer beyond the current compensation scheme to reduce the cost of electricity for UK steel producers and bring them in line with those of their competitors. At a minimum, the price disparity should be brought down to within £1/MWh of the total cost faced by key competitors in France and Germany and the Government should track any disparity going forward to ensure it does not widen again. (Paragraph 126)*

25. When implemented, the Targeted Charging Review has the potential to burden UK steel producers with costs exceeding relief provided to the sector as an energy intensive industry. We note that despite this decision having a potentially significant impact on UK steel producers it has been left entirely to Ofgem without the opportunity for the Government to intervene. (Paragraph 131)

26. *Given that UK steel producers are already facing some of the highest electricity prices in Europe and that demand for electricity will only increase as the sector decarbonises, the Government should exempt the steel sector from increased costs arising from Targeted Charging Review reforms. (Paragraph 132)*

### Public Procurement

27. Despite advances made since the publication of the Procurement Policy Note in 2015, UK steel producers are still encountering challenges when competing for and securing public contracts. Much of this is due to an opaque and informal approach taken to steel procurement by contracting authorities and action is needed from the Government to make this process more transparent. Furthermore, a lack of transparency in steel supply chains together with an absence of explicit guidance on how social and environmental considerations should be applied has meant that broader objectives are being missed. Public procurement of steel has the potential to deliver wider benefits and further action is needed to ensure that the full value offered by UK steel producers is taken into account when supplying steel into public projects. (Paragraph 141)

28. *To ensure full transparency, the Procurement Policy Note (PPN) on steel procurement in major projects should be updated to include a requirement for contracting authorities to provide supply chain plans and publicise supply opportunities for UK steel producers. The Government should also publish updated guidance on how social and environmental considerations should be made in relation to steel purchases to ensure these are taken into account by contracting authorities. (Paragraph 142)*

29.  High-quality data will be essential for monitoring and improving compliance with steel procurement policy. However, this data is currently incomplete with only partial data being reported by Government Departments and Arm's Length Bodies. We welcome the work of the Steel Procurement Taskforce in working to improve the quality of this data. However, at the very least, all Government projects should be fully reporting on the value and origin of their steel requirements. (Paragraph 146)

30.  *A requirement should be set for all Government projects, including steel contracts awarded by the Contracts for Difference scheme and Highways England, to fully report on the value and origin of their steel requirements.* (Paragraph 147)

31.  Decisive action should be taken to ensure that UK steel producers do not miss out on the Government's ambitious infrastructure programme. Setting minimum UK steel content targets for major public projects would serve as an important first step to improving opportunities for UK steel producers. *The Government should introduce minimum UK steel content targets for major public projects, starting with High Speed 2.* (Paragraph 151)

### Trade

32.  Given that global steel markets continue to be heavily distorted by state subsidisation and that the EU and the US continue to apply tariffs on imported steel, the UK requires a response from Government regarding potential trade divergence towards UK markets and significant injury to UK steel producers. (Paragraph 158)

33.  We share the concerns expressed to us that the Trade Remedies Authority's recommendation to revoke safeguards on nine categories of steel imports was not based on an open dialogue with industry and had therefore missed the wider impact its decision would have had on UK steel producers. These concerns also appear to be shared by the UK Government as demonstrated by its decision to overrule the Trade Remedies Authority's recommendation and grant industry more time to appeal its decision. A two-way dialogue with industry must inform future recommendations by the Trade Remedies Authority and we welcome the opportunity given to both parties to do so. (Paragraph 165)

### Decarbonisation

34.  There is a clear lack of direction with respect to the future of the nation's blast furnaces both within the Government and in industry. A range of options exist for the decarbonisation of primary steelmaking, including carbon capture and storage (CCS), hydrogen, or a mixture of technologies running in parallel. It will ultimately be for the sector and each individual business, with its own unique sites and products, to work out which technology is optimal for them. However, to enable these decisions industry requires certainty from Government on infrastructure and wider system changes. (Paragraph 175)

35.  We found broad agreement that the UK should retain a primary steelmaking capacity rather than push its emissions and business abroad, a point recognised in the Government's own Industrial Decarbonisation Strategy. However, if the Government is serious about its emissions targets and given that the nation's blast

furnaces will soon need to be replaced, if the UK is to retain its primary steelmaking capacity then key decisions and certainty are needed imminently. The Government's Industrial Decarbonisation strategy has so far failed to provide this certainty and the Government must step up its efforts to provide industry with direction and a supportive policy environment to enable it to transition to a low carbon future. (Paragraph 176)

36.  We identified enthusiasm from many witnesses for the use of hydrogen direct reduced iron as a technology well-suited to decarbonising the UK steel industry. However, as with other potential solutions, it is a technology that remains untested at scale. A pilot of hydrogen-based steel production in the UK would help to inform future decisions on decarbonisation; create initial capability; develop UK-based expertise; and facilitate a switch to hydrogen once the technology is proven. (Paragraph 185)

37.  *The Government should commit to a pilot of hydrogen-based steel production in the UK as part of its industrial decarbonisation strategy. Funding for the project should be sought in partnership with interested steel businesses or backed in part by the Clean Steel Fund. The Government should further consult on the most appropriate location for the pilot which would deliver the widest benefit for industry as a whole.* (Paragraph 186)

38.  Previously used steel, also known as scrap, will play a central role in efforts to decarbonise the UK steel industry. The high availability of scrap in the UK represents a valuable resource which is under-utilised, and a range of measures will be needed to ensure that the recycling of scrap is a more attractive option for UK steel producers than exporting it abroad for others to recycle. We welcome the work of the UK Steel Council in attempting to find solutions to this issue and call on Ministers from both the Department for Business, Energy and Industrial Strategy and the Department for Environment, Food and Rural Affairs (with respect to waste policy) to work with the Council to optimise steel recycling in the UK. (Paragraph 191)

## The future of the UK steel industry

39.  Many of the challenges facing the UK steel industry today are long-running and have led to crises in the past. Without fundamental reform of energy pricing and a clear decarbonisation strategy, the sector will fail to attract much needed investment and continue on a path of accelerating decline. The Government's rhetoric on the strategic importance of the sector must be matched by supportive policy. (Paragraph 196)

40.  A successful transition to net zero will be dependent on addressing the wider challenges and opportunities facing the UK steel industry. These issues will need to be tackled as part of a broader, strategic approach to decarbonisation. (Paragraph 199)

41.  The steel industry has faced a number of crises in recent years but action to support the sector has been taken on a mostly ad hoc, reactive basis. The sector cannot continue to lurch from crisis to crisis and action is needed now if the UK is to retain a resilient and competitive domestic industry. Decarbonisation presents a unique opportunity to realign the sector but this will require a comprehensive, joined-up policy framework to remove barriers to transformation and enable critical investment decisions. (Paragraph 208)

42.   *We call on Ministers to establish a new Sector Deal for the steel industry. The Sector Deal should address long-running challenges to the sector's competitiveness as part of a cohesive plan for decarbonising the industry. It should set out a range of supportive policies to assist this transition and a clear roadmap for how the industry will decarbonise in line with the Government's target to cut emissions by 78% by 2035 and reach net zero by 2050. This Sector Deal should be developed in response to the Steel Council's report later this year and announced no later than Summer 2022.* (Paragraph 209)

# Annex A: Glossary

- **Basic oxygen process**: Primary steelmaking process in which oxygen is blown through molten pig iron, initiating a series of reactions that includes the oxidation of carbon along with other impurities such as silicon, phosphorus, and manganese. This converts high-carbon pig iron into low-carbon steel.

- **Blast furnace**: Vertical shaft furnace used to produce pig iron from iron ore by the reducing action of carbon (supplied as coke) at a high temperature in the presence of a fluxing agent such as limestone. Rapid combustion is maintained by a hot blast of air blown under pressure into the lower section of the furnace.

- **Capacity Market**: Aims to manage security of electricity supply and safeguard against the possibility of future blackouts by paying participants a per MW rate for the capacity they offer to the market.

- **Carbon Capture and Storage**: Process of capturing carbon dioxide before transporting it to and storing it in an underground geological formation.

- **Carbon Capture and Utilisation**: Process of capturing carbon dioxide for later recycling, for example in plastics or biofuels.

- **Carbon Price Support**: Tax on carbon emissions paid by electricity generating stations or operators of combined heat and power stations.

- **Circular financing**: In circular financing the customer raises an invoice against the sale of a product. The product is then sold to related companies and further invoices can be raised against these sales. The product is not necessarily physically sold and moved in these transactions. This allows the original company to raise additionally money against invoices for the sale of the same goods, therefore, it has more working capital.

- **Clean Steel Fund**: £215 million of funding set to be released no earlier than 2023 to support the UK steel sector transition to lower carbon iron and steel production.

- **Contracts for Difference**: Government scheme which supports low-carbon electricity generation by awarding developers of low-carbon electricity-generating projects the difference between the strike price and the reference price for electricity produced over the course of the contract.

- **Coronavirus Business Interruption Loan Scheme (CBILS)**: Scheme available through a range of accredited lenders and partners which offered up to £5 million of financial support backed by Government-backed guarantees to small UK businesses adversely affected by COVID-19.

- **Coronavirus Corporate Finance Facility (CCFF):** a joint HM Treasury and Bank of England lending facility designed to support liquidity among

larger firms, helping them to bridge coronavirus disruption to their cash flows through the purchase of short-term debt in the form of commercial paper (CP).

– **Coronavirus Large Business Interruption Loans Scheme (CLBILS)**: Scheme available through a range of accredited lenders and partners which offered up to £200 million of financial support backed by Government-backed guarantees to mid-sized and larger UK businesses adversely affected by COVID-19.

– **Corporate governance**: System of practices, rules and processes by which a company is governed and controlled. It ensures that businesses have sufficient power, accountability and decision-making processes in place in order to effectively run a company.

– **Direct reduced iron**: Iron directly reduced from iron ore by means of a reducing gas (such as hydrogen) or elemental carbon without the need for melting the iron ore. The resulting product is also known as sponge iron.

– **Electric arc furnace**: Furnace which melts scrap steel into liquid steel by means of high-current electric arcs.

– **Energy Intensive Industries**: Exemption and compensation schemes for electricity-intensive businesses seeking exemption from the indirect costs of funding Contracts for Difference, the Renewables Obligation and the small-scale Feed-in Tariff.

– **Feed-in Tariff**: Aims to promote the uptake of renewable and low-carbon electricity generation technologies by requiring participating electricity suppliers to make payments on generation and export.

– **Future/prospective receivables**: Similar financial tool to supply chain finance insofar as companies can raise capital from a financial institution as a loan. However, where a physical invoice, and therefore proof of sale, is needed to raise capital in supply chain finance, with future receivables the lending financial institution does not need an invoice or proof of sale to lend to a company, it only needs the anticipation of future business, which in some cases may not materialise.

– **Hydrogen Strategy**: Strategy published in August 2021 setting out how the Government plans to develop a low carbon hydrogen sector and meet its ambition for 5GW of low carbon hydrogen production capacity by 2030.

– **Industrial Decarbonisation Strategy**: Strategy published in March 2021 setting out how industry can decarbonise in line with the Government's net zero targets while remaining competitive and without pushing emissions abroad.

– **Industrial Energy Transformation Fund**: £315 million of funding available up until 2025 to support businesses with high energy use to develop and deploy low carbon technologies.

- **Integrated steelworks**: Industrial plant which contains all the facilities necessary for primary steel production. The UK has two integrated sites, one at Port Talbot and one at Scunthorpe.

- **Net Zero Hydrogen Fund**: Fund subject to consultation which aims to support at-scale deployment of low carbon hydrogen production during the 2020s.

- **Pig iron**: Intermediate product obtained from smelting iron ore in a blast furnace. Brittle due to its high carbon content. Can be converted into steel using the basic oxygen process.

- **Port Talbot steelworks**: Integrated primary steel production site operated by Tata Steel. Largest of the UK's two remaining integrated steelworks.

- **Primary steelmaking**: Steel obtained from the basic oxygen process.

- **Renewables Obligation**: Scheme in England and Wales which supports the generation of renewable electricity by operating as a market-based system of tradable Renewables Obligation Certificates. Certificates are issued to generators free of charge by Ofgem in relation to the amount of renewable electricity they generate. Generators then sell the certificates to suppliers or traders, which gives generators a premium in addition to the wholesale price of their electricity.

- **Scunthorpe steelworks**: Integrated primary steel production site operated by British Steel.

- **Secondary steelmaking**: Steel obtained from the electric arc furnace route.

- **Supply chain finance**: Tool commonly used by large financial institutions such as banks. It is typically offered the biggest customers of lenders who tend to be large companies. For the lenders, supply chain finance is deemed to be relatively low risk as default rates are typically lower than for other types of lending.

- **Targeted Charging Review**: Review launched by Ofgem in August 2017 to address concerns that the framework for residual and cost-recovery charging would result in inefficient use of the networks and unfair outcomes for consumers. The proposed changes are set to be implemented in stages with reforms at the distribution level introduced in April 2022 and the transmission level in April 2023.

- **UK Emission Trading System**: Replaced the UK's participation in the EU Emission Trading System on 1 January 2021. Works on the 'cap and trade' principle where a cap is set on the total amount of certain greenhouse gases that can be emitted by sectors covered by the scheme.

# Annex B: List of Liberty Steel UK sites

210. **Liberty Steel Scunthorpe**: Manufactures hot rolled steel. With an annual capacity in excess of 400,000 tonnes, the site specialises in the manufacture of steel flat, round and square bar, steel angles (both equal and unequal), steel convex bar, steel beams and channels as well as steel crane rail.[485]

211. **Liberty Performance Steels**: Manufactures a specialised range of precision cold rolled steel strip from 0.15–8.00mm in thickness. It has particular expertise in the provision of cold rolled steel strip for the automotive, aerospace and pressing sectors including medical fixtures and high-quality sintered bearings.[486]

212. **Liberty Powder Metals**: A fully integrated steel manufacturer and distributor suppling powder metals.[487]

213. **Liberty Speciality Steels–Brinsworth Narrow Strip**: Produces a range of hot rolled narrow strip including alloy grades, stainless steels, hire rolling, free-cutting steels, high carbon grades, low carbon, medium carbon grades, boron grades, HSLA and low alloy grades.[488]

214. **Liberty Speciality Steels - Engineering Bar**: Engineering Bar has manufacturing facilities on two sites in Rotherham and Wednesbury consisting of Bright Bar Rotherham, Bright Bar Wednesbury and Roundwood Processing Centre. The division supplies hot rolled bar and coil, as well as cold finished bar. Typical applications include hydraulics, yellow goods and general machining.[489]

215. **Liberty Speciality Steels - Rotherham Steel and Bar**: Includes primary and secondary electric arc steelmaking, vacuum degassing, ingot casting, continuous casting, bar and coil rolling, and bar processing and inspection.[490]

216. **Liberty Speciality Steels - Stocksbridge**: Offers VIM steelmaking, VAR and ESR remelting, primary rolling, finishing, stockholding and machined components. The division is focused on offering alloy and stainless-steel grades for use in sectors such as aerospace, oil and gas and industrial engineering.[491]

217. **Liberty Steel Dalzell**: Manufacturers of heavy steel plate for major construction projects.[492]

218. **Liberty Steel Hartlepool**: Manufacturer of SAW carbon steel pipes.[493]

---

485   Liberty Steel Group, Liberty Steel Scunthorpe
486   Liberty Steel Group, Cold Rolled Precision Strip
487   Liberty Steel Group, Liberty Powder Metals
488   Liberty Steel Group, Hot Rolled Narrow Strip
489   Liberty Steel Group, Liberty Speciality Steels - Engineering Bar
490   Liberty Steel Group, Liberty Speciality Steels - Rotherham Steel & Bar
491   Liberty Steel Group, High Value Manufacturing
492   Liberty Steel Group, Liberty Steel Dalzell
493   Liberty Steel Group, Liberty Steel Hartlepool

219. **Liberty Steel Newport**: Manufactures and suppliers of Hot Rolled Coil (HRC) for domestic and export markets. The HRC manufactured supports a variety of industrial applications including construction, automotive, pipes and tubes, structural hollow sections, highways, yellow goods, materials-handling and power.[494]

220. **Liberty Steel Tredegar**: Specialises in the production of ERW mechanical steel tubes and sections, cold formed structural hollow sections and tubes for low-pressure applications. The plant's two mills manufacture a range of sizes and qualities for use in industries such as construction, mining, agriculture, marine, materials handling, heating and cooling, fabrication, street furniture and leisure equipment manufacture.[495]

494   Liberty Steel Group, Liberty Steel Newport
495   Liberty Steel Group, Liberty Steel Tredegar

# Formal Minutes

## Tuesday 2 November 2021

## Members present:

Darren Jones, in the Chair

Richard Fuller

Nusrat Ghani

Mark Jenkinson

Mark Pawsey

Draft Report (*Liberty Steel and the Future of the UK Steel Industry*), proposed by the Chair, brought up and read.

*Ordered*, That the draft Report be read a second time, paragraph by paragraph.

Paragraphs 1 to 209 read and agreed to.

Annexes agreed to.

Summary agreed to.

*Resolved*, That the Report be the Fourth of the Committee to the House.

*Ordered*, That the Chair make the Report to the House.

*Ordered*, That embargoed copies of the Report be made available, in accordance with the provisions of Standing Order No. 134.

[Adjourned till Tuesday 16 November at 9:45am]

# Witnesses

The following witnesses gave evidence. Transcripts can be viewed on the inquiry publications page of the Committee's website.

### Tuesday 25 May 2021

**Rt Hon Kwasi Kwarteng MP**, Secretary of State, Department for Business, Energy and Industrial Strategy                                                                  Q1–32

**Edwin Basson**, Director General, World Steel Association; **Roz Bulleid**, Head of Policy, Green Alliance; **Chris McDonald**, Chief Executive Officer, Materials Processing Institute; **Roy Rickhuss**, General Secretary, Community Trade Union; **Gareth Stace**, Director General, UK Steel                                            Q33–60

### Tuesday 22 June 2021

**Henrik Adam**, Chief Executive Officer, Tata Steel Europe                       Q61–96

**Jon Bolton**, Board Member, GFG Global Advisory Board; **Anton Krull**, Chief Financial Officer, Liberty Steel UK                                                    Q97–213

### Tuesday 29 June 2021

**Stephen Rose**, Chief Executive Officer, Wyelands Bank                       Q214–269

**Milan Patel**, Partner, King & King Chartered Accountants                    Q270–386

**Patrick Magee**, Chief Commercial Officer, British Business Bank           Q387–439

### Tuesday 06 July 2021

**Cynthia O'Murchu**, Investigative Reporter, Financial Times; **Dr Javed Siddiqui**, Professor of Accounting, Alliance Manchester Business School, The University of Manchester; **S. Alex Yang**, Associate Professor of Management Science and Operations, London Business School                                               Q440–512

### Tuesday 20 July 2021

**Rt Hon Kwasi Kwarteng MP**, Secretary of State, Department for Business, Energy and Industrial Strategy                                                         Q513–581

# Published written evidence

The following written evidence was received and can be viewed on the inquiry publications page of the Committee's website.

INQLS numbers are generated by the evidence processing system and so may not be complete.

1   Anonymous (LS0001)

2   Anonymous (LS00010)

3   British Steel (LS0007)

4   Department for Business, Energy and Industrial Strategy (LS0004)

5   GFG Alliance (LS0008)

6   Green Alliance; Hanbury Strategy; and European Climate Foundation (LS0003)

7   IPPR North (LS0005)

8   Materials Processing Institute (LS0009)

9   Metals Consulting International Limited (LS0002)

10   UK Steel (LS0006)

CRK-2/1766

# List of Reports from the Committee during the current Parliament

All publications from the Committee are available on the publications page of the Committee's website.

### Session 2021–22

| Number | Title | Reference |
|--------|-------|-----------|
| 1st | Post-pandemic economic growth: Industrial policy in the UK | HC 385 |
| 2nd | Climate Assembly UK: where are we now? | HC 546 |
| 3rd | Post-pandemic economic growth: Levelling up | HC 566 |

### Session 2019–21

| Number | Title | Reference |
|--------|-------|-----------|
| 1st | My BEIS inquiry: proposals from the public | HC 612 |
| 2nd | The impact of Coronavirus on businesses and workers: interim pre-Budget report | HC 1264 |
| 3rd | Net Zero and UN Climate Summits: Scrutiny of Preparations for COP26 – interim report | HC 1265 |
| 4th | Pre-appointment hearing with the Government's preferred candidate for the Chair of the Regulatory Policy Committee | HC 1271 |
| 5th | Uyghur forced labour in Xinjiang and UK value chains | HC 1272 |
| 6th | Mineworkers' Pension Scheme | HC 1346 |